UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| H. JONATHAN FRANK and FRANK FAMILY 1996 TRUST (on behalf of themselves and REFLEXITE CORPORATION), | : : : : | Civil Action No.: 3:03-CV-1014(JBA) |
| Plaintiffs, | : : | |
| v. | : : | |
| ARTHUR LOVETERE, CECIL URSPRUNG, LOUIS J. BACCEI, WORTH LOOMIS, THEODORE PATLOVICH, STEPHEN J. RAFFAY, WILLIAM P. ROWLAND, PETER EIO (individually and in their capacity as members of the Board of Directors of Reflexite Corporation) and REFLEXITE CORPORATION, | : : : : : : : | NOVEMBER 7. 2003 |
| Defendants. | : : | |

## AMENDED COMPLAINT

Plaintiffs H. Jonathan Frank and the Frank Family 1996 Trust (collectively "the Franks"), on behalf of themselves and Reflexite Corporation ("Reflexite" or the "Corporation"), by and through their undersigned attorneys, hereby allege as and for their Amended Complaint against Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland, Peter Eio (collectively, the "Individual Defendants" or the "Board") and Reflexite Corporation, as follows:

### SUMMARY OF THIS ACTION

1. This is an action by the Franks against Reflexite and its Board of Directors. H. Jonathan Frank helped to build Reflexite, and he is a substantial shareholder of the company

through a family trust, the Frank Family 1996 Trust. By this lawsuit, the Franks challenge a pattern of self-interested transactions that the Board undertook while acting in an oppressive and unfair manner toward the Franks (and other shareholders) that injured the corporation and the value of the Franks' investment in Reflexite. The Franks also seek relief for Reflexite's failure to provide the Franks access to corporate information. These wrongful acts appear to have been undertaken by Reflexite and its Board as part of a plan to benefit certain members of Reflexite's Board of Directors and other insiders at the expense of the Franks and the Corporation.

2. This lawsuit has two main components. The first is a shareholder derivative action brought on behalf of Reflexite Corporation, a corporation organized under the laws of Connecticut, by the Plaintiffs, in their capacity as shareholders of Reflexite, against the members of the Board of Directors of Reflexite – defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter Eio. The Defendants have breached their fiduciary duties to Reflexite by permitting Reflexite to channel corporate assets and resources to Board members and other insiders while denying comparable benefits to other shareholders such as the Franks, and otherwise diverting and wasting corporate assets in furtherance of the Board members' personal agendas.

3. Second, the Franks seek direct relief against the members of the Board for breaches of their fiduciary and other duties to the Franks. Among other things, the Board has acted over a period of several years so as to deny the Franks' access to information and to deny them other rights enjoyed by other shareholders of Reflexite. While other insider shareholders such as the Individual Defendants have been permitted to sell shares back to Reflexite, the Individual Defendants acted with malice in refusing to permit the Franks to enjoy comparable opportunities. Upon information and belief, several transactions in Reflexite shares were

performed without appropriate consents and documentation; rather than challenge such transactions, the Board sought to protect the transactions. In addition, the Board and Reflexite have failed to provide information to the Franks concerning the Franks' shareholdings in Reflexite.

4. As a result of the misconduct of the Defendants, as alleged more fully below, Plaintiffs have been compelled to commence this action, seeking monetary and injunctive relief.

## THE PARTIES

5. H. Jonathan Frank is a citizen of the State of Nevada, residing in Incline Village, Nevada.

6. The Frank Family 1996 Trust is a trust organized under the laws of Nevada. H. Jonathan Frank is a Settlor and Trustee of the Frank Family 1996 Trust, which owns shares of Reflexite stock.

7. Upon information and belief, Defendant Reflexite is a corporation organized and existing under the laws of the State of Connecticut, with an office and principal place of business located in Avon, Connecticut.

8. Upon information and belief, defendant Arthur LoVetere is a citizen of the State of Michigan, residing at 8060 Poulsen Road, Atlanta, Michigan 49709, and is Chairman of the Board of Directors of Reflexite.

9. Upon information and belief, defendant Cecil Ursprung is a citizen of the State of Connecticut, residing at 27 Walbridge Road, West Hartford, Connecticut 06119, and is President and a Director of Reflexite.

10. Upon information and belief, defendant Louis J. Baccei is a citizen of the State of Connecticut, residing at 9 Fenwick Drive, Farmington, Connecticut 06032, and is a member of the Board of Directors of Reflexite.

11. Upon information and belief, defendant Worth Loomis is a citizen of the State of Connecticut, residing at 70 Terry Road, Hartford, Connecticut 06105, and is or was a member of the Board of Directors of Reflexite.

12. Upon information and belief, defendant Theodore Patlovich is a citizen of the State of New Mexico, residing at 314 Big Horn Ridge Drive N.E., Albuquerque, New Mexico 87122, and is or was a member of the Board of Directors of Reflexite.

13. Upon information and belief, defendant Stephen J. Raffay is a citizen of the State of Connecticut, residing at 93 Westmont Street, West Hartford, Connecticut 06117, and is or was a member of the Board of Directors of Reflexite.

14. Upon information and belief, defendant William P. Rowland is a citizen of the State of New York, residing in Plattsburgh, New York, and is or was a member of the Board of Directors of Reflexite.

15. Upon information and belief, defendant Peter Eio is a citizen of the State of Connecticut, residing at 70 Sill Lane, Old Lyme, Connecticut 06371, and is or was a member of the Board of Directors of Reflexite.

16. Upon information and belief, Individual Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter Eio were the members of the Board of Directors of Reflexite at relevant times herein.

## JURISDICTION AND VENUE

17. Upon information and belief, at all times relevant to this action, each of the Defendants has been and continues to be a citizen of the State of Connecticut, except Peter Eio, Arthur LoVetere and William Rowland, who, on information and belief, have been and continue to be citizens of the States of New Mexico, Michigan, and New York, respectively.

18. At all times relevant to this action, each of the Individual Defendants has transacted and continues to transact business in the State of Connecticut and serves as a director of Reflexite, a corporation organized under the laws of the State of Connecticut.

19. Jurisdiction for this action is proper in this Court pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and action is between citizens of different states. Jurisdiction of certain claims is also proper under 28 U.S.C. § 1367.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) as the events or omissions giving rise to the claims herein occurred within this judicial district.

## ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

*Reflexite*

21. Upon information and belief, Reflexite produces reflective products and display optics. Reflexite is a private corporation and its shares are not traded on any public stock exchange.

22. Upon information and belief, Reflexite's founders, William and Hugh Rowland, bought the rights to develop a retroreflective technology from a company called Luce Reflexite, Inc. in 1963. Some time thereafter, the Rowlands formed Rowland Development Corporation where they began to develop a new retroreflective product that was eventually called "Reflexite."

In 1970, the Rowlands formed a predecessor to Reflexite Corporation and began selling a product called "Reflexite" in or about 1973.

23.     From time to time, Reflexite has sold and purchased shares from various shareholders, including members of the Board of Directors and employees of Reflexite. Upon information and belief, the Board of Directors has been active in approving such sales and purchases.

24.     Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter Eio have been the members of the Board of Directors of Reflexite at relevant times herein. Upon information and belief, these Individual Defendants caused Reflexite to undertake the actions described herein.

*The Franks Involvement with Reflexite*

25.     H. Jonathan ("Jon") Frank has been part of the Reflexite story from the very beginning, as a long-time employee and executive of Reflexite. Jon Frank joined Rowland, Inc., a predecessor to Reflexite that was founded by Hugh and William Rowland in August 1972.

26.     In 1974, Jon Frank left Rowland, Inc. to join Rowland Development Corporation as marketing manager for the "Reflexite" product line in the traffic control market. Shortly thereafter, Rowland Development Corporation entered into an exclusive distribution and development agreement with the Fasson division of Avery Corporation, and the Rowlands formed Reflexite Corporation to provide product and technical support to Fasson. Jon Frank was selected from the RDC staff to go to Fasson as product manager for the Reflexite Product line.

27.     A year later, Jon Frank formed a company called Omnicon and became a significant purchaser of the "Reflexite" product from Fasson. When Reflexite re-acquired the Reflexite product line from Fasson, Reflexite also entered into an exclusive contractual

-6-

arrangement with Jon Frank and Omnicon to represent Reflexite in the traffic control market. Jon Frank and Omnicon became one of Reflexite Corporation's largest source of sales, accounting for more than 50% of all sales of the product.

28. During this period of time, Mr. Frank assisted Reflexite Corporation in important ways. He transferred technology that he had developed, such as the use of magnesium sealing dies rather than more expensive brass. He transferred product development such as the design and process for the manufacturing of roll up signs. He also contributed financially, by, for example, deferring, interest free, commission payments Reflexite Corporation owed Omnicon in order to ease Reflexite's cash flow problems.

*The Franks' Shareholdings in Reflexite*

29. Jon Frank's shareholdings in Reflexite also date back to the early days of the company. In 1979, Hugh Rowland approached Jon Frank and asked if he would be willing to purchase 10% of Reflexite Corporation. Mr. Frank indicated that he would do so on two conditions: first, he had to be able to purchase the shares in two installments over a two-year period; second, he had to be able to sell his shares if other insiders were able to sell theirs.

30. William Rowland, Hugh Rowland and Fritz Haffenreffer, principals at Reflexite, agreed to this, and also agreed that before they would sell any of their shares of Reflexite stock, they would use "all efforts that are reasonable" to permit the Franks to sell their shares at the same price. William Rowland, Hugh Rowland and Fritz Haffenreffer executed an agreement dated January 5, 1979 (the "January 5, 1979 Agreement") reflecting this agreement and understanding.

31. In reliance on this January 5, 1979 Agreement and Mr. Rowland's assurances that Mr. Frank would be afforded the same opportunities as Mr. Rowland to sell shares of Reflexite

stock, Mr. Frank then purchased 8,471 shares on July 27, 1979 and another 8,470 shares on January 29, 1980, which represented 10% of the company. Presently, the Franks own 256,411 shares of Reflexite stock, representing approximately 11% of the outstanding shares of the company. Upon information and belief, the Franks are among the largest individual shareholders of Reflexite.

32.     Soon after the January 5, 1979 Agreement, at the insistence of the Rowlands who were seeking to reduce the commissions Reflexite paid to Omnicon, Jon Frank joined Reflexite Corporation as Vice President of Marketing and Sales for all operations. Mr. Frank declined an opportunities in 1982 and 1983 to become the President of Reflexite. Soon thereafter, Reflexite hired Defendant Cecil Ursprung to become its President.

*Unequal Treatment of the Franks Begins*

33.     Defendant Cecil Ursprung immediately began to pursue a series of policies that had the effect of reducing the value and liquidity of the Franks' and other non-board members' investment in Reflexite. In the spring of 1985, without notice or explanation, the Corporation terminated Mr. Frank's employment. It conditioned the Corporation's payment of termination benefits to Mr. Frank on Mr. Frank's signing consents to amend the Shareholders' Agreement and Certificate of Incorporation. These consents enabled the creation of an Employee Stock Option Plan (the "ESOP"). Mr. Frank expressed concerns that the ESOP would dilute the value of existing shareholdings and that there were not sufficient protections for longtime shareholders such as the Franks. In a June 14, 1985 letter to Mr. Frank, Reflexite's then-Assistant Secretary, Peter Costas, wrote "I and the other outside directors recognize the rights of minority shareholders and do feel an obligation to ensure that those rights are always protected."

34. Despite Mr. Costas' sentiments, Reflexite continued to condition Mr. Frank's termination benefits on his signature of the consents. Faced with this Hobson's choice, Mr. Frank signed the consents, but in a letter dated June 25, 1985, indicated that he had been forced to do so by Reflexite's improper efforts to hold his termination benefits hostage.

35. Mr. Ursprung and others on the Board then began to pursue a policy of permitting other insiders to sell shares, sometimes unlawfully, while denying the Franks and others a comparable opportunity to obtain liquidity. For example, in 1987, Reflexite arranged to have the shareholders, the Franks included, waive their rights and consent to a transfer by Hugh Rowland of his Reflexite stock for the purpose of disposing it to his family and charity. Upon information and belief, only Mr. Rowland was singled out for such special treatment on that occasion.

36. In November of that year, the Franks were belatedly informed by Reflexite that Mr. Rowland had disposed of additional shares by selling them to Arthur LoVetere, even though Mr. Rowland and Mr. LoVetere had not sought the other shareholders' consent as required by the Shareholder Agreements. The Board intervened to protect the unlawful sale and arranged to have the shareholders retroactively waive their rights with respect to this transaction.

37. The effect of such transfers was that the insider directors enjoyed the economic benefit of their shareholdings while shifting the risk of ownership to other shareholders such as the Franks who were denied the opportunity to sell their shares. Such transfers also injured the Corporation generally by misaligning the interests of the directors and the shareholders and by denying the shareholders of their right to approve such actions after being informed of their nature.

38. Upon information and belief, other such prohibited transfers have occurred and the Board has been active in procuring after-the-fact approvals of such sales. For example, upon

information and belief, the Defendants have arranged to permit Mr. Ursprung to sell his shares and the other Defendants procured the necessary consents after his sale took place to permit this transaction.

39.     The Defendants engaged in other self-interested transactions in Reflexite stock. For example, upon information and belief, Worth Loomis purchased some 250,000 shares of Reflexite stock at significantly discounted prices in 1999 or 2000. Comparable offers were not afforded to other shareholders, on information and belief.

40.     Upon information and belief, the Defendants have caused Reflexite to pursue a present policy in which all options issued to directors or management are accompanied by a put, permitting the recipient to require Reflexite to repurchase the shares. On information and belief, this practice was not disclosed to the shareholders.

41.     Upon information and belief, the Board arranged for a certain select few to sell large quantity of shares. Upon information and belief, former Reflexite executive Dave MacDonald was able to sell close to $2 million in shares and former Reflexite executive Jim Seeley (and/or his heirs) were permitted to sell their shares as well.

42.     Reflexite also went to great lengths to provide liquidity to certain of its insiders. For example, in January 1998, Reflexite spent some $8.1 million dollars to purchase shares from William Rowland and his family trust. Upon information and belief, Reflexite spent more than $3,000,000 of its own cash and borrowed $5,000,000 to bring about this purchase, at a price of $30 per share. Reflexite did not notify the Franks (and, on information and belief, other shareholders) of this transaction and, indeed, hid the reference to it in footnotes of a financial statement that the Franks did not receive.

43. The Franks are not aware of any instances in which Reflexite has been made to incur debt to purchase the shares of any non-director shareholders. The Franks believe that this course of action was injurious to Reflexite, imposed undue risk on the corporation, had no legitimate business purpose and was a waste of corporate assets.

44. While the Board has arranged for significant repurchases of shares from insiders, it has denied the Franks and other shareholders comparable opportunities. For example, in 1996, Mr. Frank was permitted to sell only 4,832 shares – a tiny fraction of his shares – when Reflexite engaged in a $750,000 stock repurchase. In 1997, the year Mr. Frank transferred his shareholdings to the Frank Family 1996 Trust, the Franks were only permitted to sell 1,220 shares, for approximately $36,600.

45. In 1998, the year in which Reflexite consummated its enormous $8.1 million 277,000 share buyback from Mr. Rowland, it made no offer to purchase any shares from the Franks.

46. Similarly, in 1999 the Defendants' course of conduct continued. The Franks were not given any buyback opportunities, although they are informed that the Corporation executed a $750,000 stock repurchase. Upon information and belief, the Defendants selectively permitted certain shareholders to participate in the stock repurchase, but excluded others, such as the Franks. Upon information and belief, the Defendants used Reflexite's stock repurchase program as a means of providing liquidity to chosen shareholders while shifting the risk of stock ownership to larger, non-director shareholders such as the Franks.

47. For example, in 1997-98 the Defendants' wrongful conduct continued, as the Franks began to request more equitable opportunities for liquidity, the Board caused Reflexite to change its share buyback formulas to disadvantage large shareholders such as the Franks.

Although previous buyback programs were on a percentage basis, Reflexite began to purchase the same number of shares from all shareholders, which had the effect of permitting smaller shareholder to liquidate their positions faster than shareholders such as the Franks.

48. Upon information and belief, corporate insiders registered their shares of Reflexite under multiple names to take advantage of this new policy and to sell a disproportionately large number of shares.

49. Thus, while engaging in self-dealing transactions redounding to the economic benefit of Reflexite's directors, executives and other insiders, Reflexite has denied similar opportunities to the Franks (and, upon information and belief, other shareholders), and has wrongfully acted to oppress the Franks and unfairly and arbitrarily limit the liquidity and value of their investment in Reflexite.

*Reflexite and the Board Ignore the Franks' Concerns*

50. The Franks were understandably upset that Reflexite would purchase massive quantities of Mr. Rowland's stock and minimal quantities of the Franks' and others' shares. In discussions with Defendant Arthur LoVetere and others at Reflexite, the Franks requested opportunities comparable to those given Mr. Rowland and other insiders. Jon Franks was told that such a program was not available to the Franks but was available to Mr. Rowland because he was a "founder."

51. Neither Mr. LoVetere nor any other Defendant has ever articulated any legitimate business reason for the leveraged repurchase of the Defendants' shares. Upon information and belief, good corporate governance suggests that the directors should own significant amounts of shares of the company they manage, to align their interests with those of the shareholders. The

Defendants' conduct had the effect of reducing the directors' incentives to maximize the value of Reflexite's shares.

52. On May 5, 1999, Jon Frank wrote to Defendant Arthur LoVetere to request that his concerns for liquidity be "more equitably addressed." Mr. LoVetere suggested, in a May 18, 1999 letter, that Reflexite would consider purchasing his shares at a discount or accepting his shares for a subordinated note, among other options. In June 1999, Jon Frank indicated that the Franks would be flexible about a buyback arrangement. Despite the Franks' interest in pursuing liquidity, however, neither Reflexite nor its Board followed up on any of its suggestions.

53. Thereafter, continuing the oppression of the Franks, Reflexite's buyback offers to the Franks were tiny. In 2000, the Franks were offered the opportunity to sell only 360 shares (worth $15,840) and a mere 100 shares (worth $3,625) in 2001. The Franks' liquidity was actually being reduced over time relative to other shareholders. In contrast, upon information and belief, corporate insiders held their shares under multiple listed names, so as to increase the number of shares purchased in the Reflexite repurchase programs.

54. On October 20, 2001, Jon Frank wrote to Reflexite to express his continuing concerns that his desire for fair treatment and liquidity was not being dealt with in the same manner as other corporate insiders and that the number of shares allocated to the Franks in the repurchase was so small as to be not worth pursuing.

55. The Defendants' wrongful conduct continued when, in July of 2002, the Franks were informed that the buyback program was "postponed" but were never informed of its reinstatement in October, and thus were denied the opportunity to participate in the program. Upon information and belief, Reflexite changed the buyback formula to favor large shareholders, but excluded the Franks from participation. Upon information and belief, the Defendants

selectively permitted certain shareholders to participate in the stock repurchase, but excluded others, such as the Franks.

56. Upon information and belief, Reflexite and its Board intentionally denied the Franks' comparable opportunities for liquidity or even basic notice of existing opportunities to sell shares.

57. Upon information and belief, Mr. Ursprung has stated that the Franks "will never get liquid as long as I am President of Reflexite" and that the Franks should be satisfied with the dividends that they are receiving. Thus, on information and belief, the actions of the Defendants are not based on a legitimate business reason, but out of self-interest, malice or other improper purposes.

*The Denial of Information Requests*

58. The Franks were also denied important information relevant to their shareholdings. For example, Morgan Frank, on behalf of the Frank Family 1996 Trust, requested access to the Corporation's records in his letter to Mr. Cecil Ursprung of September 16, 2002 – a letter that followed several communications between the Franks and executives and directors at Reflexite (including several requests to Defendant Arthur LoVetere, the Chairman of the Board). The requested records included, among other things, documentation concerning the Corporation's ESOP plan, records concerning the Strategic Minority Investor Program and records concerning the Corporation's repurchase of shares from its large shareholders, including Board members and insiders.

59. In a November 8, 2002 letter to the Franks, Reflexite's Chief Executive Officer, Defendant Cecil Ursprung, indicated that Reflexite would not provide the requested information, or that some of this information was not available to the Corporation. In oral communications

with the Franks, Chairman Arthur LoVetere confirmed that the Corporation would provide no information to the Franks.

60. On information and belief, the Franks have been denied other information concerning Reflexite, as detailed above, such as financial statements and information concerning share buyback programs.

*The Demand Letter*

61. As outlined above, Reflexite has consistently favored the pecuniary self-interest of its founders and directors, while denying comparable opportunities to its other shareholders. Such oppressive and self-interested conduct constitutes a violation of the fiduciary duties of the self-interested directors and officers of the Corporation, as well as a violation of the fiduciary duties of any Board members who endorsed or ratified such misconduct.

62. On February 10, 2003, the Franks sent Reflexite and its Board a formal demand letter pursuant to Connecticut General Statutes § 33-722, requesting that the Board of Directors of Reflexite immediately investigate and remediate the wrongful conduct described above (the "Demand Letter"). The Demand Letter also made a request pursuant to Connecticut General Statutes § 33-946 to inspect and copy the records of the Corporation, including all records identified in Connecticut General Statutes § 33-945.

63. Reflexite's Board purported to form a "Special Litigation Committee" ("SLC") to investigate the wrongful acts identified in the Demand Letter and other information provided by the Franks.

64. Upon information and belief, the SLC did not perform a genuine and unbiased investigation of the wrongdoing alleged by the Franks, but rather performed a perfunctory review that was a mere pretext to insulate the Board from scrutiny and/or litigation.