UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| H. JONATHAN FRANK and  FRANK FAMILY 1996 | : | Civil Action No. |
| TRUST (on behalf of themselves and REFLEXITE | : | 3:03-CV- 1014 (JBA) |
| CORPORATION), | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ARTHUR LOVETERE, CECIL URSPRUNG, LOUIS J. | : | |
| BACCEI, WORTH LOOMIS, THEODORE | : | |
| PATLOVICH, STEPHEN J. RAFFAY, WILLIAM P. | : | |
| ROWLAND, PETER EIO (individually and in their | : | |
| capacity as members of the Board of Directors of Reflexite | : | |
| Corporation) and REFLEXITE CORPORATION, | : | JUNE 18, 2004 |
| | : | |
| Defendants. | : | |

**OPPOSITION TO REFLEXITE CORPORATION'S MOTION TO DISMISS**

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 1

ARGUMENT ..................................................................................................................... 21

I.    The Standard of Review For Evaluating Decisions of a Special Litigation
      Committee ............................................................................................................. 21

II.   The Special Litigation Committee Was Not "Independent" Because of the Undue
      Control Exerted Over it by Interested Parties. .................................................... 23

III.  The Special Litigation Committee's Purported Investigation Into the Allegations
      of the Demand Was Not Reasonable or in Good Faith. ...................................... 28

      A.    The SLC Failed to Make a Reasonable or Good Faith Inquiry Into
            Numerous Pertinent Issues. ...................................................................... 28

      B.    The SLC's Inquiry Into the Rowland Transaction was not Reasonable or
            in Good Faith. ............................................................................................ 30

      C.    The SLC's Report is Biased and Its Conclusions Are Not Supported by the
            Facts. ......................................................................................................... 32

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

PAGE

Aronson v. Lewis,
    473 A.2d 805 (Del. 1984) ............................................................................................ 23

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,
    845 A.2d 1040 (Del. 2004) ........................................................................................ 23

Brehm v. Eisner,
    746 A.2d 244 (Del. 2000) ..................................................................................... 22, 23

Carlton Investments v. TLC Beatrice Holdings, Inc.,
    Civ. A. No. 13950, 1997 WL 305829 (Del. Ch. May 30, 1997) ................................ 28

Electra Investment Trust P.L.C. v. Crews,
    No. 15890, 1999 WL 135239 (Del. Ch. Feb. 24, 1999) ................................ 30, 31, 32

Finley v. Superior Court,
    80 Cal. App. 4th 1152 (Cal. Ct. App. 2000) .............................................................. 22

Harhen v. Brown,
    431 Mass. 838 (2000) ........................................................................................... 24, 27

Houle v. Low,
    407 Mass. 810 (1990) ........................................................................................... 23, 28

Johnson v. Hui,
    811 F. Supp. 479 (N.D. Cal. 1991) ....................................................................... 24, 25

Joy v. North,
    692 F.2d 880 (2d Cir. 1982) ................................................................................. 21, 22

Kaplan v. Wyatt,
    484 A.2d 501 (Del. Ch. 1984), aff'd 499 A.2d 1184 (Del. 1985) .............................. 32

Katell v. Morgan Stanley Group, Inc.,
    Civ. A. No. 12343, 1995 WL 376952 (Del. Ch. June 15, 1995) ................................ 28

Mills v. Esmark, Inc.,
    544 F. Supp. 1275 (N.D. Ill. 1982) ........................................................................... 23

Mount Moriah Cemetery v. Moritz,
    Civ. A. No. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991), aff'd 599 A.2d
    413 (1991) ................................................................................................................ 28

In re Oracle Corp. Derivative Litigation,
    824 A.2d 917 (Del. Ch. 2003) ....................................................................... 24

In re Oracle Sec. Litigation,
    852 F. Supp. 1437 (N.D. Cal. 1994) .............................................................. 24

In re Oracle Securities Litigation,
    829 F. Supp. 1176 (N.D. Cal. 1993) .............................................................. 27

Parfi Holding AB v. Mirror Image Internet, Inc.,
    794 A.2d 1211 (Del. Ch. 2001), reversed and remanded on other
    grounds, 817 A.2d 149 (Del. 2002). .............................................................. 24

Rales v. Blasband,
    634 A.2d 927 (Del. 1993) .............................................................................. 27

Scattered Corp. v. Chicago Stock Exch., Inc.,
    701 A.2d 70 (Del.    1997) ...................................................................... 22, 23

Zapata Corp. v. Maldonado,
    430 A.2d 779 (Del. 1981) ...................................................................... 21, 22, 30

## STATUTES

Connecticut Gen. Stat. § 33-724 ......................................................... 21, 22, 28

Connecticut Gen. Stat. § 33-722 .................................................................. 23

## OTHER

1 ALI Principles of Corporate Governance: Analysis and Recommendations
    § 1.23 (1994)  .............................................................................................. 24

## INTRODUCTION

Plaintiffs H. Jonathan Frank and Frank Family 1996 Trust submit this Opposition to the Motion of Reflexite Corporation ("Reflexite") to dismiss the Amended Complaint based on the purported investigation of a "Special Litigation Committee" ("SLC") of the Board of Directors of Reflexite.  As set forth more fully below, the SLC's investigation was tainted by improper interference from the very directors whose conduct the SLC was supposed to be investigating. Moreover, the SLC's investigation was cursory, omitted key witnesses and documents, ignored glaring problems and gaps in the facts, and produced a decidedly biased and unsupported report.

## FACTUAL BACKGROUND

### The Demand Letter

This case began with allegations that directors of Reflexite Corporation engaged in improper self-dealing transactions in breach of their fiduciary duties to the corporation and its shareholders.  In a February 10, 2003 Demand Letter (attached as Exhibit B to Reflexite's Memorandum of Law), H. Jonathan Frank, on behalf of Reflexite shareholder Frank Family 1996 Trust (collectively, the "Franks"), demanded that the Board of Directors of Reflexite investigate and remedy various transactions under which certain directors were permitted to sell their shares of Reflexite stock in improper self-dealing transactions.  The Franks also demanded that the Board investigate the denial of the Franks' repeated requests for information about these transactions and about Reflexite generally.

Among the improper transactions identified by the Franks was a sale of some $8.1 million in shares by Director William Rowland to Reflexite.  In that transaction, which was never disclosed to shareholders, Rowland tendered some 277,000 shares to Reflexite, in return for which Reflexite paid Rowland $8.1 million dollars in installments from 1998 to 2001.  The

Rowland transaction required Reflexite to incur substantial debt and enter into a subordination agreement with its commercial lender. The Demand Letter asserted that other insiders have been permitted to engage in such transactions to their own personal benefit and to the detriment of Reflexite.

### The Special Litigation Committee

Reflexite's eight-member Board purported to respond to the Demand Letter by forming a Special Litigation Committee ("SLC"). The Committee was initially comprised of three members: Peter Eio, Louis Baccei and Chairman Worth Loomis. None of these individuals had ever served on a Special Litigation Committee before, nor did they have any grasp of what that entailed prior to agreeing to serve on it.[1] Eio Dep. at 18-19; Baccei Dep. at 37-38; Loomis Dep. at 19. Indeed, it was not until the first meeting of the Committee itself that its members were told what the purpose of their Committee would be and how it would engage in the work it was charged to perform. Baccei Dep. at 38-39.

The selection of the members of the SLC was not by the entire Board of Directors, but by two directors accused of insider transactions. The members of the SLC were hand-chosen by Cecil Ursprung, President and Director of Reflexite, and Art LoVetere, Chairman of the Board, who are alleged in the Amended Complaint to have engaged in self-dealing transactions. Eio Dep. at 16-17 ("I was brought in and talked with Cecil Ursprung and Art LoVetere, who is the chairman, and I think they had already spoken to Worth Loomis . . . ."). Mr. Ursprung had previously been involved in selecting and approaching Messrs. Eio and Loomis to become directors on Reflexite's Board and each of them served on the Compensation Committee which

---

[1] Nor had James Lotstein or Peter Hull of Cummings & Lockwood, outside counsel for the SLC, ever previously served as counsel for a special litigation committee. Hull Dep. at 8; Lotstein Dep. at 9-10. Excerpts of depositions and deposition exhibits cited are attached to the Affidavit of Terence J. Gallagher ("Gallagher Aff.") accompanying this memorandum.

determined the compensation of Mr. Ursprung and others at Reflexite.  Ursprung Dep. at 13 ("Q: [I]n fact, you were the person who introduced Mr. Eio to Reflexite, isn't that right?  A:  I believe that's right. . . . And the same is true of Mr. Loomis; you were the one who approached him first, correct?  A:  Yes."); see also Loomis Dep. at 8; Baccei Dep. at 11.[2]  Mr. Ursprung also had discussions with the SLC members concerning the SLC's decision to hire outside counsel. Ursprung Dep. at 23.

### The SLC Belatedly Recognizes That its Chairman is Not Independent

Prior to their appointment by Defendants Ursprung and LoVetere, little or no investigation was performed into the independence of the SLC members.  The Committee members were not asked to provide any documents or lists of affiliations.  Baccei Dep. at 21; Eio Dep. at 30.  Thus, the facts that Mr. Loomis and Reflexite Director and Defendant Stephen Raffay had formerly worked together as officers at Dexter Corporation, for example, or that Mr. Baccei and Reflexite Director and Defendant Ted Patlovitch were formerly colleagues at Loctite Corporation were not detected and documented by the SLC.  Loomis Dep. at 8-9; Baccei Dep. at 9-10.[3]  In addition, the only transaction as to which the SLC analyzed the independence of its members, was the Rowland transaction.  Eio Dep. at 21.

As a result of this failure to assess the independence of the SLC members, the Board and the Committee did not realize until the first meeting of the SLC that Mr. Loomis, far from being independent, was in fact the "champion" of the Rowland transaction and had played a key role in presenting it to the Board and procuring its passage.  Baccei Dep. Ex. 3 (at CL 01067).  Mr.

---

[2] For some of the SLC members, serving on Reflexite's Board was a significant portion of their overall income.  10-15% of Mr. Baccei's income, for example, is derived from his service as a director on Reflexite's Board.  Baccei Dep. at 41-42.

[3] In fact, Defendant Ted Patlovitch was the person who first approached Mr. Baccei about joining the board of Reflexite.  Baccei Dep. at 9.

Loomis was a member of the compensation and audit committees of the Board at the time of the Rowland transaction, and was involved in analyzing the transaction and recommending that the Board approve it. Loomis Dep. at 11, 24 ("I had, as chair of the Compensation Committee, been the person who recommended the Rowland transaction to the Board . . . .").

Rather than determine the independence of its own members, the SLC took direction from other insiders as to the independence of Mr. Loomis. For example, notes from the attorneys for the SLC (Cummings & Lockwood) indicated that Reflexite's outside counsel—the same counsel that represented Reflexite during the Rowland transaction and other improper self-dealing transactions (Eio. Dep. at 55)—would determine Mr. Loomis' independence: "Jack [Kennedy] will look at B[oard of] D[irector] minutes and comp committee minutes to determine if Worth Loomis is independent."[4] Baccei Dep. Ex. 3 (at CL 01060-61). Jack Kennedy was also the person selected to determine whether Cummings & Lockwood could serve as outside counsel for the SLC. Loomis Dep. at 22.[5]

Ultimately, despite having been hand-selected by Mr. Ursprung and Mr. LoVetere, it was clear that Mr. Loomis could not sustain his position on the SLC. Mr. Ursprung's counsel was then sought on the issue. Notes prepared by the SLC's counsel at the SLC's first meeting observe: "Worth Loomis to consider whether to resign as a member of the SLC—Will talk to Cecil Ursprung." Baccei Dep. Ex. 3 (at CL 01094). Counsel for the SLC also confirmed with counsel for Reflexite that Mr. Ursprung would not block Mr. Loomis' decision to step down from the SLC: "Cecil will not oppose a request from Worth to resign from the SLC." Baccei Dep. Ex. 3 (at CL 01059). Mr. Loomis' subsequent resignation letter lists Mr. Ursprung as the

---

[4] Attorney Kennedy is a partner of Robinson & Cole, which represents Reflexite in connection with its motion to dismiss.

[5] "Q: Mr. Kennedy informed you that he believed that Cummings & Lockwood was independent and could serve as counsel for the SLC? A: Right." Loomis Dep. at 22.

first person copied.  Loomis Dep. Ex. 4.

***Interested Parties Interfere With the Work of the SLC***

With Mr. Loomis off of the Committee, the SLC was reduced to two members: Louis Baccei and its new chair, Peter Eio.  Baccei Dep. at 31.  Some concern was expressed about whether a two-person committee was appropriate.  See Baccei Dep. Ex. 3 (at CL 01094) ("Should the committee only be two people?").  In addition, a concern was expressed that the remaining members of the SLC served on the compensation committee of Reflexite's Board. Baccei Dep. Ex. 3 (at CL 01068) ("If he [Loomis] doesn't serve, others will face a similar problem because two others were also on the comp. committee.").  Nonetheless, the SLC elected to proceed.

The Special Litigation Committee had spent more than a month assembling itself and determining that Mr. Loomis could not appropriately serve on the Committee.  By the time of the SLC's first meeting on March 17, 2003, the SLC had accomplished little other than reducing its ranks and learning what its task was.  Baccei Dep. at 39; Eio Dep. at 34.  The SLC realized that it had a great deal to do and, with reduced numbers on the committee, it hoped to make expanded use of its outside counsel, Cummings & Lockwood.  Baccei Dep. at 58 ("we understood the enormous amount of help that we needed from counsel to have an accurate and good report done on time"); see also Eio Dep. at 46.

But insider Cecil Ursprung, the Reflexite President and Director at the center of many allegations of the Amended Complaint, had ideas of his own.  The SLC's work was again interrupted when Cecil Ursprung directed the SLC members to instruct their counsel to stop what they were doing.  Eio Dep. at 50; Ursprung Dep. at 30.  Notes from the counsel for the SLC indicate that on March 31, 2003, SLC member Louis Baccei indicated that he had spoken with

Mr. Ursprung who expressed concerns about attorneys' fees spent on the SLC investigation. Baccei Dep. Ex. 3 (at CL 01054). Counsel for the SLC memorialized the conversation as follows:

> After speaking with the Reflexite CEO [Cecil Ursprung], who is very concerned about incurring expenses at a time when the company's business is soft, Lou [Baccei] called me to tell me that the committee would get together next week to discuss in detail the work to be done to complete the inquiry and write the report. Until then, Peter [Eio] and Lou do not want us to do any further work on this project.

Id. Thus, even though the SLC and its counsel had only just begun work on the project, and even though nearly two months had elapsed since the Demand Letter was received by the Board, Mr. Ursprung instructed the SLC to take a "time out" to take control of attorneys' fees. Eio Dep. at 50. The SLC members then instructed counsel to stop their work, even though counsel was then working on projects for the Committee. Id. at 51. Counsel for the SLC complied with this instruction, and the attorneys from Cummings & Lockwood dropped what they were doing. Lotstein Dep. at 52.

A little more than a week later, the SLC again discussed the attorneys' fees issue with its counsel, Cummings & Lockwood. Baccei Dep. Ex. 3 (at CL 01053). Notes prepared by Cummings & Lockwood attorneys from this conference call indicate that Reflexite and its personnel expressed their anxiety over costs to the SLC members. Id. Peter Eio, the new SLC chair, conferred with Jack Kennedy, outside counsel for Reflexite, and Reflexite indicated that it was "very concerned about expenses." Id. Mr. Ursprung also expressed additional concerns about fees, and told Mr. Eio that "these expenses were direct deductions from the compensation of the employee owners of the company . . . ." [6] Ursprung Dep. at 32; Eio Dep. at 49. To

---

[6] This comment is in itself interesting in the context of this case. Mr. Ursprung appears concerned only with shareholder insiders like himself, not all shareholders (including Mr. Frank), who bear these expenses.

accommodate these concerns, the SLC explored ways to trim down its investigation. The SLC members "decided to carry on by themselves with support from Jack Kennedy." Baccei Dep. Ex. 3 (at CL 01053). No one raised the concern that Mr. Kennedy, as Reflexite's counsel during the challenged transactions, was not independent and could not appropriately advise the SLC. Lotstein Dep. at 56. Cummings & Lockwood noted its concern only that Reflexite would not ultimately reduce its bills in that manner. Baccei Dep. Ex. 3 (at CL 01053); Lotstein Dep. at 55.

The following day, the members of the SLC had a further telephone call with the attorneys from Cummings & Lockwood and extracted further concessions on fees. Baccei Dep. Ex. 3 (at CL 01051). Cummings & Lockwood agreed to be "efficient" thereafter. Lotstein Dep. at 58. The SLC members also increased their vigilance of Cummings & Lockwood's work and controlled the number of lawyers Cummings & Lockwood could employ on tasks for the SLC. See Loomis Dep. at 41 ("I objected to the number of Cummings & Lockwood lawyers that attended each meeting . . . ").

In short, the intervention of Cecil Ursprung and others at Reflexite induced the SLC to stop its work during a key period, and nearly persuaded the SLC not to use outside counsel at all. This occurred despite the recognition by the SLC that the use of outside counsel was going to be essential for the SLC to complete its task. Loomis Dep. at 41. This episode demonstrates that far from being independent, the SLC was directly under the sway of and acted at the instance of key insiders such as Reflexite President Cecil Ursprung.

This was not the only occasion on which Mr. Ursprung or Reflexite influenced the work of the Committee. In late April, it became evident that "time constraints" and the unavailability of SLC Chairman Peter Eio meant that SLC might not complete its work by the early May Board meeting as originally planned. Baccei Dep. Ex. 3 (CL 01047). Counsel for the SLC asked

counsel for Reflexite whether the Board meeting could be rescheduled. Counsel for Reflexite reported back that "he does not think that Cecil [Ursprung] will be willing to have a special board meeting to consider this matter." Id. As a result of Mr. Ursprung's refusal to entertain a special meeting of the Board, the SLC was forced to complete its work in a shorter time frame than necessary.

In addition, Mr. Ursprung controlled the SLC's presentation of its findings to the Board. Rather than decide for itself how to explain its findings and conclusions to the full Board, the SLC deferred to Mr. Ursprung once again. It was Mr. Ursprung, for example, who decided that the lawyers for the SLC would not be present at the meeting in which the SLC relayed its findings and recommendations to the Board. Cecil Ursprung let it be known that he "does not feel it is necessary to have the lawyers participate in discussion over the phone at a Board meeting." Gallagher Aff. Ex. 8 (April 29, 2003 e-mail from Dianne Edwards to Arthur LoVetere (CL 01757)). In fact, counsel for the SLC did not attend the Board meeting in person or by telephone.

From start to finish, Mr. Ursprung (and, to a lesser extent, Mr. LoVetere) exercised undue influence over the SLC. He hand-selected its members—all persons whom he personally had chosen to serve on the Reflexite Board; he restricted its access to counsel; he refused to give it sufficient time despite a request to extend its schedule; and he controlled the manner of its presentation to the full Board at the end of the SLC's investigation. Mr. Ursprung, who should have been a primary target of the SLC's investigation, was, in fact, calling the shots.

### The "Investigation" of the SLC

The SLC faced other problems beyond a lack of independence from the supposed targets of its investigation. As noted, the SLC was short-staffed and faced a tight schedule. With only

two members, reduced access to counsel and less than one month in which to complete its investigation and draft a report, the SLC performed what can best be described as a perfunctory review of a limited set of pertinent facts.

The SLC met on only four occasions.  See SLC Report, Exhibit A.  The first such occasion involved instructing the members of the SLC as to what a special litigation committee is and is supposed to do, as well as addressing the lack of independence of original Chairman Worth Loomis.  This meeting, which SLC members described as "very long," lasted no more than an hour and a half.  Loomis Dep. at 44.  Thereafter, the SLC met on only three additional occasions, two of those occasions by telephone.  Report, Exhibit A.

The review of documents was largely consigned to counsel for the SLC.  Eio Dep. at 35 ("We relied on counsel to determine what documentation was needed.").  By their own admission, the SLC members themselves reviewed mainly the documents supplied by the Franks, and delegated to counsel for the SLC any remaining documents.  Baccei Dep. at 74.

The SLC sent a single set of document requests to Reflexite's counsel.  Eio Dep. at 59.[7] No follow-up requests were ever sent, nor did the SLC bother to make document requests directly to the directors or other persons involved in the transactions identified in the Demand Letter.  Baccei Dep. at 75-76.  Neither Mr. Rowland nor Mr. Ursprung, two key players, recalls having been asked by the SLC to produce documents from their files.  Rowland Dep. at 83; Ursprung Dep. at 43.  The SLC also made no independent determination whether Reflexite had complied with the SLC's document requests.  Baccei Dep. at 78.  The SLC merely accepted what documents counsel for Reflexite produced without any further inquiry into the matter.

The SLC interviewed only six individuals.  Report, 2-7.  Most of those interviews lasted a

---

[7] "Q: [A]re you aware of any request that was made to anyone for documents, other than the requests that were made to Jack Kennedy?  A: No.  I have to answer no, I'm not."  Eio Dep. at 59 (objection omitted).

half hour or less. Mr. Rowland, for example, whose sale of $8.1 million comprised virtually the entire scope of the SLC's report, was interviewed by telephone for only about a half hour. Rowland Dep. at 81 ("Half an hour. It wasn't long, I don't believe."). The interview of Jon Frank, whose Demand Letter launched the investigation, was a mere twenty-eight minutes start to finish, of which only approximately twenty minutes were spent with questions by the SLC. Declaration of Jeffrey A. Simes ("Simes Decl.") at ¶ 4. Stephen Raffay, a member of the committee that approved the Rowland transaction (and the only one interviewed by the SLC), gave a telephone interview lasting a mere fifteen minutes. Baccei Dep. at 105-06.

Moreover, the SLC failed to interview several people who it knew possessed relevant information. The SLC did not interview all of the directors involved in the self-interested transactions the SLC looked at, nor did the SLC even interview Worth Loomis, notwithstanding the fact that he was identified as the "champion" of the Rowland transaction under which Reflexite heavily indebted itself to provide an $8.1 million payout to one of its directors. Baccei Dep. Ex. 3 (at CL 01067); Loomis Dep. at 38-39.

The SLC similarly made little effort to contact persons it believed would provide information critical of the self-interested transactions of which the Demand Letter complained. For example, former Reflexite officer David McDonald was identified by Jon Frank as having potentially negative information concerning Cecil Ursprung. He was added to the list of witnesses to be interviewed by the SLC. Eio Dep. at 60. But the SLC never contacted Mr. McDonald. Id. at 62-63. The SLC's only effort to locate him consisted of contacting Mr. Ursprung's office to obtain his number. Id. at 63-64; see also Baccei Dep. Ex. 3 (at CL 01048) ("ask Cecil about whereabouts of David McDonald"). When that failed, the SLC simply did nothing, as Mr. Eio testified:

Q:    [Ms.] Edwards [Cecil Urpsrung's secretary] informed you that she didn't know where he was?

A:    Right.

Q:    And was any other effort made to locate Mr. McDonald?

A:    No.

Q:    Did anyone, to your knowledge, consult, for example, the phone book or Internet directories?

A:    I don't know.

Q:    Who was the person on the committee responsible for trying to track down Mr. McDonald?

A:    It was probably me.  It was me, I should say.

Eio Dep. at 64.

In fact, as the accompanying Declaration of Mr. McDonald demonstrates, Mr. McDonald was available and possessed pertinent information, had the SLC bothered to collect it.  Mr. McDonald indicates that he is aware of several instances in which people with connections at Reflexite were permitted to sell shares in privately-negotiated transactions, including former director Gerry Robinson and officers John Sheppard and Keith Phillips.  McDonald Decl. at ¶ 11.  Mr. McDonald indicates that some of these self-interested transactions occurred as recently as last summer.  Id.  Moreover, Mr. McDonald contradicts Mr. Ursprung's statements to the SLC concerning a conversation between Mr. Ursprung and Mr. McDonald, during which Mr. Ursprung indicated that he would never permit the Franks to sell their shares and specifically acted so as to discriminate against the Franks.  Id. at ¶¶ 4-9.  Mr. McDonald makes clear that while he would have been willing to relate all of this to the SLC, no one ever contacted him.  Id. at ¶ 12.

***The SLC Ignores Other Transactions and Improprieties***

The SLC also pursued a narrowly focused line of inquiry. Although several additional insider transactions were identified to the SLC, the SLC conducted virtually no investigation of them. For example, the Committee did not inquire about Mr. Ursprung's history of selling or buying shares of Reflexite stock. (Eio Dep. 106-07, 17).[8]

The SLC was also aware that former officers David McDonald, Peter Smith and Jim Seely were permitted to sell considerable quantities of Reflexite stock.[9] No one interviewed them. Hull Dep. at 25.[10] Counsel for the SLC, for example, testified that he was only informed of the transactions by Reflexite's CFO, and its outside attorney. Id. at 26. The SLC members themselves relied on their own recollections, rather than an independent investigation, in summarily blessing these transactions. As Peter Eio testified:

> Q:    [T]here was no review by the committee as to what actions, if any, the Board took with respect to, for example, the Smith transaction?
>
> A:    No, we felt when we discussed it that we were sufficiently familiar with the details that we didn't need to dig any further into it. It was—we had all the details of the transaction.
>
> Q:    And that was based on your recollection?
>
> A:    Yes.

Eio Dep. at 102-03 (objection omitted).

Ironically, however, when asked what the details of this transaction were, Mr. Eio had little recollection: "I can't recollect what the actual facts were, except that it was a termination agreement and a noncompete clause attached to it." Eio Dep. at 103. Thus, while the SLC

---

[8] In addition, Mr. Ursprung's wife owned and has sold shares of Reflexite stock. Baccei Dep. Ex. 3 (at CL 01045)

[9] These transactions were apparently arranged by Defendant Ursprung. Rowland Dep. at 70-71.

[10] In fact, there appears to have been disagreement as to whether the SLC was investigating other transactions at all. "Q: Would it be fair to say that what the committee was attempting to discern was whether or not any of the directors engaged in improper or unlawful, self-interested transactions? A: I would not agree with that at all." Hull Dep. at 31 (objection omitted).

members based their assessment of these transactions on their "recollection," there was hardly any recollection on which the SLC could base a conclusion that these transactions were proper.

In addition, the SLC was informed that certain directors had procured after-the-fact waivers for sales of Reflexite stock they had engaged in that violated the Shareholders' Agreement.  One such transaction was by director and former SLC member Worth Loomis.  The SLC deemed this an "oversight," but made no effort to inquire as to whether other comparable waivers had been sought or procured.  Eio Dep. at 126-27 ("We are not aware of others.  I don't think we specifically inquired whether similar transactions had occurred.").

The SLC also made no investigation into the Franks' claims that they had improperly been denied information.  As Mr. Baccei testified, that was "not really a part of the SLC investigation."  Baccei Dep. at 104.  In fact, the SLC left that issue to the discretion of Reflexite's management—the very same management accused of denying the Franks information in the first place.  Id. at 104-05.

***The Rowland Transaction***

The only transaction that the SLC spent any time reviewing was the transaction under which Reflexite paid some $8.1 million to director Bill Rowland between 1998 and 2001 in return for Mr. Rowland's approximately 277,000 shares of Reflexite stock.  Although Mr. Rowland testified that the transaction was proposed to him by Reflexite, Rowland Dep. at 41, the SLC viewed it as a transaction that came about at Mr. Rowland's request to address his estate planning concerns.  Eio Dep. at 84-85; Baccei Dep. at 113.  The SLC's report makes no mention of this discrepancy.

With Reflexite's annual net income of less than $4 million, and with current assets of only approximately $20 million, this transaction represented a massive investment of the

company's resources. See Baccei Dep. Ex. 11. Even SLC Chairman Peter Eio conceded the unusual nature of this massive giveaway of the company's assets: "Q: Did it strike you as unusual in any way that so much money was given to one director of the company? A: Yes, it is unusual." Eio Dep. at 123 (objection omitted). Mr. Eio conceded that in his experience as a director of several companies, he has never seen a similar transaction. Id.

Not surprisingly, Reflexite did not have the financial resources available to effectuate this enormous transaction with its cash on hand. See Baccei Dep. Ex. 3 (at CL 01030) ("Bank financing was required for initial payment."); see also Baccei Dep. Ex. 11 (at WPR 018) (indicating cash on hand of only $1,020,000). It therefore had to incur substantial indebtedness, both to its commercial bank and to Mr. Rowland, to finance its payments to Mr. Rowland. Eio. Dep. at 109. Indeed, Reflexite was forced to enter into subordination agreements with its existing bank to bring about the Rowland transaction. Rowland Dep. at 53 ("Fleet asked to have this loan subordinated").

The SLC discovered that the Board's evaluation of the Rowland transaction was surprisingly single-minded. Although the Board performed a cash flow analyses to ensure that the transaction would not render Reflexite insolvent, little inquiry appears to have been made into the specific benefits Reflexite would receive for entering into so vast a transaction. When asked whether the board had analyzed what better uses the $8.1 million could be put to, Mr. Eio testified "No. That alternative was not looked at in that context." Eio Dep. at 90. Little analysis appears to have been given to the question of whether lining Mr. Rowland's pockets at the expense of the company and other shareholders was the best use of Reflexite's resources:

> Q:    Do you know whether there was any discussion as to whether paying the money to Mr. Rowland was a better or worse investment than other investments the corporation could make?

A:     I don't recollect a discussion of that.

Q:     Did you inquire into whether there was a debate about that?

A:     No.

Eio Dep. at 91 (objections omitted).  Mr. Rowland testified that he was not aware of any studies

or analyses as to what product development or other investments Reflexite could have engaged

in instead of paying him $8.1 million.  Rowland Dep. at 54.[11]  At the same time, however, the

documents reveal extensive analysis of the specific benefits to Mr. Rowland of the transaction.

See, e.g., Baccei Dep. Ex. 13 (noting "Benefits to Bill Rowland" and "Risks to Bill Rowland").

The main impetus for entering into the transactions appears to have been to assist Mr.

Rowland with his estate planning concerns and to reward Mr. Rowland for having founded

Reflexite.  Eio Dep. at 89-90.[12]  When Mr. Rowland was asked why Reflexite decided to

purchase $8.1 million in shares from him and only him, all he could come up with was "because

I'm nice, I'm a nice guy.  I don't know how you can answer that."  Rowland Dep. at 50.  Mr.

Rowland himself conceded that the same purported benefit to the corporation of redeeming

shares would have resulted from redeeming shares from all shareholders.  Rowland Dep. at 50.

What little analysis the Board did perform as to the Rowland transaction was ignored by

the SLC.  Although the SLC was told that the board had reviewed cash flow and other financial

of the Rowland transaction, Mr. Eio conceded that the SLC "did not review them."  Eio Dep. at

92.  In fact, he testified, "I don't know if they existed."  Id.  He explained that his assessment of

---

[11] Moreover, the SLC appears not to have engaged in any independent assessment of whether the promissory note Reflexite issued to Mr. Rowland was appropriate and in the company's best interests.  Hull Dep. at 28.

[12] Of course, the SLC failed to notice or mention in its report that Mr. Rowland, in addition to the massive $8.1 million pay-out by Reflexite, also had several contracts with Reflexite guaranteeing him thousands and thousands of dollars of compensation each year.  Rowland Dep. at 61-62.  Mr. Rowland receives monthly payments of $8,333.33 under a "non-compete" agreement for life, notwithstanding the restrictions on his ability to compete with Reflexite by virtue of his position as director.  Rowland Dep. at 62.  Mr. Rowland also receives $25,000 per year in deferred compensation.  Id. at 63-64.

the board's analysis was supported solely by the recollection of himself and Reflexite CFO Phil Ferrari:

> Q:    So as part of the committee review, the committee itself did not review the analyses of cash flows or balance sheet impact or what have you?
>
> A:    No.
>
> Q:    So the committee relied on Mr. Ferrari's recollection of what those were?
>
> A:    Yes.  And my recollection.

Eio Dep. at 92-93.  When asked whether Mr. Eio reviewed any documents to "confirm that your recollections were correct," Mr. Eio testified "No."  Id. at 93.  Thus, rather than conduct an independent review, the SLC simply relied on its own subjective memories and those of others close to the transaction.[13]

The SLC did not even bother to inquire into the few alternatives that were proposed to the Rowland transaction.  For example, someone on the Board (it is not clear who) suggested a partial redemption rather than a full $8.1 million redemption of Mr. Rowland's shares.  Loomis Dep. at 48.  This was rejected because of negative tax implications for Mr. Rowland.  Id.  The SLC never bothered to inquire as to what concerns might have prompted certain board members to seek a less expensive alternative for Reflexite:  "Q: Do you know why a partial redemption was raised?  Did you inquire as to why that alternat[ive] was proposed?  A:  I didn't inquire, no."  Eio Dep. at 86 (objection omitted).  Counsel for the SLC similarly stated that he did not "know why" the Board considered alternatives to the Rowland transaction.  Hull Dep. at 13.

The SLC was aware of concerns about leveraging the company raised in other contexts,

---

[13] At the same time, memory failed to as whether Mr. Rowland was present at the Board meeting at which Reflexite voted to give him $8.1 million.  The minutes of the Board meeting at which the transaction was affirmed reflect that Mr. Rowland attended the meeting, but do not indicate that he absented himself at any point.  Rowland Dep. Ex. 7.  Notes from counsel for the SLC indicate that "no one specifically remembers Bill Rowland excusing himself, but that was the standard procedure at Reflexite."  Baccei Dep. Ex. 3 (at CL 01043).

but it made no mention of these concerns when discussing the Rowland transaction.  For example, when asking Phil Ferrari about Reflexite's relatively small general buy-back program, Mr. Ferrari indicated that more significant repurchases of shareholders' stock were not pursued because the company "thought it was better to pursue product development than to leverage the Company."  Baccei Dep. Ex. 3 (at CL 01026).  No one appears to have asked why, in the context of the massive payout to Bill Rowland, these same concerns were not addressed.

***The SLC Report Misrepresents That the Rowland Transaction Was Disclosed to Shareholders***

Despite its size, complexity, burden on the company and lack of business justification, the Rowland transaction was not disclosed to Reflexite's shareholders.  Reflexite's 1998 annual report to shareholders makes no mention of the Rowland transaction.  Eio Dep. at 95-96; Baccei Dep. Ex. 11.  As Reflexite's CFO, Phil Ferrari, told the SLC, the details concerning the Rowland transaction were revealed only in financial statements which were "available but not given unless asked for.  No one asks."  Baccei Dep. Ex. 3 (at CL 01030).  Thus, a Reflexite shareholder could have learned of the Rowland transaction only after the fact, and only if he knew to ask for the particular financial statements in which the details of the transaction were buried.  And the directors knew that no one ever asked for such statements.  <u>Id.</u>

The SLC's report, however, <u>falsely</u> asserts that the Rowland transaction "was reported to the corporation's shareholders in the corporation's annual report for fiscal year 1998."  Report, at 3.  As Mr. Eio admitted, this statement is simply not true:

> Q:    But you understood that it was the case that shareholders would not be informed about the Rowland transaction unless they specifically asked to receive the statement?
>
> A:    Yes, I understand that.
>
> Q:    Okay.  So when we look at page 3 of the report, which is Exhibit 2, and we look at the fourth paragraph there, when it says "The Rowland

> transaction was reported to the corporation's shareholders in the corporation's annual report for fiscal year 1998," that statement is incorrect? Isn't that right?

A:    Yes.

Q:    And the only way that a shareholder would have learned about it is if they asked for the financial statements from the company? Isn't that right?

A:    I believe so, yes.

Q:    They only would have obtained those financial statements after the transaction has been completed?

A:    Correct.

Eio Dep. at 99-100; <u>see also</u> Baccei Dep. Ex. 11.

### *The Report of the SLC*

The Report of the SLC glosses over or ignores most of the problems and issues identified above, and quickly concludes in a mere seventeen pages that the derivative claim should be rejected. The report was drafted entirely by the SLC's counsel. Eio Dep. at 67-68. The SLC members themselves provided light comments to a single draft prior to the final meeting of the SLC on April 28, 2003. By Mr. Eio's own admission, the comments of the SLC members on the report drafted by counsel were provided orally, and were not extensive. Eio Dep. at 70-72.

The few comments the SLC members provided are revealing as to the bias of the SLC. The initial draft by counsel reported that Mr. Ursprung "has no recollection" of telling David McDonald that the Franks "will never get liquid as long as I am President of Reflexite." Baccei Dep. Ex. 8. SLC member Lou Baccei, however, directed that the final report be changed to indicate that Mr. Ursprung "denied" having said this. Baccei Dep. at 68-69; Report at 5. The report makes no mention of the fact that its counsel apparently recalled the exchange somewhat differently.

The SLC's report also demonstrates an undue fascination with the Franks' history of buying and selling Reflexite shares. Report at 11-12. While such information might be pertinent to the Franks' <u>direct</u> claims against the directors of the company, it has little relevance to whether Reflexite's directors engaged in improper self-interested transactions. Indeed, when Worth Loomis was asked how Mr. Frank's stock history was pertinent to whether any of the directors had engaged in self-interested transaction, he conceded "I guess I don't know." Loomis Dep. at 51. The only useful purpose in detailing the stock history of the Franks would be to assist the Defendants in addressing the Franks' direct claims—something with which the SLC should have had no involvement.

Perhaps more notable than what is contained in the SLC's report, however, is what is <u>not</u> contained in it. The SLC Report, for example, does not acknowledge any of the procedural problems that befell it, such as the facts that:

- The SLC failed to contact witnesses who were identified to the SLC as having pertinent information, such as David McDonald.

- Mr. Loomis withdrew as chairman because he was personally involved with and, in fact, the champion of, the Rowland Transaction.

- Robinson & Cole, the very same law firm that represented Reflexite in the Rowland transaction, was thrust on the SLC in lieu of Cummings & Lockwood to save costs, and advised the SLC on various matters.

- At Cecil Ursprung's urging, the SLC forced its counsel to stop all work and considered proceeding without assistance from independent outside counsel.

- At Cecil Ursprung's instance, the Board would not consider granting the SLC additional time to complete its analysis.

- The SLC did not interview Mr. Loomis after learning that at least one person described him as the "champion" of the Rowland transaction.

The SLC Report is similarly silent on any facts of substance contrary to the conclusion that SLC members determined to recommend to the Board. For example, for reasons unknown,

the SLC Report makes no mention at all of the facts that:

- No actual notice was given to shareholders either before or after the Rowland transaction, nor was any explanation offered as to why no notice was given. In fact, the Report falsely states that the Rowland transaction "was reported to the corporation's shareholders in the corporation's annual report for fiscal year 1998." Report at 3.

- Mr. Rowland's recollection that the Rowland transaction was Reflexite's suggestion, not his, was flatly contradicted by every other person who spoke to the SLC.

- Personnel at Reflexite expressed concerns about leverage and about foregoing product development opportunities as a reason why the company did not engage in larger buybacks of shares from shareholders, but no reference was made to these concerns in the context of the Rowland or other directors' transactions.

- The SLC never uncovered any of the data or analyses on which the Board reportedly relied in assessing the Rowland transaction.

- No one, other than Mr. Rowland himself, recalls Mr. Rowland leaving the room when the Board discussed and voted on the decision to borrow extensively to give him a $8.1 million payout.

- The "benefits" that Reflexite hoped to achieve through the Rowland transaction were benefits that it could have realized by a repurchase of shares from any or all of its shareholders.

- The only explanation anyone could offer for why Reflexite should borrow $8.1 million to benefit Mr. Rowland but not other shareholders was Mr. Rowland's status as director and founder of the company.

- The SLC did not receive written confirmation of each director's sales or purchases of Reflexite stock.

- The SLC did not examine the circumstances surrounding the sales of Reflexite stock by directors and officers other than Mr. Rowland.

- The Franks' demand as to lack of information was not investigated by the SLC at all.

In short, every fact that was in any way contrary to the conclusion that the SLC wished to propose somehow did not find its way into the final report. The SLC's report is not a careful, detailed analysis of the allegations of the Demand Letter. It is a cursory discussion of a handful

-20-

of second-hand facts intended to prop up the Committee's foregone conclusion—to dispense with the derivative action.

**ARGUMENT**

I.    **THE STANDARD OF REVIEW FOR EVALUATING DECISIONS OF A SPECIAL LITIGATION COMMITTEE.**

Section 33-724 of the Connecticut General Statutes provides that where a corporation assembles a special litigation committee to investigate a shareholder derivative demand, the complaint will be dismissed if the committee "has determined in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation."  See also In re Oracle Corp. Derivative Litig., 824 A.2d 917, 928 (Del. Ch. 2003) (dismissal is warranted only if "(1) its members were independent; (2) . . . they acted in good faith; and (3) . . . they had reasonable bases for their recommendations."); see also Zapata Corp. v. Maldonado, 430 A.2d 779, 788-89 (Del. 1981).[14]

Courts view the determinations of a Special Litigation Committee with considerable skepticism.  As the Court observed in Joy v. North, 692 F.2d 880 (2d Cir. 1982):

> The reality is . . . that special litigation committees created to evaluate the merits of certain litigation are appointed by the defendants to that litigation. It is not cynical to expect that such committees will tend to view derivative actions against the other directors with skepticism. . . . The conflict of interest which renders the business judgment rule inapplicable in the case of directors who are defendants is hardly eliminated by the creation of a special litigation committee.

---

[14] Reflexite is a Connecticut corporation, and therefore Connecticut law applies.  Because the courts of Connecticut frequently look to the corporate law of other states, including Delaware, and because the Defendants themselves cite to Delaware law and argued for the application of Delaware in their motion for a stay of discovery earlier in this case, this Memorandum refers to the law of Delaware and elsewhere throughout.

Id. at 888.[15]

Not surprisingly, courts find that the quantum of proof that must be offered to defeat a motion to dismiss is not substantial. The familiar summary judgment standard applies: if there is any material disputed fact as to whether the SLC was independent, acted in good faith, or had a reasonable basis for its recommendations, the motion to dismiss must be denied. In re Oracle, 824 A.2d at 928-29; see also Zapata, 430 A.2d at 789 (finding that the Court must be "satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations" to proceed to "the next step"); see also Scattered Corp. v. Chicago Stock Exch., Inc., 701 A.2d 70, 75 (Del. 1997) (observing that a "reasonable doubt" sufficient to defeat a motion to dismiss may be created by allegations of bias, lack of independence, or failure to conduct a reasonable investigation), overruled in part on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

As noted below, there is more than a disputed question of fact or reasonable doubt as to the independence, reasonableness and good faith of the Special Litigation Committee of Reflexite's Board. The evidence adduced here demonstrates that the SLC was not independent, because it was under the sway and direction of the very directors it was formed to investigate. The evidence also demonstrates that the SLC's investigation was a hasty and perfunctory affair designed to lead to a foregone conclusion regardless of what facts the SLC happened to uncover.

---

[15] Reflexite advances the remarkable argument that Joy v. North is somehow no longer good law in light of a California case, Finley v. Superior Court, 80 Cal. App. 4th 1152, 1159 (Cal. Ct. App. 2000). Research has revealed no Connecticut or Second Circuit precedent suggesting that Joy v. North is not good law. To the contrary, Conn. Gen. Stat. § 33-724 codifies and affirms several key features of the Joy decision.

## II. THE SPECIAL LITIGATION COMMITTEE WAS NOT "INDEPENDENT" BECAUSE OF THE UNDUE CONTROL EXERTED OVER IT BY INTERESTED PARTIES.

In reviewing the independence (*vel non*) of a special litigation committee, courts exercise exacting scrutiny. "[B]ecause the members of an SLC are vested with enormous power to seek dismissal of a derivative suit brought against their director-colleagues . . . the Court of Chancery must exercise careful oversight of the bona fides of the SLC and its process." Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1055 (Del. 2004); In re Oracle, 824 A.2d at 940-41 (same); see also Houle v. Low, 407 Mass. 810, 821 (1990) (judicial scrutiny of an SLC's independence should purge any danger of "taint"). Thus, one measures the independence of the SLC "by a yardstick that must be 'like Caesar's wife'—'above reproach.'" Beam, 845 A.2d at 1055.[16]

The term "independence" signifies that "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1984), overruled in part on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000). While a direct financial interest in the outcome of the investigation is a classic example of a lack of independence, it is "not the only criteria with which the disinterestedness of corporate directors can be measured." Mills v. Esmark, Inc., 544 F. Supp. 1275, 1284 n.6 (N.D. Ill. 1982). Social ties to interested directors or others,[17]

---

[16] Reflexite's argument that the issuance of a demand letter concedes the independence of the board of directors is fatuous. Br. at 9. First, Connecticut Gen. Stat. § 33-722 requires that demand be made in advance of bringing suit regardless of the shareholder's belief as to the Board's independence. Had a demand not been made, Reflexite would certainly argue for dismissal on that basis. Second, Reflexite formed an SLC. By Reflexite's own logic, this should concede the absence of independence. Third, the courts have rejected the inference Reflexite urges on the Court: "[i]t is not correct that a demand concedes independence 'conclusively' and *in futuro* for all purposes relevant to the demand." Scattered Corp., 701 A.2d at 74-75.

[17] "[O]ur law also cannot assume -- absent some proof of the point -- that corporate directors are, as a general matter, persons of unusual social bravery, who operate heedless to the inhibitions that social norms generate for ordinary folk." In re Oracle Corp. Derivative Litig., 824 A.2d 917, 938 (Del. Ch. 2003).

dependence on other directors for personal income,[18] or other controlling influences by other directors[19] all constitute barriers to independence. In short, if, "for any substantial reason," a director's decision is based on something other than the best interests of the corporation, that director is not independent. <u>Parfi Holding AB v. Mirror Image Internet, Inc.</u>, 794 A.2d 1211, 1232 (Del. Ch. 2001), reversed and remanded on other grounds, 817 A.2d 149 (Del. 2002).

In this case, the SLC was not independent because it was subject to undue influence and interference from interested parties. The SLC was unduly influenced by, and indeed under the control of, interested director Cecil Ursprung and others in several separate and important ways.

<u>First</u>, Mr. Ursprung (together with Mr. LoVetere) hand-selected the members of the SLC, and chose individuals whom he knew he could count on to favor his side of the dispute. The three directors chosen were directors whom Mr. Ursprung had introduced to Reflexite in the first place and who had Mr. Ursprung to thank for their status as Reflexite directors. Indeed, each of the three directors chosen sat on the Compensation Committee—the committee that determined Mr. Ursprung's compensation—giving Mr. Ursprung the confidence that the SLC members were directors who favored him.[20] In short, the manner in which the Committee was appointed demonstrates a "structural bias" weighing heavily against independence. <u>See Johnson v. Hui</u>, 811 F. Supp. 479, 486 (N.D. Cal. 1991); <u>see also In re Oracle Sec. Litig.</u>, 852 F. Supp. 1437,

---

[18] The SLC must demonstrate that none of its members are "compromised by a fear that support for the procession of this suit would endanger [their] ability to make a nice living." <u>In re Oracle</u>, 824 A.2d at 930.

[19] <u>See</u> 1 ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23 (1994); <u>Harhen v. Brown</u>, 431 Mass. 838, 843 (2000).

[20] In addition, Mr. Loomis and Reflexite Director and Defendant Stephen Raffay had formerly worked together as officers at Dexter Corporation, and Mr. Baccei and Reflexite Director and Defendant Ted Patlovitch were formerly colleagues at Loctite Corporation. Loomis Dep. at 8-9; Baccei Dep. at 9-10. Thus, the SLC members had extensive ties with the directors whose conduct they were supposed to be reviewing.

1441 (N.D. Cal. 1994).[21]   From the very start of the Committee, Mr. Ursprung's influence loomed large and negated the Committee's independence.

Mr. Ursprung was also involved in the SLC's decision to hire outside counsel.  Ursprung Dep. at 23.  Indeed, Mr. Ursprung testified that his discussions concerning the SLC's hiring of outside counsel were with Jack Kennedy, an outside attorney representing Reflexite.  Id. at 26. Mr. Ursprung thus not only chose the SLC members themselves, but was involved with Reflexite's outside counsel in hiring attorneys for the SLC.

Second, Mr. Ursprung wielded undue influence over how the SLC performed its work. Notwithstanding the lean Committee's substantial reliance on outside counsel, Mr. Ursprung made his concerns about the fees of the SLC's counsel clearly and repeatedly known to the members of the SLC.  He then directed the SLC members to instruct the Committee's counsel to take a "time out," at the early stages of the project, in order to reduce fees.[22]  The SLC stopped its work for more than a week at a crucial point in its investigation, at which time the SLC members, again urged on by Mr. Ursprung's concerns about fees, told the SLC's lawyers that they would carry on without the help of independent outside counsel.  Indeed, the SLC members proposed to rely on Reflexite's usual outside counsel—the same firm that advised the company during the challenged self-interested transactions and that now represents Reflexite in its present motion—and to write the report by themselves.  Mr. Ursprung thus managed to stop the SLC's work at a critical time and restrict the SLC's ability to rely on outside counsel.  Rather than permitting the SLC to conduct its affairs independently, Mr. Ursprung improperly injected

---

[21] In order to determine the existence of structural bias a court should ask whether the "manner in which the SLC was appointed and proceeded was one which was inevitably bound to be empathetic to defendants, and, therefore, biased in favor of terminating the litigation." Johnson, 811 F. Supp. at 486 (citations omitted).

[22] "I expressed the opinion that the billings were going far beyond what the members of the board had estimated and that the committee should take a pause . . . ." Ursprung Dep. at 30.

himself into its business and controlled the manner in which the SLC performed its work.[23]

Third, Mr. Ursprung dictated the pace of the SLC's work and the manner by which it presented its findings to the full Board of Directors. The SLC got off to a slow start because of the lack of independence of its first chairman. Towards the end of its work, facing "time constraints" and the travel schedule of substitute SLC Chairman Peter Eio, the SLC asked Mr. Ursprung to delay the board meeting at which the SLC would present its results or to establish a special meeting in which to do so. Mr. Ursprung declined, forcing the SLC to meet its original deadline. In addition, it was Mr. Ursprung, and not the SLC itself, that made the determination that the counsel for the SLC would not attend the full board meeting or present any findings, notwithstanding the fact that the SLC's counsel did much of the investigation and wrote the Report. Thus, Mr. Ursprung dictated both the sufficiency of the SLC's work and the manner in which it would present its conclusions to the Board.

Fourth, the independence of the SLC was compromised by the involvement of Reflexite's usual counsel, Robinson & Cole, in the process. Robinson & Cole, the same firm that represented Reflexite in the Rowland transaction and at all times since, was tasked with the responsibility of determining the independence of the SLC's original Chairman, Worth Loomis. Robinson & Cole was also involved in communicating to the SLC Mr. Ursprung's concerns about fees, and lawyers from Robinson & Cole attended the SLC's interview of William Rowland. Robinson & Cole was also responsible for collecting and providing documents to the SLC for the SLC's review. In short, Robinson & Cole, which was "inevitably subservient" to the interested board members to whom it answered, and should have played no role in the SLC's

---

[23] Significantly, the SLC understood the impropriety of Mr. Ursprung's involvement with the SLC. When Dianne Edwards, Cecil Ursprung's secretary, volunteered to act as secretary to the SLC, her request was denied. Loomis Dep. Ex. 5.

work at all, In re Oracle Securities Litig., 829 F. Supp. 1176, 1189 (N.D. Cal. 1993), acted as a gatekeeper and a bottleneck.[24]  Its involvement further demonstrates that the SLC was not independent.

In short, the evidence is clear that the work of the SLC was overshadowed by the influence of interested directors whom the SLC was charged to investigate.  It simply cannot be said in this case that the SLC acted in a manner "free from significant contrary personal interests and apart from the domination and control of those who are alleged to have participated in wrongdoing."  Harhen v. Brown, 431 Mass. 838, 843 (2000) (citing Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993)).  This raises grave questions of fact concerning the SLC's independence and militates against dismissal.

---

[24] "Since 'independent' directors are often beholden to the defendant directors who appointed them, the retention of independent counsel by these directors provides one of the few safeguards to ensure the legitimacy of their acts and to aid the court in assessing the reasonableness of a derivative settlement or termination."  In re Oracle, 829 F. Supp. at 1187 (citation omitted).

III.    THE SPECIAL LITIGATION COMMITTEE'S PURPORTED INVESTIGATION INTO THE ALLEGATIONS OF THE DEMAND WAS NOT REASONABLE OR IN GOOD FAITH.

The SLC formed by Reflexite's Board did not discharge its duties in good faith, nor did it conduct the "reasonable inquiry" required by Connecticut General Laws § 33-724(a).  Thus, even if the SLC could somehow be considered independent, the motion to dismiss must still be rejected because the SLC's analysis and decision were not "reasonable and principled."  Houle v. Low, 407 Mass. 810, 826 (1990).[25]

In this case, the facts overwhelmingly demonstrate that the investigation of Reflexite's SLC was not reasonable or in good faith under the circumstances.  First, the SLC failed to make a reasonable inquiry into several important facts and issues of relevance.  Second, as to the transaction the SLC did focus on—the Rowland transaction—the SLC's investigation was cursory at best.  Third, the report of the SLC demonstrates a decided bias by excluding any material information contrary to the conclusion the SLC wished to propose.

A.    The SLC Failed to Make a Reasonable or Good Faith Inquiry Into Numerous Pertinent Issues.

Due to a failure to properly assess the SLC's members' independence and due to the improper interference from Cecil Ursprung and others, the SLC got off to a late start.  Its substantive work did not begin in earnest until the second week of April, leaving it a mere three weeks to complete its entire investigation.  Not surprisingly, the SLC's investigation was hasty

---

[25] The courts have articulated various factors to be addressed in assessing the reasonableness of a special litigation committee's inquiry, including (1) the committee's conduct of fact interviews in connection with the investigation, see Mount Moriah Cemetery v. Moritz, Civ. A. No. 11431, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991), aff'd 599 A.2d 413 (1991); (2) the extent of the committee's review of documents in connection with the investigation, see Mount Moriah Cemetery, 1991 WL 50149 at *4; (3) the committee's engagement of capable counsel to assist in the investigation, Carlton Investments v. TLC Beatrice Holdings, Inc., Civ. A. No. 13950, 1997 WL 305829, at *12 (Del. Ch. May 30, 1997); Katell v. Morgan Stanley Group, Inc., Civ. A. No. 12343, 1995 WL 376952, at *10 (Del. Ch. June 15, 1995); (4) the board's creation of a committee consisting of members with "fresh sets of eyes," Katell, 1995 WL 376952, at *9; and (5) the level of expertise of any committee members chosen by the board to investigate the matter.  Id. at *10.  Unreported authority cited are provided in a Compendium accompanying this memorandum.

and incomplete.  For example,

- The SLC met only four times, twice by telephone, with the longest meeting lasting a mere hour and a half.  Report, Exhibit A; Loomis Dep. at 44.

- The SLC made a single request for documents to Reflexite's counsel and never asked the targets of its inquiry for their documents.  Baccei Dep. at 75-76; Rowland Dep. at 83; Ursprung Dep. at 43.  The SLC also made no independent determination whether Reflexite complied with the SLC's document requests. Baccei Dep. at 78.

- The SLC's six interviews were remarkably brief and largely by telephone. Report, 2-7.  Mr. Rowland was interviewed by telephone for only about a half hour, Mr. Frank was questioned over the telephone for only about twenty minutes and Stephen Raffay's telephone interview was a mere fifteen minutes.  Rowland Dep. at 81; Simes Decl. at ¶ 4; Baccei Dep. at 105-06.

- The SLC did not interview people whom it knew had pertinent information, such as Worth Loomis, David McDonald, Peter Smith, Jack Kennedy and others.  Eio Dep. at 62-63; Loomis Dep. at 38-39.

Not only was the method of the SLC's "investigation" unreasonable, but so was its scope. Many important issues raised in the Demand Letter were simply ignored by the SLC, or were looked at in the most cursory fashion.  For example, the SLC did not bother to inquire into allegations that Cecil Ursprung sold shares in a self-interested transaction.  Eio Dep. 106-07, 17. The SLC made no inquiry into the allegation that certain directors improperly obtained retroactive waivers to engage in stock sales prohibited by the Shareholders' Agreement.  Eio Dep. at 126-27.  The SLC relied on its own incomplete memory rather than an independent investigation as to transactions by other Reflexite insiders, such as Peter Smith, David McDonald and Jim Seely.  Eio Dep. at 102-03.  And the SLC made no inquiry into the allegation that the Franks were denied information, but delegated that inquiry to the very same management accused of denying the Franks information.  Baccei Dep. at 104-05.

As the courts have recognized, it is the duty of a special litigation committee to "engage[] in a reasonably thorough investigation of the facts underlying [the pertinent] allegations."

Electra Investment Trust P.L.C. v. Crews, No. 15890, 1999 WL 135239, *1 (Del. Ch. Feb. 24, 1999) (refusing to dismiss a derivative action); see also Zapata Corp. v. Maldonado, 430 A.2d 779, 788 (Del. 1981).  Among other things, a special litigation committee has a duty to speak to people with pertinent knowledge and test the facts presented to it by the insiders.  In Electra, for example, the court noted that a proper investigation of plaintiffs' breach of fiduciary duty claim against the CEO of a corporation should have included outside sources of information to verify or contradict the CEO's version of the facts.  1999 WL 135239 at *5.  In the instant case, the Special Litigation Committee simply accepted the say-so of certain insider witnesses as to what happened in the Rowland transaction, for example, or credited the memories of insiders without any effort to independently verify the truth.  Virtually no effort was made to locate key witnesses such as David McDonald, undermining the notion that the SLC performed its work in good faith. Eio Dep. at 63-64.

In summary, the SLC's inquiry was extraordinarily limited, hastily performed and one-sided.  It is with good reason therefore that the recitation of relevant facts in the SLC's report barely takes up half of its scant seventeen pages.  Serious issues of fact exist as to the reasonableness of the SLC's investigation and whether that investigation was inadequate to support its conclusions.  As a result, Reflexite's motion to dismiss should be denied.

**B.    The SLC's Inquiry Into the Rowland Transaction was not Reasonable or in Good Faith.**

As noted above, the only transaction the SLC focused on was the Rowland transaction, but even as to that transaction, the SLC's investigation was not reasonable.  Despite the fact that this was a massive transaction that even the SLC Chairman agreed was "unusual" (Eio Dep. at 123), the SLC's inquiry was marred by several fundamental flaws, including:

- • The SLC never examined the documents or analyses on which the Board relied in approving the Rowland transaction, but merely relied on its own flawed

recollection of those analyses. Eio Dep. at 92-93. Thus, the SLC did not perform an independent evaluation of whether the transaction was in Reflexite's best interests.

- The SLC never examined or inquired into what alternatives to the transaction were proposed, or what alternate uses for the $8.1 million were available. Eio Dep. at 90-91. Thus, the SLC has no basis for knowing whether the payment of $8.1 million was a good or bad idea from Reflexite's perspective. Indeed, heightening the very notion of self-dealing, the SLC uncovered mainly evidence of the Board's concern for Mr. Rowland.

- The SLC did not interview persons integrally involved with the Rowland transaction, such as Worth Loomis, a "champion" of the transaction. Baccei Dep. Ex. 3 (at CL 01067); Loomis Dep. at 38-39. The SLC's interview of Stephen Raffay—the only person it interviewed from the Reflexite committee that analyzed and recommended the transaction—lasted a scant fifteen minutes. Baccei Dep. at 105-06.

- The SLC falsely stated in its report that the Rowland transaction was disclosed in Reflexite's annual report for 1998 when in fact it was not, and no disclosures were made to shareholders concerning the Rowland transaction. Eio Dep. at 99-100; Baccei Dep. Ex. 11.

Simply put, the SLC never had before it sufficient information by which to independently evaluate the Rowland transaction. Its few inquiries into the matter were brief and cursory. It failed to talk to people directly involved in the transaction. It never bothered to obtain the documents actually relied on by the Board in approving that transaction. Its report as to the transaction was concededly inaccurate and contains false statements—such as that the transaction was disclosed in Reflexite's Annual Report, which it was not. Baccei Dep. Ex. 11. Under circumstances such as these, where "the scope of the underlying investigation" is "troubling," dismissal is inappropriate. Electra, 1999 WL 135239 at *5. The SLC's inquiry into the Rowland transaction was anything but the reasonable, good faith analysis required to warrant dismissal of a derivative action.

Moreover, that the SLC only focused on the Rowland transaction, to the exclusion of all other improper conduct raised in the Demand Letter, itself demonstrates the SLC failed to

perform its role reasonably and in good faith.  In <u>Electra</u>, the court refused to approve a settlement agreement negotiated by a special litigation committee appointed to investigate the plaintiffs' derivative claims where the agreement solved most of the alleged abuses, yet "downplayed the significance" of some of the other claims without conducting a reasonably thorough investigation of the facts underlying those claims.  1999 WL 135239 at *1.  Highly similar circumstances existed here:  although the SLC purported to investigate the Rowland transaction and discuss it in its report, virtually no consideration or discussion is given to the allegations, for example, that Cecil Ursprung and other directors improperly sold shares or that other directors procured after-the-fact waivers or shareholders' rights to sell shares.  The single-mindedness of the SLC's report and its excessive focus on the Rowland transaction, in the face of other substantial allegations, further underscores the lack of a reasonable investigation.

## C.    The SLC's Report is Biased and Its Conclusions Are Not Supported by the Facts.

What is perhaps most interesting about the short, seventeen-page[26] report produced by the SLC is that it contains not a single fact or reference that might in any way cast doubt on its conclusions.  This was not because such facts did not exist—to the contrary, even the cursory record before the SLC raised serious questions about the matters raised in the Demand Letter.  Rather, this was because the SLC was biased and sought to produce a report that would provide cover for the Defendants.

As noted above, the SLC Report is oddly silent about the reasons why Mr. Loomis resigned from the SLC after presiding over it as chairman at its first meeting.  There is no mention at all that Mr. Loomis sponsored the Rowland transaction, nor is there any mention of

---

[26] "[T]he developing rule of thumb in this jurisdiction would appear to be that a report by a Special Litigation Committee recommending dismissal of a derivative suit must be at least 150 pages in length, exclusive of appendices and attachments.  Presumably, length is thought to be supportive of thoroughness and good faith on the part of the Committee."  <u>Kaplan v. Wyatt</u>, 484 A.2d 501, 510 (Del. Ch. 1984), <u>aff'd</u> 499 A.2d 1184 (Del. 1985).

the fact that after learning this, the SLC members took no steps at all to try to learn more about what Mr. Loomis knew or did with respect to that transaction.

The SLC Report similarly makes no mention at all of the improper influence exerted by Mr. Ursprung, Mr. LoVetere and Reflexite's outside counsel. The Report neglects to mention that Mr. Ursprung arranged for the SLC to stop its work until the second week of April and that after the SLC began its work and found itself under time constraints, Mr. Ursprung was the one who would not grant any extensions.

The SLC Report also offers no explanation why witnesses who the SLC members conceded were likely to have relevant information and who made it onto the SLC's list of people they wanted to interview were never interviewed. The SLC Report is silent, for example, on the fact that David McDonald was never contacted, even though he was specifically identified as someone who knew about the self-interested transactions set forth in the Demand Letter.

The SLC Report is also devoid of any mention of facts that cast doubt on its investigation of the Rowland transaction. The Report falsely states that the transaction was disclosed in Reflexite's Annual Report to shareholders, when the SLC members knew that this was not true, knew that shareholders were not informed of the transaction in advance, and knew that shareholders were not even informed about the transaction after-the-fact. No mention is made of the concerns identified by some at Reflexite about leverage or product development opportunities and no mention is made of the fact that the SLC itself never actually reviewed the documents on which the Board relied in approving the transaction. The SLC Report simply asserts in conclusory fashion that the Rowland transaction was in the best interests of the company. The SLC could not possibly have made that determination in good faith because it made no analysis of the specific benefits of that transaction to the company, nor, indeed, had the

Board at the time of the transaction.

If the Report had been honest, the SLC would have had to disclose that it did not speak to all of the pertinent witnesses and that it reviewed virtually none of the pertinent documents. Those documents that it did review were reviewed largely by counsel under enormous fee pressure. Everything the SLC learned about the transaction was based on the say-so of interested parties and even then virtually no explanation was given as to what alternatives were considered, why they were considered, or why the Board believed the transaction was in the company's best interests.

The SLC Report is even less forthright in its reporting of other challenged transactions. In reality, the SLC performed <u>no</u> investigation of any other transactions. When other self-dealing transactions were specifically identified to the SLC, the SLC members simply relied on their own subjective and, as they themselves concede, faulty memories as to the merits of those transactions. Had the SLC Report been accurate, it would have disclosed that the SLC did nothing to ferret out or investigate any transaction other than the Rowland transaction.

Moreover, the SLC Report discloses a bias in favor of the Defendants by giving undue consideration to the trading patterns of Jon Frank. Although Jon Frank's sales of shares are at best arguably pertinent to the direct claims asserted in this lawsuit, they have no bearing on the derivative claims. That the SLC Report focused on this non-issue suggests that the Report was intended to shield the Defendants from litigation rather than fairly and honestly report on a good faith investigation.

In summary, the SLC Report reflects an attempt to conceal serious problems and gaps in the "investigation" by the SLC. The SLC offers conclusions—often hearsay conclusions related by interested parties—rather than facts to support its determination. All of this speaks to a

Report intended to support the foregone and predetermined conclusion that nothing be done to address the serious allegations raised in the Demand Letter.  For all of these reasons, Reflexite's motion to dismiss should be denied.

CONCLUSION

For the foregoing reasons, Plaintiffs request that Reflexite's motion to dismiss be denied in its entirety, and that the Court grant such other relief as it deems just and proper.

H. JONATHAN FRANK AND 1996 FRANK
FAMILY TRUST,


_____
Jonathan B. Tropp (ct11295)
Terence J. Gallagher (ct22415)
DAY, BERRY & HOWARD LLP
One Canterbury Green
Stamford, CT  06901
(203) 977-7300

-and-

Richard A. Strassberg (ct24905)
Jeffrey A. Simes (ct24906)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
(212) 813-8800

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2004 a true copy of the foregoing document was served by U.S. Mail, postage-prepaid, upon all counsel of record.

James T. Cowdery, Esq.
Sarah A. L. Merriam, Esq.
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703

Edward F. Spinella, Esq.
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103

James T. Shearin, Esq.
Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601-7006

Craig A. Raabe, Esq.
Jason M. Kuselias, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

_____
Terence J. Gallagher