UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| H. JONATHAN FRANK and FRANK FAMILY 1996 TRUST (on behalf of themselves and REFLEXITE CORPORATION), | : : : : | Civil Action No. 3:03-CV- 1014 (JBA) |
| Plaintiffs, | : : | |
| v. | : : | |
| ARTHUR LOVETERE, CECIL URSPRUNG, LOUIS J. BACCEI, WORTH LOOMIS, THEODORE PATLOVICH, STEPHEN J. RAFFAY, WILLIAM P. ROWLAND, PETER EIO (individually and in their capacity as members of the Board of Directors of Reflexite Corporation) and REFLEXITE CORPORATION, | : : : : : : : | DECEMBER 16, 2004 |
| Defendants. | : : | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PREJUDGMENT REMEDY

Pursuant to Federal Rule of Civil Procedure 64 and sections 52-278a et seq. of the Connecticut General Statutes, as adopted by District of Connecticut Local Civil Rule 4(c), H. Jonathan Frank and Frank Family 1996 Trust (the "Franks") seek a prejudgment remedy against Defendants Arthur Lovetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland, Peter Eio (collectively, "Defendants") with respect to both the derivative and direct claims asserted in the Amended Complaint. The Franks seek such a remedy now because the Defendants have announced their intention to cause Reflexite Corporation ("Reflexite") to engage in a ten million dollar tender offer on December 17, 2004 which will enrich the Defendants and impose serious financial risk on Reflexite as well as the Franks. While the Franks do not seek now to enjoin the tender offer, prejudgment relief is required to maintain the status quo, to ensure that the Defendants retain the ability to satisfy any

judgment or court order, and to ensure that the Defendants' unilateral actions do not moot the action by destroying its subject matter.

### BACKGROUND AND PROCEDURAL HISTORY

This motion seeks a prejudgment remedy in light of an announced $10 million Tender Offer by Reflexite set to take place on December 17, 2004 (the "Tender Offer") which will weaken Reflexite financially and which will affect the relationship among the parties even while litigation is pending.

The Franks are longstanding shareholders in Reflexite Corporation, a closely held corporation, who brought this lawsuit to remedy repeated breaches by certain of Reflexite's Directors of their fiduciary duties by improperly seeking to enrich themselves at Reflexite's, and the Franks', expense. The Defendants have done this by repeatedly causing Reflexite to give them "sweetheart deals" which allowed them to sell large quantities of their Reflexite stock back to Reflexite for huge sums of money. Only insiders, and not other shareholders such as the Franks, were permitted to engage in these unlawful transactions, which the Defendants arranged and, in some instances, concealed from Reflexite's shareholders. Although discovery as to the merits of this case has not yet been conducted—the Court has held that discovery in abeyance until resolution of the two pending motions to dismiss[1]—it is already evident that the Defendants have realized <u>millions</u> of dollars of improper gains and saddled Reflexite and its shareholders with the tab, including substantial amounts of debt.

The filing of this lawsuit asserting both direct and derivative claims has apparently not dampened the ardor of the Defendants for taking money out of Reflexite. This Summer, while

---

[1] The Defendants have moved to dismiss (1) for failure to state a claim and (2) based on the purported "investigation" of the Special Litigation Committee ("SLC"). The Court permitted limited discovery into the work of the SLC to determine whether it was, in fact, independent and whether it conducted a good faith investigation of the allegations. Both motions remain pending before this Court.

2

the motions to dismiss were being briefed, Reflexite's Board of Directors announced the approval of a "2004 Stock Option Plan," under which the Board of Directors would have had unfettered discretion to bestow some $9,000,000 worth of stock options on themselves and others they favor.  See Declaration of H. Jonathan Frank ("Frank Decl.") at ¶ 9.  The Franks promptly objected to the Plan on the grounds that it constituted a further breach of the Defendants' fiduciary duties at a time when the breaches of those duties were under adjudication.  Id. at ¶ 10.  Immediately after the Franks asserted their objections, the Board relented and abandoned the Plan.  Id.

Now, the Board has reformulated its strategy for permitting the Directors to liquidate their holdings of Reflexite stock while leaving the financial risk of the corporation on the Franks and other shareholders.  The Board has announced that it has authorized a Tender Offer under which Reflexite will purchase $10,000,000 of its own shares from shareholders.  Id. at ¶ 11.  The Tender Offer, as set forth in the Memorandum the Board issued to describe it to shareholders, requires shareholders to tender their shares on or by December 17, 2004.  Id.

The Tender Offer Memorandum reveals the true intention of the Defendants:  the Directors and Executive Officers of Reflexite will be tendering up to 364,000 shares for millions of dollars of personal gain.  See Frank Decl., ¶ 12 & Ex. A (Tender Offer Memorandum) at 12.  They intend to sell these shares at a price of $35.50 per share—an increase in valuation of more than 30% per share over a one year period.  See Frank Decl., Ex. A at 20.

Under the Tender Offer, Reflexite will incur $10,000,000 in new debt in order to finance the repurchase of shares from shareholders.  See id. at 11.  The principal alone for this vast sum of new debt is more than twice the amount of net income Reflexite reported in the prior fiscal year and is well in excess of all of Reflexite's working capital or available cash flow.  Id. at 29.

3

For a company with nearly $15 million in existing long term debt, the Tender Offer is a massive financial commitment, to say the least. See id. Not surprisingly, the company expects that this new debt will require negotiations with existing lenders to obtain appropriate consents and subordination agreements. Id. at 31.

The financial burden imposed on Reflexite by the Tender Offer is rendered all the more serious by the fact that the Defendants previously issued themselves stock options with associated "puts"—i.e., the right to force Reflexite to repurchase those options. These puts that the Defendants granted to themselves represent a further financial burden believed to be hundreds of thousands if not millions of dollars, exercisable at the will of the Directors. The Franks only learned of these puts through the limited discovery that has been taken to date.[2]

The tender offer is also problematic because the formula by which shareholders may tender shares is designed to shift financial risk to the Franks and other "outsider" shareholders. The Tender Offer will use a "fill the pot" method, under which the initial group of shares is purchased from each tendering shareholder until a shareholder has no more shares to sell or until Reflexite has purchased $400,000 in shares; by this method, small shareholders are more likely to be able to sell their entire shareholdings and they receive a substantial preference over larger shareholders, such as the Franks. See Frank Decl., Ex. A (Tender Offer Memorandum) at 8. The remaining shares are purchased on a pro rata basis from tendering shareholders. Because the Directors and Officers are the largest group of selling shareholders (the company's Employee Stock Option Plan will not be tendering shares, id. at 3), they will receive the lion's share of the benefits. Id. at 32.

---

[2] The puts further prove the validity of the Franks' claims. By granting themselves options with puts, the Defendants essentially created a new class of stock with rights superior to those of other shareholders. This is simply another example of how the Defendants put their own interests above those of Reflexite's shareholders.

4

The effect of the Tender Offer will be to reduce the number of shares outstanding as well as the number of shareholders. See id. at 41. Thus, even after offering shares for sale in the Tender Offer, large shareholders such as the Franks likely will find that they own a larger percentage of the corporation—a corporation now saddled with $10,000,000 in new debt—than before the Tender Offer.

The Tender Offer will substantially change the financial condition of Reflexite and will affect the relationship of the parties. As set forth below, the new circumstances presented by the Tender Offer necessitate prejudgment relief to ensure that the consequences of such substantial activities will not moot this action or work to the detriment of the Franks.

## ARGUMENT

**I.    The Standard For A Prejudgment Remedy.**

Under Connecticut General Statutes Section 52-278c(a)(2), to obtain a prejudgment remedy, a plaintiff must "set[] forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff." Conn. Gen. Stat. § 52-278c(a)(2) (2003). "[P]robable cause is a *bona fide* belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." New England Land Comp., Ltd. v. DeMarkey, Jr., 213 Conn. 612, 620, 569 A.2d 1098 (1990) (quoting Wall v. Toomey, 52 Conn. 35, 36 (1884)) (emphasis in the original). This "is a flexible common sense standard" that "does not demand that a belief be correct or more likely true than false." Id. (citing Texas v. Brown, 460 U.S. 730 (1983)). Indeed, it is irrelevant that "after discovery or a full trial on the

merits, a different result might ensue . . . ." <u>Pitney Bowes Credit Corp. v. Escotel Software, Inc.</u>, CV010183438, 2002 Conn. Super. LEXIS 660, *11 (Conn. Super. Ct. at Stamford Mar. 7, 2002).

The hearing for determining such probable cause is not a "full scale trial on the merits" to determine if plaintiff will prevail, but only a hearing to determine if "there is probable cause to sustain the validity of the claim." <u>New England.</u> 213 Conn. at 620 (citing <u>Ledgebrook Condominium Assn., Inc. v. Lusk Corp.</u>, 172 Conn. 577, 584, 376 A.2d 60 (1977)). The Court determines this by "weighing probabilities" of "both legal and factual issues." <u>Bank of Boston Connecticut v. Schlesinger</u>, 220 Conn. 152, 156, 595 A.2d 872 (1991) (quoting <u>New England</u>, 213 Conn. at 612; <u>Augeri v. C.F. Wooding Co.</u>, 173 Conn. 426, 429, 378 A.2d 538 (1977); <u>Babiarz v. Hartford Special, Inc.</u>, 2 Conn. App. 388, 393, 480 A.2d 561 (1984)). The Appellate Court has stated that even a mere affidavit by the plaintiff can suffice to provide the court with all it needs to meet this broad probable cause standard. <u>Doe v. Rapoport</u>, 80 Conn. App. 111, 117 (2003). Furthermore, the plaintiff need only meet the standard for probable cause for one count of her complaint for the court to award the prejudgment remedy. See <u>Stone v. Frederick Hobby Assoc. II</u>, CV000181620S, 2001 Conn. Super. LEXIS 1853, at *23 (Conn. Super. Ct. at Stamford July 10, 2001) (stating that since the plaintiffs met the probable cause standard on their breach of contract counts, the court ordinarily would "not need to address the plaintiffs' remaining counts.").

Plaintiffs more than meet this standard in this case, as set forth below.

## II.   The Probable Cause Standard is Easily Met Here.

The limited discovery taken so far in this case has amply demonstrated substantial breaches of the Defendants' fiduciary duties, well exceeding the probable cause standard. These breaches are chronicled in detail in the pleadings in this case, as well as the extensive briefing

6

currently pending before the Court which the Franks incorporate herein by reference.[3] A quick summary, however, of some of the evidence available to date, without even the benefit of merits discovery, includes the following:

- The Defendants caused Reflexite to incur heavy debt to confer more than $8 million dollars on Defendant William Rowland between 1998 and 2001 in a transaction as to which no notice was provided to shareholders and which caused Reflexite to incur millions of dollars of debt. This transaction was not analyzed on its merits to Reflexite and, indeed, conflicted with the Board's policy of using working capital for product development opportunities.

- The Defendants voted to give themselves unfettered authority to grant themselves and their chosen beneficiaries stock options with "put" features that could require Reflexite to repurchase the option.

- The Defendants caused Reflexite to make unusual and large purchases of shares from senior executives and current and former Board members, including Cecil Ursprung, Worth Loomis, Jerrold Robinson, David McDonald, Peter Smith and Jim Seely. The details of these transactions were concealed from Reflexite's shareholders.

- Certain Defendants engaged in sales of Reflexite shares without the requisite consents, which the Defendants arranged to procure after-the-fact.

- These special deals and efforts made by the Defendants were made on behalf of "insiders" only, and not outside shareholders such as the Franks.

- The Defendants sought to deflect attention from their misdeeds by responding to the Demand Letter with a Special Litigation Committee that was beholden to and directed by Chief Executive Officer Cecil Ursprung and that performed a whitewash "investigation" as to only certain of the issues raised in the Demand Letter.

- As the Declaration of David McDonald,[4] a former senior executive at Reflexite makes clear, Defendant Cecil Ursprung, Reflexite's CEO, announced his intention to use his influence at the company to prevent the Franks from enjoying their rights as shareholders, and stated that the Franks "will never get liquid as long as I am President of Reflexite." Indeed, the formula the company has used to repurchase shares from shareholders from time to time has been referred to as the

---

[3] Specifically, the Franks' Oppositions to the two motions to dismiss by the Defendants dated December 17, 2003 and June 18, 2004.

[4] The June 18, 2004 McDonald Declaration was submitted to the Court in support of the Franks' Opposition to Reflexite's Motion to Dismiss on the ground of the Special Litigation Committee "investigation."

7

"Frank formula" because of its tendency to exclude the Franks from liquidity opportunities.

See Frank Decl. at ¶ 6 & Exs. B, E & F.

In sum, while the Franks have not had the benefit of extensive discovery, it is already clear that the Defendants' did not exercise their duties as directors in good faith. The Amended Complaint and the briefs already submitted to this Court amply evidence questionable self-dealing conduct on the part of the Defendants, as well as a concerted effort to discriminate against the Franks and deny them their rights as shareholders. As set forth in the accompanying Declaration of H. Jonathan Frank, as a result of the Defendants' wrongful conduct, the Franks expect to prevail on their direct and/or derivative claims in an amount in excess of $8.5 million. Thus, the Franks more than satisfy the low standard of "probable cause" necessary to support this application in that amount.

### III.  The Tender Offer Warrants Immediate Relief to Protect the Interests of the Franks And to Ensure Against Harm to Reflexite.

While there has always been probable cause to support prejudgment relief based on the allegations in the Amended Complaint and the facts developed during the limited discovery taken so far, the Franks seek such relief now because of the Defendants' plan through the Tender Offer, to alter the landscape of this litigation.

The Tender Offer will pose real financial risk to Reflexite. Under the Tender Offer, the company will incur $10,000,000 of new debt, on top of its existing long-term debt of some $15,000,000. These new borrowings will vastly exceed Reflexite's net income, available working capital and cash flow, particularly when viewed in light of the substantial put obligations the Defendants have caused Reflexite to give to them. In short, the Defendants are mortgaging the future of Reflexite in order to obtain cash principally for themselves from the

8

company now.  Prejudgment relief is necessary to ensure that the money taken out of Reflexite by its Directors will be available to satisfy a judgment when the Court finds that the Directors breached their duties to the company.[5]

In addition, the Tender Offer increases the financial exposure of the Franks, even while the Franks have before this Court allegations that the Defendants have unlawfully discriminated against them in breach of the Defendants' fiduciary duties.  Because of its unusual "fill the pot" formula for accepting shares for repurchase, the Tender Offer will favor smaller shareholders such as certain of the Defendants over larger ones such as the Franks.  The Franks will actually see their proportional share of Reflexite's stock increase as a result of the Tender Offer, while a number of smaller shareholders may be able to greatly reduce or even entirely eliminate their shareholdings.  Thus, the Tender Offer will cause the Franks to own an even larger proportion of an even more debt-ridden company than before.  It is not appropriate while this lawsuit is pending for the Franks to bear the financial risks of the Defendants' efforts to take money out of the company.  That risk should be born by the Defendants, against whom prejudgment relief should issue.

Finally, prejudgment relief will promote the status quo.  The Defendants' actions have demonstrated a concerted effort on their part to siphon funds from Reflexite into their own pockets.  The aborted effort this Summer by the Defendants to arrogate to themselves the unfettered right to issue themselves financially attractive stock options was stopped only by the Franks' opposition.  This time, however, the Defendants are determined to proceed over the Franks' opposition.  Absent prejudgment relief, the Defendants' continued efforts to alter the

---

[5] Absent relief allowing the attachment of assets sufficient to protect Reflexite, plaintiffs may be left without a viable remedy as the Defendants could continue to drain Reflexite of its funds and drive the company towards bankruptcy.

9

financial circumstances of Reflexite for their own personal gain could jeopardize Reflexite's continuation as a going concern, even while this lawsuit examines their conduct. Prejudgment relief is therefore essential.

## CONCLUSION

For the foregoing reasons, the Franks' Motion for Prejudgment Remedy should be granted in all respects, and the Court should grant such other relief as it deems just and proper.

H. JONATHAN FRANK AND 1996 FRANK FAMILY TRUST

By_____
Terence J. Gallagher (ct22415)
Jonathan B. Tropp (ct11295)
DAY, BERRY & HOWARD LLP
One Canterbury Green
Stamford, Connecticut 06901
(203) 977-7300  Telephone
(203) 977-7301  Facsimile

Richard A. Strassberg (ct24905)
Jeffrey A. Simes (ct24906)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York 10022
(212) 813-8800  Telephone
(212) 355-3333  Facsimile

Their Attorneys

## CERTIFICATE OF SERVICE

       I hereby certify that on December 16, 2004 a true copy of the foregoing document was served via overnight courier upon all counsel of record.

| | |
|---|---|
| James T. Cowdery, Esq.<br>Sarah A. L. Merriam, Esq.<br>Cowdery, Ecker & Murphy, L.L.C.<br>750 Main Street<br>Hartford, CT 06103-2703 | Edward F. Spinella, Esq.<br>Reid and Riege, P.C.<br>One Financial Plaza<br>Hartford, CT 06103 |
| James T. Shearin, Esq.<br>Pullman & Comley, LLC<br>850 Main Street, P.O. Box 7006<br>Bridgeport, CT 06601-7006 | Craig A. Raabe, Esq.<br>Jason M. Kuselias, Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597 |

                                                                   Terence J. Gallagher