LEXSEE 2001 CONN SUPER LEXIS 1853

**Gregg Stone et al. v. Frederick Hobby Associates II et al.**

**CV000181620S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF
STAMFORD-NORWALK, AT STAMFORD**

*2001 Conn. Super. LEXIS 1853*

**July 10, 2001, Decided
July 10, 2001, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Court granted plaintiffs' application for prejudgment remedy as requested, in amount of $ 300,000. Court granted plaintiffs' Motion for Disclosure of Assets, said disclosure to be completed on or before August 10, 2001.

**LexisNexis(R) Headnotes**

**JUDGES:** MINTZ, J.

**OPINIONBY:** MINTZ

**OPINION:** *MEMORANDUM OF DECISION RE: APPLICATION FOR PREJUDGMENT REMEDY*

In this home construction and warranty action, the plaintiffs, Dr. Gregg W. Stone and Dr. Amy Stone, filed a prejudgment remedy application pursuant to *Connecticut General Statutes § 52-278c*, requesting an attachment on the property of the defendants, Frederick L. Hobby, III, Sally M. Leiendecker, Frederick Hobby Associates, LLC (Hobby I) and Frederick Hobby Associates II, LLC (Hobby II). n1 In conjunction with their application and pursuant to Connecticut General Statutes § 52-279n, the plaintiffs filed a motion requesting that the defendants be ordered to disclose assets or property in which they have an interest or debts

owing to them sufficient [*2]  to satisfy the prejudgment remedy sought, in the amount of $ 300,000.

> n1 The individual defendants, Frederick L. Hobby, III and Sally M. Leiendecker, are members of the Connecticut limited liability company defendant, Frederick Hobby Associates II, LLC (Hobby II). (Defendants' Exh. V, Hobby II's formation documents; Hearing Transcript (Transcript) (3/14/01), pp. 67-68, testimony of Frederick L. Hobby, III.)

In the plaintiffs' proposed nine-count complaint and affidavit filed with their prejudgment remedy application, they allege the following facts: the plaintiffs reside in a newly constructed home located in Greenwich (the premises) with their minor child. The plaintiff, Gregg W. Stone, is the owner of the premises by virtue of a statutory form warranty deed dated January 25, 2000, and the plaintiffs paid $ 3,300,000 for the premises. The plaintiffs are the first purchasers of the premises and took possession thereof on or about January 25, 2000.

Furthermore, the plaintiffs allege that: they purchased [*3]  the premises from the defendant, Hobby II. Hobby II had previously purchased the land and built the premises thereon. In order to purchase the premises, the plaintiffs entered into a sales agreement (the sales agreement) with Hobby II dated December 23, 1999. (Plaintiffs' Application, Exh. A, sales agreement; see also Plaintiffs' Exh. 2.) At the time the sales agreement was executed, the premises were not completed. Hobby II undertook to complete the premises and deliver the same

2001 Conn. Super. LEXIS 1853, *

to the plaintiffs at a closing contemplated by the sales agreement. In the sales agreement, Hobby II made certain express warranties regarding the condition of the basement n2 as well as the improvements, fixtures, systems, materials and workmanship existing on the premises at closing. n3 Additionally, in paragraph twenty of the sales agreement, Hobby II warranted "the dwelling to the extent mandated and required by [the new home warranty provisions of] Connecticut General Statutes Chapter 827." n4 Pursuant to the sales agreement, the plaintiff, Gregg W. Stone, took title to the land and the premises on January 25, 2000, upon delivery of the deed by Hobby II.

n2 Paragraph twenty-one of the sales agreement is a "warranty against water," in which Hobby II expressly "agrees to remedy . . . the penetration of any water entering the basement of the dwelling during the five [5] year period following the closing," subject to certain terms and conditions described thereafter. (Plaintiffs' Exh. 2, sales agreement, p. 7.) [*4]

n3 In paragraph nine of the rider to the sales agreement, Hobby II "warrants that the improvements, fixtures, systems, materials and workmanship existing on the premises at closing shall be free from defects in design, materials and workmanship for a period of one (1) year from the delivery of the deed. If within said period any defects in improvements, fixtures, systems, materials or workmanship shall occur, and [the plaintiffs] give [Hobby II] written notice thereof, [Hobby II] agrees to repair any such defect and any damage to the premises caused thereby, at its expense, to the original condition intended by the parties, but it is understood that the method of such repairs shall be at the reasonable discretion of [Hobby II], provided that the improvements shall be restored to the same or better condition than that which existed prior to the occurrence of the defect. Hairline cracks resulting from normal shrinkage and settling, and any deterioration resulting from wear and tear shall not constitute defects in workmanship or materials. The basement is warranted to be free from water for a period of five (5) years in accordance with the terms of paragraph 21 hereinbefore. The provisions of this paragraph shall survive delivery of the deed. Nothing set forth in this paragraph shall be deemed to limit or negate any statutory warranties protecting [the plaintiffs] . . . For a period of one (1) year following the date of

closing, [Hobby II] guarantees that the heating system will heat the interior of the dwelling to 70 [degrees] F when the exterior temperature is 0 [degrees], and that the air conditioning system will cool the interior of the dwelling to 70 [degrees] when the exterior temperature is 90 [degrees]. The provisions of this paragraph shall survive delivery of the deed." (Plaintiffs' Exh. 2, rider to sales agreement, p. 30-31.) [*5]

n4 Chapter 827 of the General Statutes contains express and implied new home warranty provisions and encompasses § 47-116 through § 47-199.

Moreover, the plaintiffs allege that: they took title to the premises prior to the completion of certain items set forth in the sales agreement. In order to induce the plaintiffs to close on the premises prior to completion of such items, Hobby II entered into a completion agreement (the completion agreement) with the plaintiffs dated January 25, 2000. The completion agreement provides for the completion of certain "punch list" items within sixty days of the date of the agreement and further provides that if the work is not completed within the specified time frame, Hobby II "shall be deemed in breach of [the completion] agreement entitling [the plaintiffs] to all remedies due to [them] in law or in equity." (Plaintiffs' Application, Exh. B, completion agreement; see also Plaintiffs' Exh. 2.)

The plaintiffs further allege that: subsequent to the closing, the plaintiffs determined that the improvements, fixtures, systems, materials and workmanship [*6] existing on the premises suffered from a myriad of substantial defects in design, materials and workmanship, n5 in violation of the warranties contained in the sales agreement. Moreover, despite demand, Hobby II failed to complete all of the punch list work described in the completion agreement n6 within the specified sixty day period following January 25, 2000, that is, by March 25, 2000.

n5 The alleged substantial defects in design, materials and workmanship existing on the premises include, *inter alia*: domestic water supply and delivery system contaminated and tainted with dangerous chemical and other constituents; domestic water and air supply and delivery and filtration systems contaminated with radon, a cancer-causing poisonous gas; inadequate, defective and non-functional

plumbing system and fixtures associated therewith, including non-functional sinks, toilets and bathtubs; central vacuum system defectively designed, installed and/or non-functional; electronic garage doors which do not close properly and do not guard against accidental closure and crushing of objects or beings that may become located thereunder; cracked, broken and damaged floor tiles and limestone details; and damaged, incomplete and defective painting, furnishings, cabinetry, grouting and trim items built, designed and/or installed by Hobby II. Furthermore, the basement allegedly suffers from water pooling, infiltration, damage and seepage. [*7]

n6 The punch list work that allegedly was not completed, in violation of the completion agreement, includes, *inter alia*: radon remediation equipment; hanging lights; light switches; mailbox; ceiling fans and light covers; limestone shelving; utility hooks; door bells; completion of the finished basement, including specialty items; cleaned gutters; landscaping; gravel installation; ceiling; specialty bathroom fixtures and installations; decorative columns; sauna plumbing and electrical; entertainment center electrical work; electrical conduits and jacks; wall and floor damage due to Hobby II's changes in work; specialty window trim; and numerous other matters set forth in the sales agreement and schedule D thereof

Finally, the plaintiffs allege that: on or near the January 25, 2000, closing date, Hobby II transferred substantially all of its assets, including the proceeds of the closing, to Hobby I, Frederick L. Hobby, III and Sally M. Leiendecker. The plaintiffs allege that Hobby II made the transfer under improper circumstances, in that Hobby II: (1) had actual intent to hinder, delay [*8] or defraud the plaintiffs and/or any creditor of Hobby II, without receiving a reasonably equivalent value in exchange; (2) was engaged or about to engage in business for which the remainder of its assets were unreasonably and disproportionately small; (3) intended or reasonably should have believed that it would incur debts in excess of its ability to pay them as they became due; (4) made the transfer at a time when it was insolvent or became insolvent as a result of the transfer; and (5) made the transfer to one or more insiders for an antecedent debt at a time when Hobby II was insolvent and said insiders

had reasonable cause to believe that Hobby II was insolvent.

The plaintiffs' proposed complaint asserts the following nine counts against the various defendants in this action: (1) breach of express warranty as to Hobby II; (2) breach of agreement or contract as to Hobby II, (3) breach of implied new home warranty pursuant to *General Statutes § § 47-118* and *47-121* as to Hobby II; (4) piercing the corporate veil as to Hobby I, Frederick L. Hobby, III and Sally M. Leiendecker; (5) violation of the Uniform Fraudulent Transfer Act, *General Statutes § 52-552a* [*9] et seq. as to Hobby I, Hobby II, Frederick L. Hobby, III and Sally M. Leiendecker; (6) reckless endangerment as to Frederick L. Hobby, III; (7) intentional infliction of emotional distress as to Frederick L. Hobby, III; (8) negligence as to Frederick L. Hobby, III; and (9) violation of the Connecticut Unfair Trade Practices Act (CUTPA), *General Statutes § 42-110a* et seq., as to Hobby I, Hobby II, Frederick L. Hobby, III and Sally M. Leiendecker.

On February 26th and March 13th through 16th of 2001, this court held a hearing in which the parties were provided with an opportunity to present evidence and to examine witnesses. Subsequently, the plaintiffs filed a post-hearing memorandum in support of their application for a prejudgment remedy and motion for disclosure of the defendants' assets and the defendants filed a memorandum in opposition thereto.

The plaintiffs argue that during the several days of testimony heard by this court, they established probable cause for the court to grant their application in full and to order all of the defendants to disclose assets sufficient to satisfy the application. Moreover, the plaintiffs contend that: (1) [*10] they have proven damages of $ 373,983.66; (2) they have established liability on all nine counts of their proposed complaint; and (3) any defenses raised by the defendants are without merit. In opposition, the defendants argue that the plaintiffs: (1) have the burden of proving probable cause to obtain a judgment; (2) have failed to sustain their burden of proof as to any of their nine counts; and (3) have failed to sustain their burden of establishing probable cause that they will obtain a judgment in a particular amount. The defendants conclude, therefore, that the court should deny the plaintiffs' application for a prejudgment remedy.

A "prejudgment remedy" is any "remedy that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive a defendant in a civil action of, or affect the use, possession or enjoyment by such defendant, his property prior to final judgment." *Fermont Division v. Smith 178 Conn. 393, 398, 423 A.2d*

*80 (1979)*, quoting *General Statutes § 52-278a(d)*. "The purpose of a prejudgment remedy is to preserve the asset while the matter is being litigated." *DSP Software Engineering* **[*11]** *v. NCT Group, Inc., 2000 Conn. Super. LEXIS 2171,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 370062 (August 10, 2000) *(Melville, J.).*

The standard for the granting of an attachment is well known. "If the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted, the prejudgment remedy applied for shall be granted as requested or as modified by the court" *General Statutes § 52-278d(a)(4).*

It is also axiomatic that "prejudgment remedy proceedings do not address the merits of the action; they concern only whether and to what extent the plaintiff is entitled to have property of the defendant held in the custody of the law pending adjudication of the merits of that action . . . The trial court, vested with broad discretion, need determine only the likely success of the plaintiff's claim by weighing **[*12]** probabilities . . . Civil probable cause constitutes a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a person of ordinary caution, prudence and judgment, under the circumstances, in advancing the action . . . The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim." (Citations omitted; internal quotation marks omitted.) *Tyler v. Schnabel, 34 Conn. App. 216, 219-20, 641 A.2d 388 (1994);* accord *East Lyme v. Wood, 54 Conn. App. 394, 397, 735 A.2d 843 (1999).* Civil probable cause "is a flexible common sense standard that does not demand that a belief be correct or more likely true than false." *Fischel v. TKPK, Ltd, 34 Conn. App. 22, 24, 640 A.2d 125 (1994).*

The first two counts of the plaintiffs' proposed complaint, in essence, assert causes of action for breach of contract against Hobby II. n7 "The key elements of a breach of contract action are: (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party and (4) damages." *Calvanese & Kastner,* **[*13]** *LLC v. Jones, 2001 Conn. Super. LEXIS 459,* Superior Court, judicial district of New Britain, Docket No. 503069 (February 6, 2001) *(Swords, J.).* "The general rule of damages in a breach of

contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed." *Gazo v. City of Stamford, 255 Conn. 245, 264, 765 A.2d 505 (2001).*

> n7 The plaintiffs characterize their first count as a claim for breach of the express warranties set forth in the sales agreement dated December 23, 1999, and the second count as a claim for breach of the completion agreement dated January 25, 2000. (See Plaintiffs' Application: Exh. A, sales agreement; Exh. B, completion agreement; se also Plaintiffs' Exh. 2.)

In order to meet their burden of showing probable cause for the validity of their breach of contract claims, the plaintiffs must at least establish the existence of a contract or contracts. *DSP Software Engineering v. NCT Group, supra, 2000 Conn. Super. LEXIS 2171,* Superior Court, Docket **[*14]** No. 370062. Of course, discovery and a full trial on the merits will provide the parties ample opportunity to develop their claims more fully. *Swaim v. Kovacs, 1998 Conn. Super. LEXIS 1491,* Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 157759 (May 27, 1998) *(Lewis, J.).*

This court finds that the plaintiffs have established the existence of both the written sales agreement and completion agreement between themselves and Hobby II. (Plaintiffs' Application: Exh. A, sales agreement; Exh. B, completion agreement; see also Plaintiffs' Exh. 2.) The plaintiffs have demonstrated probable cause for this court to conclude that the plaintiffs performed their obligations under the agreements in that they took title to and possession of the premises, and paid Hobby II the requisite amounts for the premises. n8

> n8 In addition to the plaintiffs' statement in their affidavit that they paid Hobby II $ 3,300,000 for the premises, the closing documents, received as defendants' exhibits M through U, indicate that the plaintiffs performed their payment obligations, including, *inter alia*: the statutory form warranty deed for the premises, dated January 25, 2000, reciting Hobby II's receipt of $ 3,300,000 in exchange for the premises; (Defendants' Exh. N.); and the state of Connecticut real estate conveyance tax return executed by Hobby II and/or Frederick L. Hobby, III on January 25, 2000, similarly reciting a payment in the amount of $ 3,300,000 from the

buyer, plaintiff Gregg W. Stone, in consideration for the premises conveyed. (Defendants' Exh. O.)

**[*15]**

Moreover, the plaintiffs have established probable cause that Hobby II breached or failed to perform in accordance with either the express warranties contained in the sales agreement, n9 or with the terms of the completion agreement. The plaintiffs' witness, Robert Randall (Randall), a licensed engineer who was qualified as an expert witness on construction, credibly testified and the court finds that in March of 2001, he observed, investigated and analyzed the conditions on the premises and determined the presence and severity of any faulty materials, unsound engineering standards, unworkmanlike construction, conditions unfit for habitation, design defects and water infiltration. n10 (Hearing Transcript (Transcript): (3/15/01) pp. 150-68; (3/16/01) pp. 1-69.) Additionally, Randall took photographs of the premises and prepared an estimate of the cost to complete the basement and other areas of the premises in accordance with the specifications in the agreements, excluding the cost of any "extras." (Transcript, (3/15/01) pp. 156-64. See also Plaintiffs' Exh. 55, Randall report dated March 1, 2001; Exh. 56, Randall supplemental report dated March 14, 2001; Exh. 53 (a-i), photos; **[*16]** Exh. 54 (a-v), enlarged photos.)

n9 The express warranties contained in the sales agreement are described *supra*, notes 2 and 3.

n10 Additionally, Randall made determinations as to whether the conditions he observed on the premises were pre-existing, meaning in existence prior to January 25, 2001 (within one year of the closing date), or whether the conditions resulted from deterioration or other occurrences after construction. (Transcript, (3/15/01) pp. 157-58.)

Randall testified at length regarding the "Exterior Installation and Finish System" (EIFS) n11 used on the cladding system and the entire exterior of the premises, and the unsound manner in which EIFS was integrated into the premises. (Transcript: (3/15/01) pp. 164-68; (3/16/01) pp. 1-35.) Randall credibly opined and the court finds that EIFS remediation or replacement was necessary, at an estimated cost of $ 167,302.60, in order to eliminate defects on the premises such as chronic water intrusion and retention, and related decay and discoloration **[*17]** caused by fungi, mold and mildews. (Transcript: (3/16/01) pp. 34, 1-35; see also Plaintiffs'

Exh. 55, Randall portfolio dated March 1, 2001, p. 2.) Regarding the cost to complete the basement, the credible evidence suggests and the court finds that the work will cost, at minimum, an estimated $ 68,844.56. n12 Additionally, the plaintiffs demonstrated, through testimony and documentary exhibits, that various items on the premises needed to be repaired within one year of the closing date and as a result, the plaintiffs incurred out of pocket expenses in the amount of $ 35,274.17 to pay for such repairs. n13 Furthermore, the plaintiffs established that approximately $ 45,562.33 worth of repairs are still needed on the premises. n14 Accordingly, this court finds that the plaintiffs have established probable cause that a judgment will be rendered in their favor on their breach of contract claims in the amount of the prejudgment remedy sought. In ruling on a prejudgment remedy, however, the court must evaluate not only the plaintiffs' claim, but also any defenses raised by the defendants, since a good defense will be sufficient to negate the existence of probable cause that a judgment will **[*18]** be rendered in favor of the plaintiffs. See *General Statutes § 52-278d(a)(4)*.

n11 Randall described EIFS as a synthetic stucco product which is applied over the exterior of a building and looks like masonry, but is much lighter in weight. Furthermore, Randall testified that while it is possible for EIFS to be successfully integrated into a structure through proper design and workmanship, EIFS is prone to problems including, *inter alia*, water intrusion, typically resulting from rain falling on the exterior of a structure and penetrating into the interior, as well as the tendency of EIFS to retain moisture emanating from within a structure such as from showers or damp basements, and resulting in the growth of fungi and the decay of wooden structures. (Transcript, (3/15/01) pp. 164-66.)

n12 This estimate derives from Randall's testimony that it would cost either $ 92,358.25 or $ 84,674.13 to complete bath and fireplace items in the basement, depending on the court's interpretation of the applicable basement specifications. (Transcript, (3/16/01) pp. 35-40.) The plaintiffs state in their memorandum, however, that they claim only the lesser amount of $ 84,674.13 and furthermore, they concede that they have already received $ 15,829.57 from escrow funds. (Plaintiffs' memorandum, p. 5.) Therefore, the remaining cost to complete the basement is approximately $ 68,844.56. **[*19]**

n13 The plaintiffs explained that while their gross out of pocket expenses were $ 37,074. 17, an amount of $ 1,800.00 was paid by an insurer. (Transcript (3/16/01), pp. 72-73, testimony of Amy Stone.) Thus, the plaintiffs' net out of pocket expenses for repairs were $ 35,274.17. The plaintiffs demonstrated both the nature and cost of various items of repair through invoices and billing statements. (Plaintiffs' Exh. 5-15, 17-21, 25, 26, 36, 37.) The plaintiffs evidenced their payment for these items through copies of their checks and a credit card statement. (Plaintiffs' Exh. 35, checks; Exh. 36, credit card statement.)

n14 The necessary repairs comprising the $ 45,562.33 amount were described by Randall in his testimony before this court, as well as in the report he authored following his inspection of the premises. (Transcript, (3/16/01) pp. 42-52, Randall's testimony; see also Plaintiffs' Exh. 55, Randall report dated March 1, 2001.)

As a defense to the breach of contract claims, the defendants assert that the plaintiffs defaulted on their contractual obligations in that they failed [*20] to pay Hobby II for its post-closing work on the premises. The defendants contend, therefore, that Hobby II was justified in refusing to continue its work on the premises until the plaintiffs made appropriate payments to Hobby II. In support of this defense, the defendants point to a clause in the sales agreement furnishing Hobby II with the right to suspend performance if the plaintiffs failed to make payments when initially due, provided however, that Hobby II was not at that time in material default under the agreement. (Plaintiffs' Exh. 2, sales agreement, p. 15-16, P3[g].) The defendants claim that an April 4, 2000, invoice sent to the plaintiffs, instructing the plaintiffs to remit a $ 14,170.43 payment n15 to Hobby II, remains unpaid and therefore, any suspended performance by Hobby II was justified. (Plaintiffs' Exh. 24; Defendants' Exh. E, invoice.)

n15 The amount of $ 14,170.43 encompasses $ 4,170.43 for expenses purportedly incurred by Hobby II for work done on the premises on or before March 25, 2000--within the sixty day time frame permitted for the completion of work under the completion agreement--plus a request for a $ 10,000 deposit as a condition precedent to Hobby II's willingness to provide certain items of work deemed to be "extras" by Hobby II. (Plaintiffs' Exh. 24; Defendants' Exh. E, invoice.)

[*21]

In opposition, the plaintiffs argue that the April 4, 2000 invoice is dated several days after the completion agreement's March 25, 2000 deadline had passed and as such, the invoice represents the defendants' belated attempt to invent a breach by the plaintiffs in order to justify Hobby II's failure to complete the work on the premises in a timely manner. Additionally, the plaintiffs contend that the defendants cannot cure their own default by billing the plaintiffs for false or improper items.

This court finds that the defendants' defense is insufficient to defeat the plaintiffs' showing of probable cause. The defendants cite no authority to support their contention that it is a valid defense to a breach of contract claim to allege a *subsequent* "breach" or "default" by the other party to the contract. It is unclear to this court how Hobby II's failure to complete its obligations by the time specified in either the sales agreement or the completion agreement may nonetheless be excused or justified by the plaintiffs' failure to pay an invoice dated thereafter.

Moreover, the invoice itself is questionable in nature. The first item listed on the invoice is for carpentry [*22] work done in preparation for the installation of a light fixture that had been selected by the plaintiffs. The sales agreement, however, provides in two separate places that lights were to be installed by Hobby II at no extra charge to the plaintiffs beyond the $ 3,300,000 already called for under the agreement. n16 The second item listed on the invoice is for expenses incurred by Hobby II in emptying the plaintiffs' personal trash from a dumpster that was placed on the premises for the collection of construction debris. While the defendants assert that Hobby II properly charged the plaintiffs for the emptying of the dumpster, this court is persuaded by the credible testimony of Gregg W. Stone. Stone stated and the court finds that after the plaintiffs requested the removal of the dumpster from the premises, instead Hobby II gave the plaintiffs permission to share in the use of the dumpster and did not notify the plaintiffs that they would be billed for such use. (Transcript (3/16/01), p. 106.) The remainder of the invoice lists similarly questionable items.

n16 Paragraph 14 of Schedule A to the sales agreement, entitled "electrical," provides that existing light fixtures are included, and that "additional light fixtures to be supplied and paid for by the [plaintiffs] with *installation at pre-wired locations included.*" (Emphasis added.) (Plaintiffs' Exh. 2, sales agreement, p. 19.) Additionally, paragraph 47 of Schedule D to the sales agreement provides that "ceiling light

2001 Conn. Super. LEXIS 1853, *

fixtures, chandeliers and wall sconces *where existing electric service provided*" will be "*installed* by [Hobby II] *at no extra charge.*" (Emphasis added.) (Plaintiffs' Exh. 2, sales agreement, p. 27.) The defendants concede in their memorandum that the April 4, 2000 invoice seeks payment for the installation of a light fixture supplied by the plaintiffs, and *not* for the installation of any new wiring. (Defendants' memorandum, p. 23-24.)

[*23]

Consequently, this court finds that the defendants' defense is insufficient to defeat the plaintiffs' showing of probable cause and accordingly, this court finds probable cause that a judgment will be rendered in the plaintiffs' favor on their breach of contract claims in the amount of the prejudgment remedy sought, $ 300,000. Because the court has found probable cause to believe the plaintiffs would prevail on these counts against Hobby II and that prejudgment remedies ought to issue, the court ordinarily would not need to address the plaintiffs' remaining counts. *Message Center Management, Inc. v. Getchell, 2000 Conn. Super. LEXIS 3416,* Superior Court, judicial district of Tolland at Rockville, Docket No. 073738 (December 18, 2000) (*Sferrazza, J.*).

In this case, however, the bulk of the arguments presented in the parties' respective post-hearing memoranda focus on the plaintiffs' fourth count, specifically, on whether an appropriate basis exists for the court to pierce the corporate veil of the limited liability company defendant, Hobby II. Disregard of a corporate entity or limited liability company for the purpose of imposing liability upon individual shareholders or members for acts of the [*24] corporation or company is commonly referred to as "piercing the corporate veil." In the present case, the plaintiffs seek to pierce the corporate veil of Hobby II for the purpose of reaching the assets of the individual defendants, Frederick L. Hobby, III and Sally M. Leiendecker, as well the assets of the other named limited liability company defendant, Hobby I. n17

n17 The issue of whether the assets of Frederick L. Hobby, III, Sally M. Leiendecker and Hobby I may be reached upon the theory of piercing Hobby II's corporate veil is critical to the plaintiffs' application, especially in light of Frederick L. Hobby, III's testimony at the prejudgment application hearing indicating that Hobby II currently has no assets. (Transcript (3/14/01), p. 67.)

The plaintiffs argue that Hobby II's veil may be pierced by this court under the instrumentality theory or the identity theory, or both. The plaintiffs argue that the actions of defendants Frederick L. Hobby, III, Sally M. Leiendecker and Hobby I have thwarted [*25] the plaintiffs' ability to rely on the express warranties in the sales agreement and the warranties created by statute. Moreover, the plaintiffs argue that these defendants and their agents and attorneys, have frustrated the plaintiffs' ability to enforce the sales agreement and the completion agreement by warning the plaintiffs that in any attempt to enforce their rights, the plaintiffs will be unable to collect against Hobby II, because Hobby II is a shell company with no assets and no ability to pay any potential damage award. The plaintiffs conclude that Frederick L. Hobby, III, Sally M. Leiendecker and Hobby I may be held liable as the agents, mere departments, alter egos or controllers responsible for the conduct of Hobby II. The defendants, in turn, argue that the plaintiffs have failed to sustain their burden of establishing the requisite elements under either the instrumentality or identity theory.

At the outset, this court notes that Hobby II was formed as a Connecticut limited liability company in February of 1998. (Defendants' Exh. V, documents evidencing formation.)

*General Statutes § 34-133(a)* provides, with certain exceptions, [*26] that: "a person who is a member or manager of a limited liability company is not liable, solely by reason of being a member or manager, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company." Thus, "one of the principal reasons to use an LLC is that the owners and managers, if the owners so elect, have limited liability from contract and tort claims of third parties. *M. Pruner, A Guide to Connecticut Limited Liability Companies, § 3.1.1, p. 9 (1995).*" *Litchfield Asset Management v. Howell, 2000 Conn. Super. LEXIS 2991,* Superior Court, judicial district of Litchfield at Litchfield, Docket No. 076827 (November 14, 2000) (*Gill, J.*). This is not unlike the protection from liability afforded by incorporation. See *General Statutes § 33-673.*

The limitation on liability provided by incorporation or the formation of a limited liability company is not, however, without boundaries. "When [a] corporation is the mere alter ego, or business conduit [*27] of a person, it may be disregarded." *De Leonardis v. Subway*

*Sandwich Shops, Inc., 35 Conn. App. 353, 358, 646 A.2d 230,* cert. denied, *231 Conn. 925, 648 A.2d 162 (1994).* "Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity, has been so controlled and dominated that justice requires liability to be imposed on the real actor." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. 544, 552, 447 A.2d 406 (1982).* "The rationale behind [piercing the corporate veil] is that if the shareholders themselves, or the corporations themselves, disregard the legal separation, distinct properties, or proper formalities of the different corporate enterprises, then the law will likewise disregard them so far as is necessary to protect individual and corporate creditors." 1 W. Fletcher, Cyclopedia of the Law of Private Corporations (1990) § 41.10, p. 614. The same rationale applies in the case of a limited liability company. See, e.g., *Litchfield Asset Management v. Howell, supra, 2000 Conn. Super. LEXIS 2991,* Superior Court, Docket [*28] No. 076827; *New England National, LLC v. Kabro, 2000 Conn. Super. LEXIS 470,* Superior Court, judicial district of New London, Docket No. 550014 (February 16, 2000) (Martin, J.); see also M. Pruner, *supra,* § § 3.1.1.4, 7.14, pp. 10, 106-07.

Ordinarily, "a corporate veil is pierced by a creditor suing an individual who has used a corporation as an instrument of fraud." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. 555.* The burden of proving that the corporate veil should be pierced is on the plaintiff. *Season-All Industries Inc. v. R.J. Gross, Inc., 213 Conn. 486, 492, 569 A.2d 32 (1990).* The usual result of piercing the corporate veil is that the controlling shareholders, directors, officers or members become liable for corporate or company liabilities. *Litchfield Asset Management v. Howell, supra, 2000 Conn. Super. LEXIS 2991,* Superior Court, Docket No. 076827. The veil should, however, only be pierced under extraordinary circumstances. *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. 557.*

Piercing the corporate veil, or alternatively the alter ego theory, may be proven through the instrumentality rule [*29] or the identity rule. See *Toshiba America Medical Systems v. Mobile Medical Systems, 53 Conn. App. 484, 489, 730 A.2d 1219,* cert. denied, *249 Conn. 930, 733 A.2d 851 (1999).* The instrumentality and identity rules may be applied in order to "pierce the corporate veil" of a limited liability company. See generally, *Litchfield Asset Management v. Howell, supra, 2000 Conn. Super. LEXIS 2991,* Superior Court, Docket No. 076827; *Leisure Resort Technology, Inc. v. Trading Cove Associates, 2000 Conn. Super. LEXIS 2787,* Superior

Court, judicial district of Middlesex at Middletown, Docket No. 091180 (October 13, 2000) (*Gordon, J.*); *New England National. LLC v. Kabro, supra, 2000 Conn. Super. LEXIS 470,* Superior Court, Docket No. 550014.

"The instrumentality rule requires . . . proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other [*30] positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Emphasis omitted; internal quotation marks omitted.) *Toshiba America Medical Systems v. Mobile Medical Systems, supra, 53 Conn. App. 489-90.* The second element addresses the kind of misconduct that will impose personal liability upon individuals who have exercised complete domination over a corporation in total disregard of its existence as a separate entity. *Campisano v. Nardi, 212 Conn. 282, 292, 562 A.2d 1 (1989).* Such misconduct has been found, even in the absence of fraud or illegality, when the individual in control has, for example, used a corporate instrumentality to avoid personal liability that he had previously assumed. *212 Conn. at 292-93.* Whether each element is satisfied depends on the facts of the case. *Id.*

The identity rule is generally employed in a situation where two corporations or companies are, in reality, controlled as one entity because of common owners, officers, directors, members or shareholders, [*31] and because of a lack of observance of corporate or company formalities between the two entities. *See Falcone v. Night Watchman, Inc., 11 Conn. App. 218, 221, 526 A.2d 550 (1987).* In an appropriate case, however, the rule may also be employed to hold one or more individuals liable. *Id.* "The identity rule has been stated as follows: if plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., supra, 187 Conn. 554.* The Connecticut Supreme Court cautions, however: "that stock ownership, while important, is not a prerequisite to piercing the corporate

veil but is merely one factor to be considered in evaluating the entire situation . . . It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control [*32] or influence exercised by the individual sought to be held liable." *187 Conn. at 556.* Of paramount concern is *how* the control was *used*, not that it existed.

The court finds the following pertinent facts: Frederick L. Hobby, III is one of two members of Hobby II and Sally M. Leiendecker is the other. (Transcript (3/14/01), pp. 67-68, testimony of Frederick L. Hobby, III.) Each member has a fifty percent ownership interest in Hobby II, as well as full authority to manage and control the company's business. (Defendants' Exh. V, documents evidencing Hobby II's formation, membership, ownership and control.) Hobby II's office is located in Frederick L. Hobby, III's private home, owned by him in his individual capacity, and Hobby II pays no rent and has no lease with him. (Transcript (3/14/01), pp. 72-73, testimony of Frederick L. Hobby, III.) Furthermore, Hobby II currently has no assets and it never had any assets other than the premises now owned by the plaintiffs. (Transcript (3/14/01), p. 67, testimony of Frederick L. Hobby, III.) Attorney Gold, the attorney who formed Hobby II as a limited liability company, created Hobby II to enable the development of the subject [*33] premises and to shield and protect Frederick L. Hobby, III and Sally M. Leiendecker, the principals of Hobby II, from personal liability. (Transcript (3/16/01), pp. 103-04, 118-19, testimony of Attorney Gold.) Moreover, during a meeting between the parties in May of 2000, Attorney Gold, while acting on behalf of Hobby II, told the plaintiffs to "go ahead and sue us [Hobby II]. There is no money in [Hobby II]. Why do you think we set it up as an LLC in the first place?" n18 (Transcript (3/13/01), pp. 112-15, testimony of Gregg W. Stone.) This last statement evidences an intent on the part of the individual defendants, Frederick L. Hobby III and Sally M. Leiendecker, to use the limited liability company as a shield in order to avoid responsibility for contractual obligations owed to the plaintiffs.

> n18 This court is mindful of the rule "that evidence of settlement negotiations is not admissible at trial . . . based upon the public policy of promoting the settlement of disputes." *Tomasso Bros., Inc., v. October Twenty-Four, Inc., 221 Conn. 194, 198, 602 A.2d 1011 (1992).* At the time of the meeting between the parties in May of 2000, however, the plaintiffs had not yet instituted or threatened to institute any legal proceeding against any of the defendants in this action. In fact, both the plaintiffs' and the

defendants' witnesses testified that the original purpose of the meeting was for the parties to resolve their differences and continue their working relationship on the premises, not to settle any existing or imminent legal claims. (Transcript: (3/13/01). pp. 111-13; (3/16/01), pp. 107-11.) Accordingly, this meeting may not properly be considered a settlement negotiation and therefore, the parties' communications during the meeting are not privileged or protected from disclosure.

[*34]

Furthermore, the court notes that a number of documents used by Hobby II in connection with the subject premises list entities other than Hobby II as the operative actor. The names of these other entities or actors are similar to, and may easily be confused with, the name Hobby II. n19 The defendants argue that many of these documents were prepared by third parties who simply address, or refer to Hobby II, in shorthand fashion and as such, the documents do not reflect actions attributable to Hobby II or its members. The defendants maintain that Hobby II observed company formalities, pointing to evidence indicating that Hobby II paid for items relating to construction on the subject premises from an account maintained in the name of Hobby II. (Defendants' Exh. Y, account statement p. 6; Defendants' Exh. AA, check.) The plaintiffs, in turn, argue and the court finds that the defendants themselves have affirmatively acted with disregard for Hobby II's existence as an entity that is separate and distinct--both from its individual members as well as from other entities. The court finds a Connecticut real estate conveyance tax return (the return) executed by Frederick L. Hobby, III [*35] to be an illustrative example. n20 (Defendants' Exh. O, return.) The third and tenth lines of the return name the limited liability company, Hobby II, as the grantor-seller of the premises and Gregg W. Stone as the grantee-buyer. On the seventh line, however, in response to the question of whether the grantor is a limited liability company, the answer box labeled "NO" has been checked. Moreover, the middle portion of the return seeks a signed declaration of the accuracy of statements made in the return, to be signed either by the grantor, the grantor's attorney or authorized agent. Significantly, the individual defendant, Frederick L. Hobby, III, signed this declaration as the "grantor" of the premises in his individual capacity, rather than in his capacity as an authorized agent or member of the limited liability company defendant, Hobby II.

> n19 It is important to recall that the legal name for the limited liability company defendant

referred to throughout this decision as Hobby II is actually "Frederick Hobby Associates II, LLC." (Defendants' Exh. V, formation documents.) However, the listing or advertising information for the subject premises describes "Frederick Hobby II Associates" as the owner. (Plaintiffs' Exh. 1, home listing.) A brochure displaying a photograph of the subject premises on its cover describes "Frederick Hobby II Associates" as "owner" on the third page, while the name "Rick Hobby Associates, LLC" is printed on the sixth page. (Plaintiffs' Exh. 3, brochure of home.) Various statements, invoices and proposals sent from third parties to Hobby II regarding construction on the subject premises are addressed to "Frederick L. Hobby Associates," "Frederick Hobby Associates II," or "Frederick Hobby Associates." (Defendants' Exh. G, K.) A letter from a water system supply company is addressed to "Frederick Hobby & Associates." (Defendants' Exh. H.) [*36]

n20 Other examples relied upon by the plaintiffs which the court finds credible include: a proposal by Connecticut Basement Systems Inc. to perform radon remediation services on the premises, submitted to and signed by Frederick L. Hobby, III in his individual capacity; (Defendants' Exh. G, p 6.); a liability and casualty insurance policy insuring Frederick L. Hobby, III, Sally M. Leindecker, Hobby I and Hobby II all under the same policy, and naming yet another entity, FLH Inc. d/b/a FLH Builders, as the policyholder; (Plaintiffs' Exh. 44, insurance policy; see also Plaintiffs' Exh. 47, insurer's reservation letter); an application for a permit to build a new structure on the subject premises dated June 19, 1998, listing, on its front side, FLH Inc. as the "authorized agent and permittee (builder)," Hobby II as the "owner of land and building," Frederick L. Hobby, III as "assuming responsibility for supervision and compliance with . . . specifications, this application, and laws and ordinances," and on its reverse side, bearing the notarized signature of Frederick L. Hobby, III as the "authorized agent and permittee (builder);" (Defendants' Exh. A, application for building permit; see also Defendants' Exh. B, building permit issued by the town of Greenwich); Sally M. Leiendecker's letter to the plaintiffs dated March 9, 2000, bearing the name "Frederick Hobby Associates" on its letterhead, identifying Leiendecker as a "partner" of the named entity—

an apparent partnership, and listing an office address identical to that of Hobby II, located in the personal home of Frederick L. Hobby, III; (Plaintiffs' Exh. 23A, letter; see also Transcript (3/14/01), pp. 72-73.); and Frederick L. Hobby, III's letter to the plaintiffs dated March 29, 2000, printed on the same letterhead, although this letter bears the characters "II, LLC," *handwritten* on the letterhead just after the printed name of "Frederick Hobby Associates." (Plaintiffs' Exh. 23B.)

[*37]

Based on the totality of the evidence described above, the definition of probable cause and the criteria for the imposition of the instrumentality and identity rules, this court finds that the plaintiffs have satisfied their burden of demonstrating that there is probable cause to sustain the validity of their claim to pierce the corporate veil of Hobby II. Regarding the instrumentality rule, the first element of complete control is certainly present, as would be the case for most limited liability companies having only two members who are also the only two owners and managers. Secondly, probable cause supports the belief that the control was used by the defendants to commit a wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiffs' legal rights, as they may have misused the limited liability company form as a cloak to evade contractual obligations to the plaintiffs. n21 Thirdly, the requirement of proximate cause is satisfied because there is probable cause to believe that the plaintiffs' losses emanate, at least in part, from acts of self-dealing or self-interest on the part of the defendants [*38] in their exercise of control over Hobby II. The plaintiffs have demonstrated that Frederick L. Hobby, III and Sally M. Leiendecker exercised such domination over Hobby II that in essence, the limited liability company had no mind, will or existence of its own.

n21 The defendants argue that absent evidence of fraud or some wrong or injustice, even if the plaintiffs establish their first and second counts, specifically, that Hobby II breached a contract with the plaintiffs, the defendants insist that a mere breach of contract *cannot* support an application of the instrumentality rule in order to pierce the corporate veil of an entity. A similar argument was rejected, however, by the Appellate Court in *Toshiba America Medical Systems v. Mobile Medical Systems, 53 Conn. App. 484, 730 A.2d 1219,* cert. denied, *249 Conn. 930, 733 A.2d 851 (1999).* In *Toshiba,* the appellant claimed that the

trial court improperly pierced the corporate veil under the instrumentality rule and found him liable as the sole shareholder of a corporation despite finding that the predicate breaches of contracts did not rise to the level of deceptive, unethical or immoral acts to constitute a CUTPA violation. *53 Conn. App. at 491-92.* The Appellate Court rejected the appellant's argument, stating: "The instrumentality rule merely requires the trial court to find that the defendants committed an unjust act in contravention of the plaintiff's legal rights . . . When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." (Citation omitted; internal quotation marks omitted.) *Id.* In this case, probable cause supports the finding that Hobby II committed an unjust act in contravention of the plaintiff's legal rights by using the privilege of doing business in the limited liability company form as a cloak to evade contractual obligations to the plaintiffs.

Furthermore, the defendants argue that the plaintiffs knew they were dealing with the limited liability company Hobby II and, since the plaintiffs did not allege that they were fraudulently induced to enter into the contracts with the limited liability company, this court may not properly reach the individual defendants. Again, a similar argument was raised in and rejected by the Appellate Court in *Toshiba*, and this court is similarly unpersuaded in this case. See *53 Conn. App. at 493-94.*

**[*39]**

Moreover, the evidence described above, when viewed in the aggregate, provides probable cause for this court to apply the identity rule. The plaintiffs have demonstrated that Frederick L. Hobby, III and Sally M. Leiendecker used Hobby II interchangeably with their own personal identities and with identities of other entities under their control, and failed to observe formalities for the limited liability company. The names of these other entities, whether real or fictitious, represent entities which are, in reality, controlled as one entity because of common owners or members and because of a lack of observance of formalities between the entities. Furthermore, when viewed in the aggregate, the evidence shows such a unity of interest and ownership that Hobby II's independence as a limited liability company had in effect ceased or had never begun, and an adherence to the fiction of Hobby II's separate identity would serve only to defeat justice and equity by permitting the individual defendants to escape liability arising out of a "shell" operation conducted for their benefit. This situation is characteristically appropriate for implementation of the identity rule. See *Falcone v. Night Watchman, Inc., supra,* 11 Conn. App. 221. **[*40]** Thus, the plaintiffs have sustained their burden of demonstrating that there is probable cause to sustain the validity of their claim to pierce Hobby H's corporate veil under both the instrumentality and the identity rules.

In summary, this court finds that the plaintiffs have established that there is probable cause to substantiate the validity of their breach of contract claims against Hobby II, as well as their claim to pierce the corporate veil of Hobby II in order to reach the assets of Frederick L. Hobby, III, Sally M. Leiendecker, and Hobby I. The court notes that while there are numerous questions remaining to be resolved at trial with respect to the efficacy of the plaintiffs' claims, these questions do not militate against a finding of probable cause. *Three S. Development Co. v. Santore,* 193 Conn. 174, 178-79, 474 A.2d 795 (1984). This court has taken into account all revelant defenses, n22 set-offs, n23 and claims of adequate insurance n24 pursuant to *General Statutes 52-278d(a)(4).* The court hereby grants the plaintiffs' application for prejudgment remedy as requested, in the amount of $ 300,000. Accordingly, this court grants **[*41]** the plaintiffs' Motion for Disclosure of Assets, said disclosure to be completed on or before August 10, 2001.

n22 This court need not address the defendants' defense regarding the plaintiffs' own negligence, because contributory or comparative negligence is not an applicable defense to those counts of the plaintiffs' application relied upon by this court in its decision to grant the prejudgment remedy.

n23 See *supra,* note 12.

n24 See *supra,* note 13, regarding the plaintiffs' insurance coverage. Additionally, the court notes that the defendants' insurers are defending under a reservation of rights.

MINTZ, J.