GOODWIN | PROCTER

Richard M. Strassberg
212.813.8859
Jeffrey A. Simes
212.813.8879
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
599 Lexington Avenue
New York, NY 10022
T: 212.813.8800
F: 212.355.3333

February 10, 2003

**By Federal Express**

The Board of Directors
Reflexite Corporation
120 Darling Drive
Avon, Connecticut 06001

Re:     **Frank Family Trust and H. Jonathan Frank**

Dear Sirs:

We represent the Frank Family 1996 Trust and H. Jonathan Frank (the "Franks"). As you know, the Frank Family Trust owns more than 250,000 shares of Reflexite Corporation ("Reflexite" or the "Corporation"). It has come to our attention that certain directors and other insiders of the Corporation appear to have engaged in self-interested transactions while acting in an oppressive manner toward the Franks with the intent to injure the liquidity of the Franks' investment in Reflexite, and reduce the value of their shareholdings in the Corporation. The Corporation has also acted in manner intended to deny the Franks access to corporate information. These wrongful acts appear to have been undertaken by the Corporation as part of a plan to benefit certain members of the Corporation's Board of Directors and other insiders at the expense of the Franks. The purpose of this letter is to alert you to the wrongful acts of the Corporation and its Directors, and to make a formal demand, pursuant to Connecticut General Statutes § 33-722, that the Board of Directors or Reflexite immediately investigate and remediate this wrongful conduct. This will also constitute a demand pursuant to Connecticut General Statutes § 33-946 to inspect and copy the records of the Corporation, including all records identified in Connecticut General Statutes § 33-945.

*The Franks' Request for Information*

We understand that the Corporation has rejected the Franks' prior request for information and records concerning Reflexite's business. For example, Morgan Frank, on behalf of the Frank Family Trust, previously demanded access to the Corporation's records in his letter to Mr. Cecil Ursprung of September 16, 2002 – a letter that followed several communications between the Franks and executives and directors at Reflexite (including several requests to Arthur LoVetere, the Chairman of the Board). The requested records included, among other things, documentation

CL 00379

GOODWIN | PROCTER

The Board of Directors of
    Reflexite Corporation
February 10, 2003
Page 2


concerning the Corporation's ESOP plan, records concerning the Strategic Minority Investor Program and records concerning the Corporation's repurchase of shares from its large shareholders, including Board members and insiders.

The Corporation wrongfully refused to provide the Frank Family Trust the information it has requested. By letter dated November 8, 2002, Reflexite's Chief Executive Officer, Cecil Ursprung, indicated that Reflexite would not provide the requested information, or, incredibly, that some of this information was not available to the Corporation. In oral communications with the Franks, Chairman Arthur LoVetere confirmed that the Corporation would provide no information to the Franks.

The Franks' requests were both reasonable and within their rights as shareholders of Reflexite. We reiterate these requests for records, and we request all minutes of the meetings of the Board of Directors and all accounting records of the Corporation concerning these issues, under Connecticut General Statutes § 33-946. The Corporation's continued refusal to provide the Franks access to the corporate records is detrimental to the rights of the Franks as shareholders, as well as a continuing violation of the Connecticut General Statutes, and by this letter we formally request that the Board immediately investigate and remediate this misconduct.

### Self-Dealing Transactions and Preferential Treatment of Insiders

We also understand that the Corporation has repurchased the shares of Board members and other insiders at terms favorable to those insiders while refusing to accord comparable treatment to the Franks or other non-insider shareholders. On occasion, the Corporation has undertaken debt and financial risk in order to permit it to prefer its insiders and purchase their shares. For example, Reflexite's financial statements state that the Corporation spent more than $3,000,000 of its cash and borrowed $5,000,000 in October of 1997 in order to purchase 277,000 shares in Reflexite held by William Rowland, a founder and director of Reflexite, at a price of $30 per share. We believe that similar additional transactions have been conducted whereby the Corporation purchased insiders' equity stakes in the Corporation to the benefit of such insiders.

While engaging in self-dealing transactions redounding to the economic benefit of Reflexite's directors, executives and other insiders, Reflexite has denied similar opportunities to the Franks, and has wrongfully acted to limit the liquidity and value of the Franks' investment in Reflexite. We are informed that President Cecil Ursprung, when asked about the Franks' ability to sell shares, said that the Franks "will never get liquid as long as I am President of Reflexite." The Corporation has thus consistently acted in a manner to favor the pecuniary self-interest of its founders and directors, while denying comparable opportunities to its other shareholders. Such oppressive and self-interested conduct constitutes a violation of the fiduciary duties of the self-

GOODWIN | PROCTER

The Board of Directors of
    Reflexite Corporation
February 10, 2003
Page 3

interested directors and officers of the Corporation, as well as a violation of the fiduciary duties of any Board members who endorsed or ratified such misconduct.

We hope that by bringing these wrongful acts to the attention of the Board of Directors, the disinterested members of the Board, if any, will cause the Corporation to take appropriate actions to remedy this misconduct. While it is likely that this demand is futile in light of the self-interested directors' control over the matters outlined herein, we nonetheless offer this demand letter in the hope that the Corporation and the Board can avoid incurring the expense and disruption of legal proceedings. Pursuant to Connecticut General Statutes § 33-946, the Corporation must provide access to the requested documents by February 19, 2003, five (5) business days from receipt of this letter, and we will plan on being at the Corporation at 10:00 a.m. on that day to inspect and copy the documents.

If you require any additional information concerning this matter, please contact us.

Very truly yours,

Richard M. Strassberg, Esq.
Jeffrey A. Simes, Esq.

cc:    Jack Kennedy (counsel to Reflexite Corporation)
       Mr. H. Jonathan Frank
       Mr. Morgan Frank
       Frank Family 1996 Trust

CL 00381

# REPORT

## OF THE

# SPECIAL LITIGATION COMMITTEE

## OF THE

# BOARD OF DIRECTORS

## OF

# REFLEXITE CORPORATION

# APRIL 28, 2003

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     PROCEDURAL BACKGROUND ...............................................................1

      A.     SUMMARY OF THE FRANKS' DEMAND .....................................1

      B.     FORMATION OF THE SPECIAL LITIGATION COMMITTEE..................1

III.    PROCESS OF THE SPECIAL LITIGATION COMMITTEE....................................2

      A.     COMPOSITION OF THE COMMITTEE.....................................................2

      B.     RETENTION OF COUNSEL .....................................................................2

      C.     SUMMARY OF COMMITTEE MEETINGS ................................................2

      D.     SUMMARY OF DOCUMENTS REVIEWED ..............................................2

      E.     SUMMARY OF WITNESSES INTERVIEWED............................................2

             1.     PHILIP FERRARI...........................................................2

             2.     CECIL URSPRUNG ......................................................4

             3.     WILLIAM ROWLAND .................................................5

             4.     STEPHEN RAFFAY .....................................................5

             5.     ARTHUR LoVETERE....................................................6

             6.     H. JONATHAN FRANK ..............................................6

IV.    FACTUAL BACKGROUND ......................................................................7

      A.     ARRANGEMENTS RELATED TO PURCHASE AND SALE OF STOCK ......................7

             1.     AMENDED AND RESTATED 1986 STOCKHOLDERS' AGREEMENT ........7

             2.     CREATION OF ESOP.................................................8

              3.     ANNUAL STOCK BUYBACK PROGRAMS .............................8

              4.     REFLEXITE STOCK OPTION PLAN .....................................8

              5.     INSURED BUY-SELL AGREEMENTS....................................9

      B.     EVENTS CULMINATING IN THE APPROVAL OF THE ROWLAND TRANSACTION.....................................9

      C.     THE PRINCIPAL TERMS OF THE ROWLAND TRANSACTION...........................10

      D.     OTHER REFLEXITE REDEMPTIONS .....................................................10

      E.     HISTORY OF FRANKS' STOCK PURCHASES, STOCK SALES AND OPPORTUNITIES TO SELL STOCK .....................................................11

V.    DISCUSSION .................................................................................................. 12

A.    THE COMMITTEE'S INDEPENDENCE ................................................. 12

B.    THE COMMITTEE'S DUE CARE.......................................................... 12

C.    ANALYSIS OF APPLICABLE LAW RELATING TO THE DEMAND........................ 14

1.    CONNECTICUT LAW REGARDING DIRECTOR CONFLICTING
INTEREST TRANSACTIONS ............................................................... 14

2.    APPLICABLE LAW REGARDING EQUAL TREATMENT OF
SHAREHOLDERS........................................................................... 15

D.    RANGE OF POSSIBLE RESPONSES TO THE DEMAND ........................................ 17

VI.    CONCLUSION ................................................................................................. 17

EXHIBIT A - MINUTES OF COMMITTEE MEETINGS

EXHIBIT B - DOCUMENT LOG

## I.    INTRODUCTION

This report (the "*Report*") of the Special Litigation Committee (the "*Committee*") of the Board of Directors (the "*Board*") of Reflexite Corporation (the "*Corporation*") is being submitted to the Board for its review and consideration. The Report has been prepared by the Committee in connection with its inquiries into the demand (the "*Demand*") made upon the Corporation by letter dated February 10, 2003 from the attorneys representing the Frank Family 1996 Trust and H. Jonathan Frank, (collectively, the "*Franks*"), pursuant to § 33-722 of the Connecticut General Statutes (the "*C.G.S.*").

## II.    PROCEDURAL BACKGROUND

### A.    SUMMARY OF THE FRANKS' DEMAND

The Demand alleges that the Corporation has engaged in self-dealing transactions in redeeming shares of its directors and other insiders while unlawfully denying the Franks similar opportunities to obtain liquidity for their shares.

In support of these allegations, the Franks cite, by way of example, the Corporation's redemption of 277,000 shares held by William Rowland, a founder and director of the Corporation, for $30 per share that was approved by the Board in October of 1997 (the "*Rowland Transaction*").

The Demand alleges that wrongful acts have occurred and contains "a formal demand, pursuant to Connecticut General Statutes § 33-722, that the Board of Directors of Reflexite immediately investigate and remediate this wrongful conduct." The Demand also contains a request for information that is being handled directly by the Corporation.

### B.    FORMATION OF THE SPECIAL LITIGATION COMMITTEE

The Committee was formed pursuant to resolutions adopted by independent members of the Board at a meeting held on February 26, 2003 (the "*Board Resolutions*"). The Board Resolutions authorize and direct the Committee to make inquiries with respect to the Demand and "to make such recommendations as it deems appropriate to the Board of Directors on what actions, if any, it believes, in the sound exercise of its business judgment, the Corporation should take in the best interest of the Corporation, concerning, among other things, whether to pursue by litigation or otherwise any claims the Corporation may have relating to the Demand."

## III.    PROCESS OF THE SPECIAL LITIGATION COMMITTEE

### A.    COMPOSITION OF THE COMMITTEE

The Board Resolutions designated Louis J. Baccei, Peter Eio and Worth Loomis to serve as members of the Committee. By a letter dated March 21, 2003, Worth Loomis resigned as a member of the Committee.

The Committee appointed Peter Eio to serve as chairman of the Committee at its meeting on March 28, 2003.

### B.    RETENTION OF COUNSEL

Pursuant to the Board Resolutions, the Committee was authorized "to retain independent counsel to advise it concerning its legal responsibilities and otherwise assist it in carrying out its duties . . . ." The Committee retained Cummings & Lockwood LLC ("*Counsel*") for these purposes.

### C.    SUMMARY OF COMMITTEE MEETINGS

Meetings of the Committee were conducted on March 17, 2003, March 28, 2003, April 21, 2003 and April 28, 2003. Minutes of each of these meetings are attached hereto as Exhibit A.

### D.    SUMMARY OF DOCUMENTS REVIEWED

In conducting its inquiry, the Committee or Counsel reviewed the documents described in the document log attached hereto as Exhibit B.

### E.    SUMMARY OF WITNESSES INTERVIEWED

In conducting its inquiry, the Committee interviewed a number of individuals. Summaries of the information obtained by the Committee in those interviews are set forth below.

#### 1.    Philip Ferrari

Philip Ferrari is currently the Vice President - Finance of the Corporation and served in such capacity at the time of the Rowland Transaction. Mr. Ferrari does not recall attending the October 9, 1997 Board meeting at which the Rowland Transaction was approved.

Mr. Ferrari recalled that in approximately the summer of 1997 Mr. Rowland initiated the discussion with the Corporation concerning the purchase of his shares in order to address estate planning concerns raised by his advisors. Mr. Ferrari recalls that management discussed the structure and viability of the Rowland Transaction with Worth Loomis, a member of the Board's Audit and Finance Committee. Various alternatives were discussed. One alternative, a partial redemption of Mr. Rowland's shares, was not acceptable to Mr. Rowland's tax advisors due to tax considerations.

Mr. Ferrari stated that the redemption superceded the January 1, 1993 Stock Redemption Agreement between the Corporation and Mr. Rowland, pursuant to which the Corporation carried life insurance on the life of Mr. Rowland and was obligated to purchase certain shares owned by him upon his death and upon the subsequent death of his spouse. The Corporation offered similar agreements to larger shareholders. (See Article IV, Section A, subpart 5 below.)

Mr. Ferrari stated that the purchase price for Mr. Rowland's shares was based upon the share price established by Houlihan Lokey pursuant to its annual valuation of the Corporation's shares with respect to Corporation's Employee Stock Ownership Plan (the "ESOP"). Mr. Ferrari also stated that the Corporation also undertook an analysis of the impact of the Rowland Transaction on the Corporation's future cash flows, debt covenants, earnings per share and balance sheet.

The Rowland Transaction was reported to the Corporation's shareholders in the Corporation's annual report for fiscal year 1998. It also was disclosed in the Corporation's financial statements for that year. Mr. Ferrari recalls discussing the Corporation's rationale for the Rowland Transaction with H. Jonathan Frank. He told Mr. Frank that Mr. Rowland was the creator of the Corporation's core technology and that Mr. Rowland had been a continuing contributor to the growth of the Corporation.

Mr. Ferrari also stated that the terms and structure of the Rowland Transaction were very favorable to the Corporation. Mr. Ferrari stated that the Corporation believed that the price per share paid to Mr. Rowland was very fair and that it would ultimately be less than the value of the shares as determined by the next ESOP appraisal. Mr. Ferrari also stated that the interest rates on the promissory notes issued by the Corporation in the Rowland Transaction were well below interest rates typically associated with subordinated debt. In addition, Mr. Ferrari stated that the consummation of the Rowland Transaction allowed the Corporation to discontinue paying the premiums on the life insurance associated with Mr. Rowland's Stock Redemption Agreement.

Mr. Ferrari also described the Corporation's purchase of shares of two officers of the Corporation, James Seely, a Vice President of the Corporation, in 1992 and Peter Smith, a Vice President of the Corporation in 2001. Mr. Ferrari stated that

these purchases arose out of the termination of the employment of Messrs. Seely and Smith with the Corporation and the Corporation's desire for these individuals to execute non-compete agreements upon their termination.

Mr. Ferrari stated that from time to time, over the past five years, the Corporation has considered various methods of providing liquidity to its larger shareholders. He stated that the Corporation has considered the use of a "Dutch auction" or exchanging shares for debt instruments of the Corporation. He stated that the Corporation decided not to pursue these alternatives, each of which would have added debt to the Corporation, in favor of investing in the Corporation's internal product development. Mr. Ferrari also stated that the Corporation engaged the investment banking firm Brown Brothers Harriman ("*BBH*") in January 2002 to identify one or more investors who would be willing to purchase the larger blocks of the Corporation's shares from shareholders who were no longer actively involved in the Corporation. Mr. Ferrari stated that the BBH engagement was withdrawn in August 2002 after BBH was unable to identify viable buyers due to difficulties with one of the Corporation's product initiatives and adverse economic conditions.

2.    Cecil Ursprung

Cecil Ursprung has been the President and CEO of the Corporation since the Fall of 1983. Mr. Ursprung attended both the October 1997 and January 1998 Board meetings that approved the Rowland Transaction and the financing thereof.

Mr. Ursprung recalled that the Rowland Transaction arose out of estate planning that Mr. Rowland was doing at that time. Mr. Ursprung recalls being informed that, for tax purposes, any partial sale of Mr. Rowland's stock to the corporation could have been treated as a "deemed dividend."

Mr. Ursprung is confident that the Corporation and the Board undertook a detailed cash-flow analysis of the effects of the Rowland Transaction on the Corporation's finances. Mr. Ursprung also recalled that Mr. Rowland did not participate in the discussions regarding the Rowland Transaction and most likely was not in the room at the time.

Mr. Ursprung said that he has had "very little" interaction with H. Jonathan Frank. Mr. Frank generally communicated with Arthur LoVetere, Chairman of the Corporation's Board of Directors. In June of 2002, Mr. Ursprung had a meeting with Morgan Frank in San Francisco to discuss shareholder issues generally, liquidity, and the Rowland Transaction.

4

Mr. Ursprung denied that he ever said that the Franks "will never get liquid as long as I am President of Reflexite." In fact, Mr. Ursprung stated that the Corporation acknowledges the importance of providing the Corporation's shareholders with opportunities to obtain liquidity for their shares.

### 3. William Rowland

William Rowland described his long-term association with the Corporation and its predecessors. Mr. Rowland also described the original allocation of shares between his brother, his brother-in-law, Jerry Robinson, Mr. Rowland and, eventually, H. Jonathan Frank.

When it was offered by the Corporation in 1988, Mr. Rowland participated in the program that provided insurance for the purchase of his shares at the time of his death. Mr. Rowland did not believe that H. Jonathan Frank participated in this program, although it was offered to him.

Mr. Rowland recalls that the Rowland Transaction was documented by the Corporation and its counsel. At the time, Mr. Rowland was working with an attorney to establish the Rowland Family Trust.

Mr. Rowland recalls that he recused himself from the Board meeting at which the Rowland Transaction was considered. He is confident that the Board undertook an analysis of the financial impact the Rowland Transaction would have on the Corporation. He indicated that an analysis of the impact of such a transaction on the Corporation's finances would have been necessary. He also noted that the Rowland Transaction had no effect on the price of the outstanding shares of stock. In fact, the price of the Corporation's shares increased in value in subsequent years.

### 4. Stephen Raffay

At the time of the Rowland Transaction, Mr. Raffay was a member and Chairman of the Board's Audit Committee and a member of the Compensation Committee. He recalls that the Rowland Transaction was considered in detail by the Audit Committee. In that regard, the Committee considered cash flow and balance sheet issues. The Audit Committee determined that the Rowland Transaction would not have a significant impact on the Corporation's finances. The Audit Committee reported to the Board that the Rowland Transaction was both affordable and advisable. The price per share was that utilized in the Corporation's ESOP at the time.

5.     <u>Arthur LoVetere</u>

Mr. LoVetere has had several conversations with H. Jonathan Frank regarding Mr. Frank's stock position in the Corporation. Mr. LoVetere recalls that, at times, Mr. Frank was inclined to sell stock and, at other times, to hold or even buy. The conversations normally concerned the Corporation's plans to establish a "Dutch auction," or to solicit a large, equity investor to purchase sizeable blocks of stock.

Mr. LoVetere recalls that Mr. Frank was never willing to sell his stock at a discount. In fact, Mr. LoVetere recalls that, when the Corporation was performing well, Mr. Frank was not inclined to sell.

Mr. LoVetere attended Board meetings at which the Rowland Transaction was considered and approved. He recalls that the Board was given ample opportunity to consider all information regarding the Rowland Transaction and that it was not done on "short notice." He also recalls that the Board considered the effect of the Rowland Transaction on the Corporation's finances.

6.     <u>H. Jonathan Frank</u>

H. Jonathan Frank amplified upon the claims asserted in the Demand. With respect to the claim that the Corporation has engaged in self-dealing transactions by redeeming shares of its directors and other insiders, Mr. Frank stated that the Corporation had redeemed the shares of Mr. Rowland, as well the shares of James Seely, Peter Smith and David McDonald, former officers of the Corporation.

Mr. Frank also stated that he believed that a sale of shares was made to a member of the Board at a discounted price. Mr. Frank stated that he was not aware of which member of the Board purchased these shares, but that a similar offer to purchase shares was not made to him.

With respect to the claim that he has been denied similar opportunities to obtain liquidity for his shares similar to those provided to directors and other insiders, Mr. Frank cited to the transactions described above. Mr. Frank also stated that he believed that the Corporation purchased roughly 24,000 shares from a shareholder in October of 1998 (Mr. Frank was unsure of the identify of the selling shareholder) and that a similar offer was not extended to him. He also recalled that the ESOP made an offer in May of 1992 to purchase shares of shareholders of the Corporation over the age of 60, but that Mr. Frank was not eligible to sell his shares due to this age restriction.

Mr. Frank also stated that he made a demand upon the Corporation that the Corporation purchase all or a part of his shares in a conversation with Arthur LoVetere,

Chairman of the Board. Mr. Frank stated that he told Mr. LoVetere that he was willing to be flexible with regard to the structure of such a transaction, such as taking a secured note payable over 5 to 7 years, but that he was not willing to accept a discounted price. Mr. Frank stated that he had subsequent conversations with Mr. LoVetere and Mr. Ferrari regarding a possible transaction, but that the Corporation never made a specific offer for his shares.

Mr. Frank also stated that he learned of the Rowland Transaction on or about June 30, 1998 from his review of the Corporation's financial statements at that time. He also stated that Jerrold Robinson, a former member of the Board, told him that Mr. Rowland's shares were redeemed because he was a "founder" of the Corporation.

## IV.    FACTUAL BACKGROUND

As a result of the interviews conducted by the Committee and the documents reviewed by the Committee or described by Counsel to the Committee, the Committee has found the factual background relating to the Demand to be as set forth below.

### A.    ARRANGEMENTS RELATED TO PURCHASE AND SALE OF STOCK

Set forth below is a description of the various mechanisms established by the Corporation to provide liquidity for its shares.

#### 1.    Amended and Restated 1986 Stockholders' Agreement

The Amended and Restated 1986 Stockholders' Agreement (the "*Stockholders' Agreement*") is by and between the Corporation and all of the Corporation's shareholders as of January 1, 1986, including H. Jonathan Frank.

Section 2 of the Stockholders' Agreement provides that if a shareholder desires to sell his shares and has received a bona fide written offer that such shareholder is willing to accept, the shareholder will offer his shares to the Corporation at the same price and upon the same terms as are set forth in the bona fide written offer. If the Corporation declines to accept this offer, the selling shareholder must offer each of the other shareholders then owning or having options to acquire five percent of the outstanding shares of the Corporation the right to purchase their proportionate share of the offered shares on the same terms and conditions as the bona fide written offer. If the other shareholders decline to purchase all of the offered shares, the selling shareholder shall then be free for thirty days to sell his shares to any party.

2.    Creation of ESOP

In 1985, the Corporation established an Employee Stock Ownership Plan (the "*ESOP*"). In connection with establishing the ESOP, the Corporation solicited its larger shareholders to sell shares to the ESOP. Pursuant to this offer, H. Jonathan Frank elected to sell 941 of his shares in October of 1985 to the ESOP for $27.50 per share.

From time to time the ESOP has provided an opportunity for the Corporation's shareholders to obtain liquidity for shares by offering to purchase their shares of the Corporation. The ESOP also provides liquidity to employee-shareholders upon the termination of their employment with the Corporation.

The Franks participated in sales of shares owned by them to the ESOP as more particularly described in Section E below.

3.    Annual Stock Buyback Programs

The Corporation conducted a stock buyback program in most years, commencing in 1996, to provide liquidity to its shareholders. The program was open to all shareholders, although it principally benefited smaller shareholders in its operation. Each year the Corporation makes available an amount of money based on the financial condition of the Corporation (the "*Buyback Amount*") to purchase shares from its shareholders. The Corporation then notifies its shareholders of the Buyback Amount and the offering price per share, which offering price is equal to the appraised value of the Corporation's shares as established annually for the ESOP. Shareholders are then asked to notify the Corporation of the amount of shares, if any, they desire to sell to the Corporation.

The Corporation allocates the Buyback Amount among all selling shareholders in accordance with a pre-announced formula and thus the Corporation may not be able to purchase the entire amount of the shares offered by each selling shareholder.

The Franks participated in the Corporation's buyback programs as more particularly described in Section E below.

4.    Reflexite Stock Option Plan

The Corporation and its shareholders adopted a stock option plan (the "*Stock Option Plan*") in April of 1995. The Stock Option Plan permits grants of both incentive stock options and non-qualified stock options to key employees of the Corporation.

8

All shares purchased upon exercise of stock options granted under the Stock Option Plan are subject to (a) a call option which permits the Corporation to buy the option shares in the event the grantee ceases to serve as a director or be employed by the Corporation, and (b) a put option in favor of the grantee, which permits the grantee to sell the options shares to the Corporation at any time. The purchase price for shares purchased under the call option or the put option is the value of the shares as determined by the ESOP appraisal.

5.    <u>Insured Buy-Sell Agreements</u>

In 1988, the Board adopted a plan to offer liquidity for the estates of shareholders of the Corporation by purchasing a predetermined dollar amount of the Corporation's stock from the estates of participating shareholders. In order to fund the purchase of these shares upon the death of the shareholder, the Corporation obtained life insurance policies on the life of the shareholder, with the Corporation as the beneficiary. The purchase price of the shares is the most recent value established for purposes of the ESOP prior to the participating shareholder's death. Each participating shareholder entered into a stock redemption agreement with the Corporation setting forth the terms and conditions of this arrangement.

Daniel A. Bullard of Bullard Financial Services worked with the Corporation in establishing the insured stock redemption arrangements. In a letter dated March 25, 2003, Mr. Bullard stated that H. Jonathan Frank was offered an opportunity to participate in this arrangement but declined to do so.

**B.    EVENTS CULMINATING IN THE APPROVAL OF THE ROWLAND TRANSACTION**

As discussed in the summary of the Committee's interview with Phil Ferrari in Article III, Section E above, Mr. Rowland approached the Corporation in the summer of 1997 regarding the purchase of his shares as part of his estate planning.

Management of the Corporation considered the economic impact and viability of the purchase of Mr. Rowland's shares, as well as the potential structure and terms of such a purchase. Management also consulted with Worth Loomis as a member of the Board's Audit and Finance Committee.

The Corporation's management negotiated with Mr. Rowland and his attorney regarding the final terms of the transaction and related purchase documents.

The Rowland Transaction was submitted for approval to the Board at a meeting held on October 9, 1997. The minutes from this meeting indicate that following a discussion the Rowland Transaction was unanimously approved.

## C.    THE PRINCIPAL TERMS OF THE ROWLAND TRANSACTION

In January of 1998, the Corporation purchased 277,000 shares of the Corporation's stock owned by Mr. Rowland and The Rowland Family Charitable Remainder Trust (the "*Trust*") for $30 per share for a total aggregate purchase price of $8,310,000.

Mr. Rowland received $2,310,020 from the Corporation at the closing of the transaction and received a promissory note from the Corporation in the principal amount of $4,000,000 payable over three (3) years at an interest rate per annum equal to LIBOR Rate determined for a one year interest period plus 150 basis points.

The Trust received $1,000,000 at the closing of the transaction from the Corporation and received a promissory note from the Corporation in the principal amount of $999,980 payable in full on January 15, 2000 at an interest rate per annum equal to LIBOR Rate determined for a one year interest period plus 150 basis points.

The promissory notes received by Mr. Rowland and the Trust were subordinated in right of payment to all outstanding indebtedness for borrowed money of the Corporation.

## D.    OTHER REFLEXITE REDEMPTIONS

The Corporation purchased all of the shares owned by two of its officers, James Seely and Peter Smith, and a Division President, David McDonald.

In 1992, the Corporation purchased all of 68,560 shares owned by Mr. Seely, the Corporation's Vice President of Technology, for $24.60 per share, which was the then current appraised value, for a total purchase of roughly $1.7 million. This purchase was consummated in connection with Mr. Seely's separation from the Corporation. The purchase price was payable in equal annual principal installments over not less than three years, with the interest payable monthly at 84% of the prime rate, adjusted annually, with the requirement that Mr. Seely confirm his compliance with a two year non-compete agreement with the Corporation prior to each payment of principal.

In 2001, the Corporation purchased all 4,439 shares owned by Mr. Smith, the Corporation's Vice President of Marketing, for a total purchase price of $160,913.75

in connection with Mr. Smith's separation from the Corporation and the execution by Mr. Smith of a non-compete agreement with the Corporation.

Over a period of two years, commencing in 1997, the Corporation purchased 22,568 shares owned by Mr. McDonald, a Division President of the Corporation, for a total purchase price of $697,040 in connection with Mr. McDonald's separation from the Corporation and in exchange for a one-year non-compete restriction, an indefinite confidentiality restriction, and a release of any claims against the Corporation, and its officers and employees. A portion of these shares were obtained by Mr. McDonald through stock option exercises, and, therefore, he had the right to "put" these shares to the Corporation.

E.    HISTORY OF FRANKS' STOCK PURCHASES, STOCK SALES AND OPPORTUNITIES TO SELL STOCK

Set forth below is a list provided by the Corporation of each instance where the Franks' purchased, sold, or declined an opportunity to sell, their shares in the Corporation.

1.    H. Jonathan Frank elected to sell 941 shares to the ESOP at $27.50 per share ($25,877.50) in September of 1985.

2.    H. Jonathan Frank declined to sell shares at $38.50 per share to the ESOP on September 3, 1986.

3.    H. Jonathan Frank declined to sell shares at $38.50 per share to the ESOP on December 6, 1986.

4.    Mr. and Mrs. H. Jonathan Frank declined to sell shares at $50.17 per share to the ESOP on November 20, 1987.

5.    H. Jonathan Frank and Virginia Frank declined to sell shares at $35.17* to the ESOP on October 10, 1988. (* This followed a 2 for 1 stock split on December 21, 1987.)

6.    The Franks declined to sell shares for at $24.60* * to the ESOP in May of 1992. (* * This followed 2 for 1 stock splits on October 25, 1990 and on July 1, 1991.)

7.    H. Jonathan Frank purchased 1,000 shares for $30.00 per share as part of the Corporation's buy-back program for fiscal year 1996.

11

8.    H. Jonathan Frank sold 4,832 shares for $32.00 per share ($794,984) pursuant to the buy-back program for fiscal year 1997.

9.    H. Jonathan Frank sold 1,220 shares for $30.00 per share ($36,600.) pursuant the to buy-back program for fiscal year 1998.

10.    The Franks declined to sell shares at $31.25 per share pursuant to the Corporation's buy-back program for fiscal year 1999.

11.    The Franks declined to sell shares at $28.50 per share pursuant to the Corporation's buy-back program for fiscal year 2000.

12.    H. Jonathan Frank sold 200 shares for $44.00 per share ($8,800.) pursuant to the Corporation's buy-back program for fiscal year 2001.

13.    The Franks declined to sell shares at $36.25 per share pursuant to the Corporation's buy-back program for fiscal year 2002.

## V.    DISCUSSION

### A.    THE COMMITTEE'S INDEPENDENCE

Prior to commencing its inquiry, the Committee examined the independence of each of its members. The Committee found that Louis J. Baccei was not a director of the Corporation at the time of the Rowland Transaction. The Committee found that Peter Eio was a director of the Corporation at the time of the Rowland Transaction but was not present at the meeting at which the Rowland Transaction was approved by the Board of the Corporation. The Committee also concluded that neither Mr. Baccei nor Mr. Eio had ever engaged in a sale of shares to the Corporation. In addition, the Committee determined that neither Mr. Baccei nor Mr. Eio had a relationship with any director, officer or shareholder of the Corporation that would reasonably be expected to exert an influence on his judgment with respect to the allegations asserted in the Demand.

### B.    THE COMMITTEE'S DUE CARE

The Committee has been advised by Counsel that C.G.S. § 33-756 sets forth the general standard of conduct for directors. This section provides, in pertinent part, as follows:

(a)    A director shall discharge his duties as a director, including his duties as a member of a committee: (1) in good faith; (2) with care an ordinarily prudent person in a

like position would exercise under similar circumstances; and (3) in a manner he reasonably believes to be in the best interests of the corporation.

(b)    In discharging his duties a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by: (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in matters presented; (2) legal counsel, public accountants or other persons as to matters the director reasonably believes are within the person's professional or expert competence; or (3) a committee of the board of directors of which he is not a member if the director reasonably believes the committee merits confidence.

In an effort to satisfy this standard of conduct and to conduct a reasonable inquiry upon which its conclusions would be based, the Committee took the following actions:

1.    It submitted a list of questions and a request for the production of documents to the Corporation regarding the claims made in the Demand.

2.    It submitted a request to the Franks' counsel that it provide all relevant information that such counsel believes the Committee should consider as it addresses the Demand and requested an opportunity to interview the Franks.

3.    It reviewed certain of the documents described on the document log attached hereto as Exhibit B and had counsel review the others.

4.    It conducted the interviews summarized in Article III, Section E of this report.

5.    It requested Counsel to advise it regarding the applicable law relating to the claims made in the Demand.

6.    It held four (4) meetings of the Committee as summarized in the minutes of each meeting attached hereto as Exhibit A.

C.    ANALYSIS OF APPLICABLE LAW RELATING TO THE DEMAND

    1.    <u>Connecticut Law Regarding Director Conflicting Interest
Transactions</u>

The Committee has been advised by Counsel that under C.G.S. § 33-782,
a transaction where a director, or any person with whom or which such director has a
personal, economic or other association, has a conflicting interest may not be enjoined,
set aside or give rise to an award of damages or other sanctions in a proceeding by a
shareholder or by or in the right of the corporation because the director or such other
person has an interest in the transaction, if the transaction falls within one of the
following three categories:

> (1) A majority (but no fewer than two) qualified directors
> (meaning directors not having a "conflicting interest")
> approve the transaction after the director who has the
> conflicting interest discloses to them the nature of the
> conflict and all facts known to him that a prudent person
> would believe to be material to a judgment whether to
> proceed with the transaction;

> (2) A majority of qualified shares (meaning shares not
> owned or controlled by the director who has the conflicting
> interest) approves the transaction after receiving required
> disclosure of the conflict;

> (3) The transaction, judged according to the circumstances
> at the time of commitment, is established to have been fair
> to the corporation.

The Committee has also been advised by Counsel that there are a number
of circumstances that will cause a director to have a "conflicting interest" with respect to
a transaction. First, the director will have a conflicting interest where the director is a
party to the transaction. Second, the director will have a conflicting interest where the
director has a beneficial interest in or is so closely linked to the transaction that the
interest would reasonably be expected to exert an influence on the director's judgment if
he were called upon to vote on the transaction. Third, the director will have a conflicting
interest where the director has a familial or fiduciary relationship with a person that is a
party to the transaction or that has an interest in or is so closely linked to the transaction
that the interest of such related party would reasonably be expected to exert an influence
on the director's vote. Finally, the director will have a conflicting interest if an individual
or entity, to which the director has an employment, fiduciary or business relationship

14

with, is a party to or has an interest in or is so closely linked to the transaction and of such financial significance to such individual or entity that their interest would reasonably be expected to exert an influence on the director's vote.

After considering the interviews conducted and the documents reviewed by the Committee or reported upon by Counsel to the Committee, the Committee is of the opinion that the Rowland Transaction was properly approved by the Board in accordance with Connecticut law and was fair to the Corporation.

### 2.    Applicable Law Regarding Equal Treatment of Shareholders

The Committee has been advised by Counsel about the applicable law pertaining to the treatment of shareholders in closely-held corporations, a summary of which is set forth below.

Connecticut courts have not addressed whether shareholders in closely-held corporations should be granted an equal opportunity to obtain liquidity for their shares. However, there exists judicial precedent that Connecticut courts determining issues of first impression under Connecticut corporation law will look to Delaware judicial authorities for guidance. See, e.g., Joy v. North, 692 F.2d 880 (2d Cir. 1982) (applying Delaware law to examination of decisions by a special litigation committee); Ostrowski v. Avery, 243 Conn. 355, 703 A.2d 117 (1997) (applying Delaware law to director usurpation of a corporate opportunity).

The Delaware Supreme Court addressed the issue of the equal treatment of shareholders of closely-held corporations in Nixon v. Blackwell, 626 A.2d 1366 (Del. 1993). In Nixon, the court stated that "[i]t is well established in our jurisprudence that stockholders need not always be treated equally for all purposes." The Court also stated that:

> A stockholder who bargains for stock in a closely-held corporation and who pays for those shares can make a business judgment whether to buy into such a minority position, and if so on what terms. One could bargain for definitive provisions of self-ordering permitted to a Delaware corporation through the certificate of incorporation or bylaws by reason of the provisions in 8 Del.C. §§ 102, 109 and 141(a). Moreover, in addition to such mechanisms, a stockholder intending to buy into a minority position in a Delaware corporation may enter into definitive stockholder agreements and such agreements

may provide for elaborate earnings tests, buy out provisions, voting trust, or other voting agreements.

Courts in other jurisdictions, however, have not completely rejected the equal opportunity doctrine. In Donahue v. Rodd Electrotype Co., 328 N.E.2d 505, 518 (Mass. 1975), the Massachusetts Supreme Judicial Court held that when a corporation purchases the shares of a member of the corporation's controlling group, the corporation must offer each of the other shareholders an equal opportunity to sell their shares to the corporation. In Wilkes v. Springside Nursing Home, Inc., 353 N.E.2d 657 (1976), the Donahue court rescinded the application of a strict equal opportunity doctrine and instead held that the actions of the majority, or controlling, shareholders must be analyzed to determine whether such actions had a legitimate business purpose. See also, Daniels v. Tomas, Dean & Hoskins, Inc., 804 P.2d 359, 366 (Mont. 1990); Crosby v. Beam, 548 N.E.2d 217 (Ohio 1989); Toner v. Baltimore Envelope Company, 498 A.2d 642 (Md. 1985). In Toner, the Court stated:

> While we recognize that the majority/directors can violate their duty in the context of causing a selective corporate purchase of its shares, any conclusion that the majority/directors have breached their obligations should be based on all the relevant facts. These include the purpose of the purchase in the business setting prevailing when the decision to purchase was made.

Of note, the decisions cited above address the actions of majority or controlling shareholders towards minority shareholders and do not relate to actions where there are no majority or controlling shareholders. In fact, some courts have rejected the "legitimate business purpose" test when the defendants did not own or control a majority of the corporation's stock at the time of the selective redemption and have instead provided that in such cases the redemption be afforded the protections of the business judgment rule. See, e.g., Delahoussaye v. Newhard, 785 S.W.2d 609 (Mo. Ct. App. 1990).

After considering the interviews conducted and the documents reviewed by the Committee or reported upon by Counsel to the Committee, the Committee is of the opinion that the Corporation was not, and is not, obligated to offer the Franks an opportunity to sell shares to the Corporation in a manner similar to the Rowland Transaction or the other redemptions described in Article IV, Section D above.

### D.    RANGE OF POSSIBLE RESPONSES TO THE DEMAND

The Committee considered a range of possible responses to the Demand. First, it considered whether it should recommend that the Corporation pursue the alleged wrongful acts on its own initiative. However, for the following reasons, the Committee decided not to recommend that the Corporation pursue that course of action. The Committee finds that the Rowland Transaction and the other redemptions described in Article IV, Section D were consummated in accordance with applicable law and were in the best interests of the Corporation. The Committee further finds that the Corporation was not, and is not, obligated to afford the Franks a similar opportunity to sell their shares to the Corporation. The Committee further finds that pursuing a lawsuit as anticipated by the Demand is not in the best interests of the Corporation.

Second, the Committee considered whether it should recommend that the Corporation pursue a settlement of the claims set forth in the Demand. The Committee determined that this subject was beyond the scope of the Committee's mandate. However, the Committee does note the desirability of reaching an amicable resolution of the claims asserted in the Demand.

Third, the Committee considered whether to recommend that the Corporation reject the Demand.

## VI.    CONCLUSION

After considering the interviews conducted and the documents reviewed by the Committee or reported upon by Counsel to the Committee and after carefully considering the alternatives, the Committee has concluded that the Demand should be rejected by the Corporation.

Accordingly, the Committee hereby recommends that the Corporation reject the Demand.

.HrtLib1:426501.1 04/28/03

## EXHIBIT A

### Minutes of the Reflexite Corporation Special Litigation Committee Meeting of March 17, 2003

The Special Litigation Committee of the Board of Directors (the "*Board*") of Reflexite Corporation (the "*Corporation*") met on March 17, 2003 at the offices of Cummings & Lockwood LLC in Hartford, Connecticut. All of the members of the Special Litigation Committee (the "*Committee*"), being Louis Baccei, Peter Eio and Worth Loomis, were present, as well as James Lotstein, Peter Hull and Christopher Calio of Cummings & Lockwood LLC, counsel to the Committee ("*Counsel*"). The Committee requested that Counsel keep the minutes of the meeting.

1. Counsel discussed the role and duties of the Committee.

2. The Committee ratified its selection of Cummings & Lockwood LLC as counsel to the Committee after conducting an examination of counsel's independence.

3. The Committee next analyzed the independence of each member of the Committee and explored the connections of each member to the directors, officers and shareholders of the Corporation and to the matters described in the written demand dated February 10, 2003 (the "*Demand*") made upon the Corporation by the Frank Family 1996 Trust and H. Jonathan Frank (the "*Franks*").

4. Counsel and the Committee reviewed the claims set forth in the Demand made upon the Corporation by the Franks.

5. The Committee engaged in a preliminary discussion of the claims made in the Demand and the events referenced therein.

6. Counsel and the Committee discussed the process for conducting the Committee's inquiry and the timeline of the inquiry.

7. A review of the due diligence of the records of the Corporation conducted by Counsel to date was described.

8. The Committee authorized Counsel to request certain additional documentation and information from the Corporation and the Franks and to arrange interviews with certain individuals.

9. Counsel provided the Committee with a fee estimate and explained the basis for this estimate.

10. The Committee discussed available dates to conduct interviews and to meet again to discuss the progress of the investigation.