UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| H. JONATHAN FRANK and FRANK FAMILY 1996 TRUST, | : : | Civil Action No.: 3:03-CV-1014(JBA) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ARTHUR LOVETERE, CECIL URSPRUNG, LOUIS J. BACCEI, WORTH LOOMIS, THEODORE PATLOVICH, STEPHEN J. RAFFAY, WILLIAM P. ROWLAND and PETER EIO, | : : : : | |
| | : | |
| Defendants. | : | JUNE 24, 2005 |

## SECOND AMENDED COMPLAINT

Plaintiffs H. Jonathan Frank and the Frank Family 1996 Trust (collectively "the Franks"), by and through their undersigned attorneys, hereby allege as and for their Second Amended Complaint against Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter Eio (collectively, the "Defendants"), as follows:

## SUMMARY OF THIS ACTION

1.    This is an action by the Franks against certain current and former members of the Board of Directors of Reflexite Corporation ("Reflexite").  H. Jonathan Frank helped to build Reflexite, and he is a substantial shareholder of the company through a family trust, the Frank Family 1996 Trust.  By this lawsuit, the Franks challenge a pattern of discrimination against the Franks and a concerted effort by the Defendants to deny the Franks the rights and privileges enjoyed by other shareholders and, notably, the Defendants themselves.

2.     The Board has acted over a period of several years so as to deny the Franks' access to information and to deny them the rights and privileged enjoyed by other shareholders of Reflexite.  Among other things, while other insider shareholders such as the Board have been permitted to sell significant quantities of shares back to Reflexite, the Board acted with malice in refusing to permit the Franks to enjoy comparable opportunities.  The Board wrongfully and unreasonably denied the Franks' requests for access to information concerning the Franks' shareholdings in Reflexite.

3.     In short, while engaging in various transactions that procured benefits for themselves and other shareholders of Reflexite, the Defendants acted in an oppressive and unfair manner toward the Franks that injured the value of the Franks' investment in Reflexite and the Franks access to corporate information. As a result of the misconduct of the Defendants, as alleged more fully below, Plaintiffs have been compelled to commence this action, seeking monetary and injunctive relief.

## THE PARTIES

4.     H. Jonathan Frank is a citizen of the State of Nevada, residing in Incline Village, NV.

5.     The Frank Family 1996 Trust is a trust organized under the laws of Nevada.  H. Jonathan Frank is a Settlor and Trustee of the Frank Family 1996 Trust, which owns shares of Reflexite stock.

6.     Upon information and belief, defendant Arthur LoVetere is a citizen of the State of Michigan, residing at 8060 Poulsen Road, Atlanta, Michigan 49709, and is Chairman of the Board of Directors of Reflexite.

7.      Upon information and belief, defendant Cecil Ursprung is a citizen of the State of Connecticut, residing at 27 Walbridge Road, West Hartford, Connecticut 06119, and is President and a Director of Reflexite.

8.      Upon information and belief, defendant Louis J. Baccei is a citizen of the State of Connecticut, residing at 9 Fenwick Drive, Farmington, Connecticut 06032, and is a member of the Board of Directors of Reflexite.

9.      Upon information and belief, defendant Worth Loomis is a citizen of the State of Connecticut, residing at 70 Terry Road, Hartford, Connecticut 06105, and is or was a member of the Board of Directors of Reflexite.

10.     Upon information and belief, defendant Theodore Patlovich is a citizen of the State of New Mexico, residing at 314 Big Horn Ridge Drive N.E., Albuquerque, New Mexico 87122, and is or was a member of the Board of Directors of Reflexite.

11.     Upon information and belief, defendant Stephen J. Raffay is a citizen of the State of Connecticut, residing at 93 Westmont Street, West Hartford, Connecticut 06117, and is or was a member of the Board of Directors of Reflexite.

12.     Upon information and belief, defendant William P. Rowland is a citizen of the State of New York, residing in Plattsburgh, New York, and is or was a member of the Board of Directors of Reflexite.

13.     Upon information and belief, defendant Peter Eio is a citizen of the State of Connecticut, residing at 70 Sill Lane, Old Lyme, Connecticut 06371, and is or was a member of the Board of Directors of Reflexite.

14.     Upon information and belief, Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter

Eio were (and in some instances still are) the members of the Board of Directors of Reflexite at relevant times herein.

## JURISDICTION AND VENUE

15.    Upon information and belief, at all times relevant to this action, each of the Defendants has been and continues to be a citizen of the State of Connecticut, except Peter Eio, Arthur LoVetere and William Rowland, who, on information and belief, have been and continue to be citizens of the States of New Mexico, Michigan, and New York, respectively.

16.    At all times relevant to this action, each of the Defendants has transacted and continues to transact business in the State of Connecticut and serves or has served as a director of Reflexite, a corporation organized under the laws of the State of Connecticut.

17.    Jurisdiction for this action is proper in this Court pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and action is between citizens of different states. Jurisdiction of certain claims is also proper under 28 U.S.C. § 1367.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) as the events or omissions giving rise to the claims herein occurred within this judicial district.

## ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

*Reflexite*

19.    Upon information and belief, Reflexite is a Connecticut corporation that produces reflective products and display optics.  Reflexite is a private corporation and its shares are not publicly traded on any public stock exchange.

20.    Upon information and belief, Reflexite's founders, William and Hugh Rowland, bought the rights to develop a retroreflective technology from a company called Luce Reflexite, Inc. in 1963.  Some time thereafter, the Rowlands formed Rowland Development Corporation

where they began to develop a new retroreflective product that was eventually called "Reflexite." In 1970, the Rowlands formed Reflexite Corporation and began selling a product called "Reflexite" in or about 1973.

21.     From time to time, Reflexite has sold and purchased shares from various shareholders, including members of the Board of Directors and employees of Reflexite. Upon information and belief, the Board of Directors has been active in approving such sales and purchases.

22.     Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter Eio have been the members of the Board of Directors of Reflexite at relevant times herein. Upon information and belief, the Defendants caused Reflexite to undertake the actions described herein.

***The Franks Involvement with Reflexite***

23.     H. Jonathan ("Jon") Frank has been part of the Reflexite story from the very beginning, as a long-time employee and executive of Reflexite. Jon Frank joined Rowland, Inc., a predecessor to Reflexite that was founded by Hugh and William Rowland in August 1972.

24.     In 1974, Jon Frank left Rowland, Inc. to join Rowland Development Corporation as marketing manager for the "Reflexite" product line in the traffic control market. Shortly thereafter, Rowland Development Corporation entered into an exclusive distribution and development agreement with the Fasson division of Avery Corporation, and the Rowlands formed Reflexite Corporation to provide product and technical support to Fasson. Jon Frank was selected from the RDC staff to go to Fasson as product manager for the Reflexite Product line.

25.     A year later, Jon Frank formed a company called Omnicon and became a significant purchaser of the "Reflexite" product from Fasson. When Reflexite re-acquired the

Reflexite product line from Fasson, Reflexite also entered into an exclusive contractual arrangement with Jon Frank and Omnicon to represent Reflexite in the traffic control market. Jon Frank and Omnicon became Reflexite Corporation's largest source of sales, accounting for more than 50% of all sales of the product.

26.     During this period of time, Mr. Frank assisted Reflexite Corporation in important ways.  He transferred technology that he had developed, such as the use of magnesium sealing dies rather than more expensive brass. He transferred product development such as the design and process for the manufacturing of roll up signs. He also contributed financially, by, for example, deferring, interest free, commission payments Reflexite Corporation owed Omnicon in order to ease Reflexite's cash flow problems.

***The Franks' Shareholdings in Reflexite***

27.     Jon Frank's shareholdings in Reflexite also date back to the early days of the company.  In 1979, Hugh Rowland approached Jon Frank and asked if he would be willing to purchase 10% of Reflexite Corporation.  Mr. Frank agreed to purchase shares of Reflexite on the express condition that he be afforded the same opportunities for liquidity that would be made available to others.

28.     In reliance on this agreement, Mr. Frank then purchased 8,471 shares on July 27, 1979 and another 8,470 shares on January 29, 1980, which represented 10% of the company.

29.     Presently, they own a large number of shares of Reflexite stock, representing a sizeable portion of the outstanding shares of the company.  Upon information and belief, the Franks are among the largest individual shareholders of Reflexite.

30.     Soon after purchasing these shares, at the insistence of the Rowlands who were seeking to reduce the commissions Reflexite paid to Omnicon, Jon Frank joined Reflexite

Corporation as Vice President of Marketing and Sales for all operations.  Mr. Frank declined opportunities in 1982 and 1983 to become the President of Reflexite.  Soon thereafter, Reflexite hired Defendant Cecil Ursprung to become its President.

### Unequal Treatment of the Franks Begins

31.    Defendant Cecil Ursprung immediately began to pursue a series of policies that had the effect of reducing the value and liquidity of the Franks' investment in Reflexite.  In the spring of 1985, without notice or explanation, the Corporation terminated Mr. Frank's employment. It conditioned the Corporation's payment of termination benefits to Mr. Frank on Mr. Frank's signing consents to amend the Shareholders' Agreement and Certificate of Incorporation to enable an Employee Stock Option Plan (the "ESOP").

32.    Mr. Frank expressed concerns that the ESOP would dilute the value of existing shareholdings and that there were not sufficient protections for longtime shareholders such as the Franks.  In a June 14, 1985 letter to Mr. Frank,  Reflexite's then-Assistant Secretary, Peter Costas, wrote "I and the other outside directors recognize the rights of minority shareholders and do feel an obligation to ensure that those rights are always protected."

33.    Despite Mr. Costas' sentiments, Reflexite continued to condition Mr. Frank's termination benefits on his signature of the consents.  Faced with this Hobson's choice, Mr. Frank signed the consents, but in a letter dated June 25, 1985, indicated that he had been forced to do so by Reflexite's improper efforts to hold his termination benefits hostage.

34.    Mr. Ursprung and others on the Board then began to pursue a policy of permitting other insiders to sell shares, sometimes unlawfully, while denying the Franks and others a comparable opportunity to obtain liquidity.  For example, in 1987, Reflexite arranged to have the shareholders, the Franks included, waive their rights and consent to a transfer by Hugh Rowland

of his Reflexite stock for the purpose of disposing it to his family and charity. Thus, the Board's subsequent refusal to repurchase shares from the Franks was not based on any legitimate concerns about the effect of such repurchases on Reflexite, but was instead intended to exclude the Franks and benefit the Board.

35.    As a further example, in November of that year, the Franks were belatedly informed by Reflexite that Mr. Rowland had disposed of additional shares by selling them to Arthur LoVetere, even though Mr. Rowland and Mr. LoVetere had not sought the other shareholders' consent as required by the Shareholder Agreements among the Franks and other shareholders. The Board intervened to protect the unlawful sale and arranged to have the shareholders retroactively waive their rights with respect to this transaction. Similarly, upon information and belief, the Defendants have arranged to permit Mr. Ursprung to sell his shares and the other Defendants procured the necessary consents after the sale took place to permit this transaction. Once again, the Board demonstrated that it was not concerned about the formalities to which it would subsequently hold the Franks.

36.    The effect of such transfers was that the Board was able to reduce the proportionate shareholdings of themselves and other shareholders while increasing the proportionate shareholding of the Franks. The Board's improper actions had the effect of increasing the percentage of outstanding shares owned by the Franks while reducing the percentage of shares owned by the Board and most other shareholders.

37.    This conduct also had the effect of shifting the risk of share ownership to other shareholders such as the Franks who were denied the opportunity to sell their shares. The Franks were never informed of the true intent of the Board nor was their consent or the consent of other shareholders sought or obtained for the Board's plan to single out the Franks for mistreatment.

38.    The Defendants engaged in other self-interested transactions in Reflexite stock. For example, upon information and belief, Worth Loomis purchased a considerable quantity shares of Reflexite stock at significantly discounted prices in 1999 or 2000.  Comparable offers were not afforded to other shareholders, on information and belief.

39.    Upon information and belief, the Defendants have caused Reflexite to pursue a present policy in which all options issued to directors or management are accompanied by a "put," permitting the recipient to require Reflexite to repurchase the shares.  On information and belief, this practice was not disclosed to the Franks.  The effect of these puts is to pass the risks of share ownership onto the Franks who, on information and belief, are the only significant shareholders to lack such rights.

40.    Upon information and belief, the Board arranged for certain large shareholders to sell large quantity of shares.  Upon information and belief, former Reflexite executive Dave MacDonald was able to sell close to $2 million in shares and former Reflexite executives Jim Seeley (and/or his heirs), John Sheppard and Keith Phillips were permitted to sell their Reflexite shares as well.  Thus, the Board was not concerned about the effect of such large sales on the financial health of Reflexite.

41.    Another confirming example was a significant transaction in January 1998, in which Reflexite spent some $8.1 million dollars to purchase shares from William Rowland and his family trust.  Reflexite spent more than $3,000,000 of its own cash and borrowed approximately $5,000,000 to bring about this purchase, at a price of $30 per share.  Reflexite did not notify the Franks (and, on information and belief, other shareholders) of this transaction and, indeed, hid the reference to it in footnotes of a financial statement that was not provided to the Franks.

42.    The effect of this and similar transactions was to provide substantial liquidity for the members of the Board and other shareholders, but to deny it to the Franks.  Moreover, as these transactions increased the Franks' percentage of share ownership in Reflexite, they also increased the relative risk of the Franks' growing investment in Reflexite:   the increasing proportion of shares the Franks held were in a company with an ever growing debt burden which the Board caused the company to assume to provide liquidity to themselves and others, but not the Franks.

43.    The few buyback opportunities the Board made available to the Franks were specifically and intentionally designed to prevent the Franks from achieving significant liquidity and to deny them the rights and benefits enjoyed by other shareholders.  For example, in 1996, Mr. Frank was permitted to sell only 4,832 shares – a tiny fraction of his shares – when Reflexite engaged in a $750,000 stock repurchase.   In 1997, the year Mr. Frank transferred his shareholdings to the Frank Family 1996 Trust, the Franks were only permitted to sell 1,220 shares, for approximately $36,600.

44.    In 1998, the year in which Reflexite consummated its enormous $8.1 million 277,000 share buyback from Mr. Rowland, it made no offer to purchase <u>any</u> shares from the Franks.

45.    Similarly, in 1999 the Defendants' course of conduct continued and the Franks were not given any buyback opportunities, although they are informed that the Corporation executed a $750,000 stock repurchase.  Upon information and belief, the Defendants selectively permitted certain shareholders to participate in the stock repurchase, but excluded others, such as the Franks.  Upon information and belief, the Defendants used Reflexite's stock repurchase

program as a means of providing liquidity to chosen shareholders while shifting the risk of stock ownership to larger, non-director shareholders such as the Franks.

46.    As the Franks began to request more equitable opportunities for liquidity, the Board caused Reflexite to change its share buyback formulas to disadvantage the Franks. Although previous buyback programs were on a percentage basis, Reflexite began to purchase the same number of shares from all shareholders, which had the effect of permitting smaller shareholder to liquidate their positions faster than shareholders such as the Franks.

47.    On information and belief, Reflexite's new buyback formula was specifically and intentionally conceived by the Defendants and implemented so as to minimize Jon Frank's ability to sell his shares and to discourage him from participating in the program.  Defendant Cecil Ursprung referred to the buyback program as the "Jon Frank" program, referring to the fact that it singled out Mr. Frank for discriminatory treatment.

48.    Upon information and belief, the Board members and other shareholders other than the Franks were permitted to register their shares of Reflexite under multiple names to take advantage of this new policy and to sell a disproportionately large number of shares.

49.    Thus, while engaging in self-dealing transactions redounding to the economic benefit of Reflexite's directors, executives and other insiders, the Defendants denied similar opportunities to the Franks, and has wrongfully acted to oppress the Franks and unfairly and arbitrarily limit the liquidity and value of their investment in Reflexite.

**Reflexite and the Board Ignore the Franks' Concerns**

50.    The Franks were understandably upset that Board would cause Reflexite to purchase massive quantities of their own stock and virtually none of the Franks' shares.  In discussions with Defendant Arthur LoVetere and others at Reflexite, the Franks requested

opportunities comparable to those given to the Board and others. The Franks were told that they would not be given the liquidity opportunities provided to others. It was explained to the Franks that the purchase of $8 million of Mr. Rowland's shares was undertaken because he was a "founder."

51.     Neither Mr. LoVetere nor any other Defendant has ever articulated any legitimate business reason for the leveraged repurchase of the Defendants' and others' shares and the concerted refusal to make comparable purchases of the Franks' shares. Upon information and belief, good corporate governance suggests that the directors should own significant amounts of shares of the company they manage, to align their interests with those of the shareholders. The Defendants' conduct had the effect of reducing the directors' incentives to maximize the value of Reflexite's shares. Thus, the refusal to permit the Franks to sell their shares, while the Board was selling its, served no legitimate business purpose.

52.     On May 5, 1999, Jon Frank wrote to Defendant Arthur LoVetere to request that his concerns for fair treatment and liquidity be "more equitably addressed." Mr. LoVetere suggested, in a May 18, 1999 letter, that Reflexite would consider purchasing his shares at a discount or accepting his shares for a subordinated note, among other options. On information and belief, repurchases from all other shareholders have been at the appraised price of Reflexite's stock and not at a discount. Thus, the Board's response to the Franks' request for fair treatment was further discrimination.

53.     In June 1999, Jon Frank responded that the Franks would be flexible about a buyback arrangement. Despite the Franks' interest in pursuing liquidity opportunities, however, neither Reflexite nor its Board followed up on any of its suggestions.

54.     Thereafter, continuing the oppression of the Franks, Reflexite's buyback offers to the Franks were tiny.  In 2000, the Franks were offered the opportunity to sell only 360 shares ($15,840 worth of shares) and a mere 100 shares (or $3,625) in 2001 – a tiny fraction of their overall share holdings.  The Franks' liquidity was actually being reduced over time relative to other shareholders.

55.     The motivation of the Board for this unfair and discriminatory treatment of the Franks was their animosity toward the Franks for having expressed concerns about certain self-dealing transactions in which the Board had engaged or was suspected to have engaged.

56.     Upon information and belief, as a result of the Franks' inquiries into the Board's behavior, the Board decided to deny the Franks the benefits, opportunities and information provided to other shareholders.  For example, Cecil Ursprung informed one former employee of Reflexite that "as long as I am CEO of this company, he [Jon Frank] will never get his equity out of here."  When the former employee asked why, Mr. Ursprung responded that Jon Frank is not a friend of Reflexite.

57.     Reflexite did not treat other large shareholders in so unfair a manner as it treated the Franks.  For example, one former Reflexite employee inquired of Cecil Ursprung what would happen if certain large shareholders such as former Board member Gerry Robinson or Jon Frank were to pass away.  Mr. Ursprung responded that he would take care of Gerry Robinson's estate, but that he would deal very differently with Jon Frank's estate.

58.     On October 20, 2001, Jon Frank wrote to Reflexite to express his continuing concerns that his desire for fair treatment and liquidity was not being dealt with in the same manner as other corporate insiders and that the number of shares allocated to the Franks in the repurchase was so small as to be not worth pursuing.

59.     On information and belief, last year Mr. Ursprung stated to a Reflexite employee that Mr. Ursprung would do whatever he could to delay or prevent Jon Frank from getting any money out of Reflexite.

60.     The Defendants' wrongful conduct continued when, in July of 2002, the Franks were informed that the buyback program was "postponed" but were never informed of its reinstatement in October, and thus were denied the opportunity to participate in the program. Upon information and belief, Reflexite changed the buyback formula that year to favor large shareholders, but excluded the Franks from participation.  Upon information and belief, the Defendants intentionally and with malice excluded the Franks from this opportunity.

61.     Upon information and belief, Reflexite and its Board intentionally denied the Franks' opportunities for liquidity comparable to those provided to other shareholders, and even denied the Franks basic notice of existing opportunities to sell shares.

62.     On information and belief, the actions of the Defendants were not based on a legitimate business reason, but out of malice, self-interest, and other improper purposes.

### The Denial of Information Requests

63.     The Franks were also denied important information relevant to their shareholdings.  For example, Morgan Frank, on behalf of the Frank Family 1996 Trust, requested access to the Corporation's records in his letter to Mr. Cecil Ursprung of September 16, 2002 – a letter that followed several communications between the Franks and executives and directors at Reflexite (including several requests to Defendant Arthur LoVetere, the Chairman of the Board). The requested records included, among other things, documentation concerning the Corporation's ESOP plan, records concerning the Strategic Minority Investor Program and records concerning the Corporation's repurchase of shares from its large shareholders, including

Board members and insiders. In a November 8, 2002 letter to the Franks, Reflexite's Chief Executive Officer, Defendant Cecil Ursprung, indicated that Reflexite would not provide the requested information, or that some of this information was not available to the Corporation. In oral communications with the Franks, Chairman Arthur LoVetere confirmed that the Corporation would provide no information to the Franks.

64.     On information and belief, the Franks have been denied other information concerning Reflexite, as detailed above, such as financial statements and information concerning share buyback programs.

***The Board's Subsequent Conduct***

65.     On February 10, 2003, the Franks sent Reflexite and its Board a formal demand letter pursuant to Connecticut General Statutes § 33-722, requesting that the Board of Directors or Reflexite immediately investigate and remediate the Defendants' self-dealing transactions and other issues (the "Demand Letter").

66.     Reflexite's Board purported to form a "Special Litigation Committee" ("SLC") to investigate the wrongful acts identified in the Demand Letter and other information provided by the Franks. In fact, the SLC did not merely investigate the issues raised in the Demand Letter, but also took it upon itself, improperly, to investigate the Franks' claim that the Board had discriminated against them.

67.     For example, the SLC inquired into the buyback programs of the company and the Franks' prior sales of shares. Such an inquiry was conceded by the members of the SLC not to be relevant to the purported derivative action. Its only relevance was to help the Board protect itself against the Franks "direct" claim.

68.     Moreover, the SLC did not perform a genuine and unbiased investigation of the wrongdoing alleged by the Franks, but rather performed a perfunctory review that was a mere pretext to insulate the Board from scrutiny and/or litigation.

69.     The SLC investigation further evidences the intent of the Board: to cover up their practice of discriminating against the Franks and to continue to deny the Franks their rights. That the Board did so using the resources of Reflexite confirms that their actions and intent were improper.

### The 2004 Stock Option Plan and Tender Offer

70.     In the summer of 2004, the Board of Directors approved a "2004 Stock Option Plan" to issue "put" options for as many as 250,000 shares of common stock to certain directors and employees.  These options would have enabled the grantees to compel Reflexite to purchase the stock of the grantee at any time.  The Board of Directors would have had sole discretion as to who will receive such options and when such options may be exercised.

71.     On information and belief, the Plan was intended to discriminate against the Franks and to create a de facto new class of preferred shares to be held by shareholders (including the Board) other than the Franks.  The Plan was designed to entrench the Franks' position and further limits their rights vis-à-vis other shareholders.  It would also have left the Franks holding a larger percentage of a company with greatly expanded debt obligations.

72.     The Franks voiced their opposition to the proposed 2004 Stock Option Plan and the Defendants and Reflexite ultimately abandoned the Plan and did not implement it.  On information and belief, it was the Franks' opposition to the Plan, and their stated intention to bring judicial scrutiny to the unfairness of the Plan, that caused the Board to relent.

73.    In late 2004, during the pendency of this lawsuit, the Board of Directors caused Reflexite to engage in a $10 million tender offer of Reflexite shares.  For the first time, the Board was going to permit the Franks to tender a substantial number of shares at the same price given to other shareholders.  At the same time, however, the Tender Offer caused Reflexite to incur some $10 million in debt, increasing the financial risk associated with the Franks' remaining shares.

74.    On information and belief, the Tender Offer was prompted by a desire to permit certain Defendants to achieve liquidity and by a desire to create a more favorable record for the Defendants in this lawsuit.

## COUNT ONE
### Breach of Fiduciary Duties

75.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

76.    The Defendants also owed fiduciary duties to the Franks, who are, and at all relevant times have been, shareholders of Reflexite.

77.    The Defendants' actions set forth above were performed in violation of the Defendants' fiduciary duties to the Franks.

78.    The Defendants have acted oppressively and with malice towards the Franks, as evidenced, for example, by Defendants' actions towards the Franks and the statements that certain Board members made that the Franks would never be permitted to sell their shares.

79.    The actions of the Defendants, as described herein, constitute acts of misconduct of the Board of Directors vis-à-vis the Franks, designed to oppress the Franks and deny them their rights as shareholders.  These acts include, *inter alia*

-17-

a)    establishing improper and unfair double standards by which the Defendants and other shareholders were permitted to sell shares of Reflexite stock and realize the economic benefits of share ownership while denying comparable opportunities to the Franks;

b)    acting with malice and oppression towards the Franks in refusing to provide them with information and refusing to treat them in a fair manner;

c)    unjustifiably interfering with the rights of the Franks as shareholders by singling them out to be denied information about and opportunities to participate in opportunities and liquidity events that were made available to other shareholders;

d)    denying the Franks access to information concerning their shareholdings in Reflexite and their concerns about the self-interested transactions discussed herein;

e)    denying the Franks access to the books and records of Reflexite and other information germane to the Franks' ownership of Reflexite shares;

f)    assisting other Defendants to engage in oppression of the Franks;

g)    refusing or failing to perform an adequate investigation of the wrongdoing alleged by the Franks and utilizing the resources of Reflexite to either cover up or prevent remediation of their discrimination of the Franks;

h)    proposing and approving the 2004 Stock Option Plan, the effect of which would have been to further discriminate against the Franks;

i)    excluding the Franks from opportunities and benefits enjoyed by other shareholders and the Defendants themselves;

j)    establishing a share buyback formula for the express purpose of entrenching the Franks' proportionate shareholdings and denying them the benefits of share ownership provided to other shareholders.

80.    The Franks have been irreparably harmed and continue to be irreparably harmed by the Defendants' mistreatment and oppression of the Franks.

81.    As a direct and proximate result of such wrongful conduct, the Franks have suffered injury to an extent that any remedy at law for damages they may have would be inadequate.

-18-

82.    The Franks are thus entitled to injunctive relief requiring that Defendants refrain from engaging in such conduct and/or injuring or restricting the rights of the Franks as shareholders or the value of the Franks' shareholdings of Reflexite stock in such a manner in the future.

83.    As a direct and proximate result of the breaches by Defendants of their respective fiduciary duties the Franks, the Franks have suffered damages.

84.    The Franks are thus entitled to recover compensatory damages in an amount to be determined at the trial of this action and are also entitled to recover punitive damages by reason of the willful and intentional conduct engaged in by Defendants as alleged herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs, and against the Defendants, as follows:

a)      finding that Individual Defendants Arthur LoVetere, Cecil Ursprung, Louis J. Baccei, Worth Loomis, Theodore Patlovich, Stephen J. Raffay, William P. Rowland and Peter Eio breached their fiduciary duties to the Franks;

b)      granting injunctive relief requiring that the Defendants refrain from engaging in further acts intended to injure the value of the Franks' shareholdings in Reflexite or using Reflexite's assets or resources to do so;

c)      awarding compensatory and punitive damages against Defendants in amounts to be determined at the trial of this action;

d)      granting pre-judgment interest from the date of the wrongs to the date of the judgment herein;

e)      awarding Plaintiffs' attorneys' fees and costs; and

f)      granting such other and further relief as this Court deems just and proper.

PLAINTIFFS H. JONATHAN FRANK and
FRANK FAMILY 1996 TRUST

By:_____/s/ Terence J. Gallagher_____
       Richard A. Strassberg (ct24905)
       Jeffrey A. Simes (ct24906)
       GOODWIN PROCTER LLP
       599 Lexington Avenue
       New York, New York 10022
       (212) 813-8800

              -and-

       Terence J. Gallagher (ct22415)
       Jonathan B. Tropp (ct11295)
       DAY, BERRY & HOWARD LLP
       One Canterbury Green
       Stamford, CT  06901

## CERTIFICATION

This is to certify that a copy of the foregoing was sent via overnight courier, postage prepaid, this 24th day of June 2005, to:

James T. Cowdery, Esq.
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555


Edward F. Spinella, Esq.
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103
(860) 240-1045


James T. Shearin, Esq.
Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601-7006
Phone:  (203) 330-2000

_____/s/_____
Terence J. Gallagher