EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

H. Jonathan Frank and      :
Frank Family Trust,        :
    Plaintiffs,         :
                          :
v.                         :      Civil No. 3:03cv1014(JBA)
                          :
Arthur LoVetere, et al.,   :
    Defendants.         :

## RULING ON DEFENDANTS' MOTIONS TO DISMISS
## [DOCS. ## 40, 41, 42, 49, 68]

On November 7, 2003, H. Jonathan Frank and the Frank Family 1996 Trust filed an amended complaint [doc. # 38] against Reflexite Corporation and individual defendants Arthur LoVetere, Cecil Ursprung, Louis Baccei, Worth Loomis, Theodore Patlovich, Stephen Raffay, William Rowland, and Peter Eio, alleging that: the individual defendants breached their fiduciary duty to Reflexite Corporation (Count One); the individual defendants breached their fiduciary duty to the plaintiff (Count Two); defendant Rowland breached a 1979 contract and a 1986 Stockholder Agreement (Count Three); Rowland is liable on a promissory estoppel theory (Count Four); all defendants except Rowland tortiously interfered with contractual relations between Rowland and Frank (Count Five); and plaintiff is entitled to an accounting from all defendants (Count Six). The complaint invokes this Court's diversity jurisdiction under 28 U.S.C. § 1332. Currently before the Court are motions to dismiss all claims in the complaint. For the reasons that follow, the

1

defendants' motions will be granted as to Counts One, Three, Four, Five and Six and denied as to Count Two.

## I.    FACTUAL BACKGROUND[1]

Reflexite is a Connecticut corporation that "produces reflective products and display optics." Am. Compl. ¶ 21. It is a private corporation whose shares are not traded on any public stock exchange. Defendant Arthur LoVetere is Chairman of the Reflexite Board of Directors. Am. Compl. ¶ 8. Defendant Cecil Ursprung is the President and a Director of Reflexite. Id. ¶ 9. Defendant William Rowland is a founder of Reflexite and a member of the board of directors. Defendants Louis Baccei and Peter Eio are current members of Reflexite's Board of Directors, and, as was clarified at oral argument, Defendants Theodore Patlovich, Stephan Raffay, and Worth Loomis are former board members.

Jonathan Frank is a citizen of Nevada who began as an employee of a Reflexite predecessor corporation in 1972. Throughout the 1970s he had various business relationships with Reflexite, including an exclusive contractual arrangement to sell Reflexite in the "traffic control market," and he became "one of

---

[1]Except where noted, the facts are drawn from the complaint and will be accepted as true for purposes of the motions to dismiss. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), Leonard F. v. Israel Discount Bank of N.Y.,199 F.3d 99, 107 (2d Cir. 1999), Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). Facts relating to the Reflexite Special Litigation Committee formed in February 2003 are drawn from the record derived from the discovery permitted on that topic. See Amended Scheduling Order [doc. #60].

Reflexite Corporation's largest source[s] of sales." Am. Compl. ¶ 27.

In 1979, Hugh Rowland (William Rowland's brother and a co-founder of Reflexite) "approached Jon Frank and asked if he would be willing to purchase 10% of Reflexite Corporation. Mr. Frank indicated that he would do so on two conditions: first, he had to be able to purchase the shares in two installments over a two-year period; second, he had to be able to sell his shares if other insiders were able to sell theirs." Id. ¶ 29. He entered a written agreement with Hugh and William Rowland and Fritz Haffenreffer, another principal at Reflexite, providing: "Before actually selling stock ... that would result in a transfer of voting control to a third party" they would "use all efforts that are reasonable to assure [Frank] the opportunity of selling [his] shares at the same price." See id. ¶ 30; Rowland Mem. of Law [doc. #41] Ex. A.  Frank then purchased 8,471 Reflexite shares in 1979 and another 8,470 in 1980, representing 10% of the company. In 1997, Jonathan Frank transferred all of his Reflexite shares to the Frank Family 1996 Trust, and he no longer owns any Reflexite stock in his own name.

In approximately 1980, Jonathan Frank became "Vice President of Marketing and Sales for all operations [at Reflexite]. Mr. Frank declined ... opportunities in 1982 and 1983 to become the President of Reflexite. Soon thereafter, Reflexite hired

Defendant Cecil Ursprung to become its President." Id. ¶ 32.

In 1985, Reflexite terminated Frank's employment "without notice or explanation." Id. ¶ 33.  Frank alleges that Reflexite engaged in "improper efforts to hold his termination benefits hostage" by conditioning payment of the benefits on his consent to the creation of an employee stock option plan ("ESOP"), which he opposed on grounds that it "would dilute the value of existing shareholdings." Id. ¶¶ 33-34.

Frank further alleges that after his departure from Reflexite, the directors "began to pursue a policy of permitting other insiders to sell shares, sometimes unlawfully, while denying the Franks and others a comparable opportunity to obtain liquidity." Id. ¶ 35.  Frank alleges two instances where Hugh Rowland was allowed to sell Reflexite shares and the other shareholders were only informed after the fact. Id. ¶¶ 35-36. He also alleges one instance where Defendant Ursprung was allowed to "sell his shares and the other Defendants procured the necessary consents after his sale took place to permit this transaction." Id. ¶ 38.  Additionally, Frank alleges that the Board permitted Defendant Loomis to purchase shares at discounted prices. Id. ¶ 39.

Frank's largest complaint is a stock redemption transaction involving William Rowland ("Rowland transaction").  In January 1998 "Reflexite spent some $8.1 million dollars to purchase

shares from William Rowland and his family trust.  Upon

information and belief, Reflexite spent more than $3,000,000 of

its own cash and borrowed $5,000,000 to bring about this

purchase, at a price of $30 per share.  Reflexite did not notify

the Franks (and, on information and belief, other shareholders)

of this transaction and, indeed, hid the reference to it in

footnotes of a financial statement that the Franks did not

receive."  Id. ¶ 42.  Frank alleges that this sale was injurious

to the corporation, and that "it has denied the Franks and other

shareholders comparable opportunities."  Id. ¶ 44.  In

particular, Frank alleges that Reflexite's stock buyback

arrangements in 1998-99 disadvantaged large stockholders.  Id. ¶

47.  The complaint states that "Defendants' wrongful conduct

continued when, in July of 2002, the Franks were informed that

the buyback program was 'postponed' but were never informed of

its reinstatement in October, and thus were denied the

opportunity to participate in the program."  Id. ¶ 55.  The

complaint alleges that "Mr. Ursprung has stated that the Franks

'will never get liquid as long as I am President of

Reflexite'..."  Id. ¶ 57.

 Between 1999 and 2001 plaintiffs raised their concerns with

Defendant LoVetere and others in a series of letters that

resulted in "tiny" buyback offers from Reflexite.  Id. ¶ 53.  In

2002, Morgan Frank on behalf of the Trust requested information

from Reflexite concerning the ESOP, the "Strategic Minority Investor Program and records concerning the Corporation's repurchase of shares from its large shareholders, including Board members and insiders." Id. ¶ 58. Defendant Ursprung turned down the requests.

On February 10, 2003, plaintiffs sent Reflexite a formal demand letter pursuant to Connecticut General Statutes § 33-722 requesting that the Board investigate and remedy the failure to provide the requested information; the letter also demanded an investigation into allegations that "the Corporation has repurchased the shares of Board members and other insiders at terms favorable to those insiders while refusing to accord comparable treatment to the Franks or other non-insider shareholders." Demand Letter at 2, Mem. of Law in Support of Reflexite's Mot. to Dismiss [doc. #69], Ex. A. In response to the demand letter, the Reflexite board formed a Special Litigation Committee ("SLC") consisting of directors Louis Baccei, Peter Eio, and Worth Loomis, although Loomis resigned when it was discovered that he had voted to approve the Rowland transaction. Report of Special Litigation Committee, 4/28/03, Reflexite Mem. of Law, Ex. B at 2. Between March 28, when the committee began its investigation, and April 28, when it approved the final report, the SLC and its counsel interviewed six witnesses: Defendants Ursprung, Rowland, Raffay and LoVetere;

6

Plaintiff Jonathan Frank; and Reflexite Vice President of Finance
Philip Ferrari.  The report concluded that "the Rowland
Transaction was properly approved by the Board in accordance with
Connecticut law and was fair to the Corporation," and that "the
Corporation was not, and is not, obligated to offer the Franks an
opportunity to sell shares to the Corporation in a manner similar
to the Rowland Transaction or the other redemptions" offered to
Reflexite executives Seely, Smith, and McDonald.  Id. at 15, 16.

      In November 2003, defendants moved to dismiss the amended
complaint on several grounds.  After briefing on those issues had
been completed, the Court permitted discovery on the further
theory that the shareholder derivative count was barred under
Connecticut General Statutes § 33-724 because the SLC had
declined to pursue the litigation.  Further briefing was
submitted on the SLC issue and oral argument on all motions was
heard on March 24, 2005.

**II.  STANDARD**

      Defendants' motions except those concerning the SLC are
brought pursuant to Federal Rules of Civil Procedure 12(b)(6) and
12(b)(1).  To survive such a motion to dismiss, the plaintiff
must set forth "'a short and plain statement of the claim' that
will give the defendant fair notice of what the plaintiff's claim
is and the grounds upon which it rests."  Conley v. Gibson, 355
U.S. 41, 47 (1957), quoting Fed. R. Civ. P. 8(a)(2), see also

7

<u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46 (footnote omitted), <u>see also</u> <u>Jahgory v. NY State Dep't of Educ.</u>, 131 F.3d 326, 329 (2d Cir. 1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).

The standard of review for a motion to dismiss pursuant to Connecticut General Statutes § 33-724 is discussed <u>infra</u>, § III.A.1, in the context of the overall statutory scheme.

## III. DISCUSSION

### A.   Count One: Derivative Claim for Breach of Fiduciary Duty

Count One of the Amended Complaint asserts a shareholder derivative claim against the individual defendants for breach of fiduciary duty by, among other things, approving insider stock transactions, failing to inform stockholders of these transactions, and "failing to make an adequate and disinterested investigation of the wrongdoing discussed in the [plaintiff's] Demand Letter." Am. Compl. ¶ 74. Reflexite argues that Count One should be dismissed because an independent SLC made a

8

reasonable and good faith review of the demand letter and properly rejected the demand as not in the best interest of the corporation.

### 1.    Connecticut General Statutes § 33-724

Connecticut General Statutes § 33-724 provides:

  (a) A derivative proceeding shall be dismissed by the court on motion by the corporation if one of the groups specified in subsection (b) or (f) of this section has determined <u>in good faith after conducting a reasonable inquiry upon which its conclusions are based</u> that the maintenance of the derivative proceeding is not in the best interests of the corporation.

  (b) Unless a panel is appointed [by the court] pursuant to subsection (f) of this section, the determination in subsection (a) of this section shall be made by: (1) A majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum; or (2) a majority vote of a committee consisting of two or more independent directors appointed by a majority vote of independent directors present at a meeting of the board of directors, whether or not such independent directors constituted a quorum.

  ...

  (d) If a derivative proceeding is commenced after a determination has been made rejecting a demand by a shareholder, the complaint shall <u>allege with particularity</u> facts establishing either (1) that a majority of the board of directors did not consist of independent directors at the time the determination was made or (2) that the requirements of subsection (a) of this section have not been met.

Conn. Gen. Stat. § 33-724 (emphasis added).

Thus subsection (a) of the statute requires: (1) independent decisionmaking by either the board or an SLC; (2) good faith; and (3) reasonable inquiry.  Subsection (d) of the statute

establishes a heightened pleading standard in the situation presented here, where the Reflexite board, on the recommendation of the SLC, rejected plaintiff's demand. The statute appears to contemplate that the court will review the plaintiff's complaint on its face, using a heightened review standard akin to that required in fraud cases under Federal Rules of Civil Procedure 9. See Official Commentary (3), Model Business Corp. Act ("MBCA")[2] § 7.44 (1999) ("Discovery is available to the plaintiff only after the plaintiff has successfully stated a cause of action" under the heightened pleading standard). However, in this case, the Court, by agreement of the parties, permitted discovery on the issue of whether the SLC's determination was made independently, in good faith and after reasonable inquiry. See Tr. of Tel. Conf. 10/30/03 [doc. # 47] at 27-30. Because of the unusual procedural posture of this case, the Court will apply plaintiff's proffered evidence adduced during discovery to particularize the general allegations of the complaint, many of which are made "on information and belief." Thus, to successfully oppose Reflexite's motion to dismiss Count One, plaintiff must show "with particularity" facts supporting his allegations that the SLC lacked good faith, reasonableness and independence as required under Conn. Gen. Stat. § 33-724(a).

---

[2]Connecticut adopted the MBCA's shareholder derivative statute in 1997.

10

This standard comports with the deference afforded corporate decisionmaking under the business judgment rule.  See generally Kamen v. Kemper Financial Servs., 500 U.S. 90, 101 (1991).  In cases such as this, where the plaintiff is required to make a demand on the corporation[3] before filing suit, courts have taken two different approaches to reviewing the board's decision to reject that demand.  See 5 James Wm. Moore et al., Moore's Federal Practice, § 23.1.08[3][b] (3d ed. 2004).  The first approach is one of deference under the business judgment rule, and requires only that "the court must examine the good faith, reasonableness, and independence of the committee's actions." Id.  For instance, in New York, "[w]hile the court may properly inquire as to the adequacy and appropriateness of the committee's investigative procedures and methodologies, it may not under the guise of consideration of such factors trespass in the domain of business judgment. ... The [limited investigation] may be expected to show that the areas and subjects to be examined are reasonably complete and that there has been a good-faith pursuit of inquiry into such areas and subjects."  Auerbach v. Bennett, 47 N.Y.2d 619, 634 (N.Y. 1979).[4]  The second approach involves a

---

[3]Although plaintiff pleads as an alternative theory that demand was futile, see Am. Compl. ¶ 76, he did not press the argument in briefing or at oral argument, and therefore the Court will consider it abandoned.

[4]The Connecticut statute does not entirely follow Auerbach because it additionally requires the court to examine whether the

more searching review to "determine whether the committee reached

a reasonable and principled decision..." Moore's Fed. Prac. §

23.2.08[3][b].  This approach was initiated by the Massachusetts

Supreme Judicial Court, adopting a proposal from the American Law

Institute that a reviewing court should evaluate factors such as

"the likelihood of a judgment in the plaintiff's favor, the

expected recovery as compared to out-of-pocket costs, whether the

corporation itself took corrective action, whether the balance of

corporate interests warrants dismissal, and whether dismissal

would allow any defendant who has control of the corporation to

retain a significant improper benefit." Houle v. Low, 556 N.E.2d

51, 59 (Mass. 1990).[5]

Although no Connecticut court appears to have addressed this

issue, Connecticut's statute governing shareholder derivative

---

SLC's conclusions were in fact based on the results of its
inquiry.  See Conn. Gen. Stat. § 33-724(a).

[5]See also Lewis v. Boyd, 838 S.W.2d 215, 224-25 (Tenn. App.
1992) ("The court's review of the adequacy of the committee's
investigation should examine (1) the length and scope of the
investigation, (2) the committee's use of independent counsel or
experts, (3) the corporation's or the defendants' involvement, if
any, in the investigation, and (4) the adequacy and reliability
of the information supplied to the committee.  When considering
whether the committee has reached a reasoned and principled
decision that is in the corporation's best interests, the court
should consider: (1) the likelihood that the plaintiff will
succeed on the merits, (2) the possible financial burden on the
corporation compared with the litigation costs, (3) the extent to
which dismissal will permit the defendants to retain improper
benefits, and (4) the effect continuing the litigation will have
on the corporation's business reputation and good will.").

proceedings would be incompatible with the latter "reasonable and principled" approach. The statute limits a court's consideration of a corporation's motion to dismiss to whether a proper group rejected the shareholder demand "in good faith after conducting a reasonable inquiry upon which its conclusions are based ... ." Conn. Gen. Stat. § 33-724(a). The official commentary to § 7.44 of the MBCA, which is identical to § 33-724, explains that the MBCA "authorizes the court to examine the [board's] determination to ensure that it has <u>some support</u> in the findings of the inquiry." Official Commentary (2), MBCA § 7.44 (1999) (emphasis added). The policy reason for this limited review is that a corporation should be free to determine in its own business judgment whether litigation is in its best interest, free from unnecessary interference. <u>See generally</u> <u>Kamen</u>, 500 U.S. at 101 (1991) (referencing "the basic principle of corporate governance that the decisions of a corporation--including the decision to initiate litigation--should be made by the board of directors or the majority of shareholders.") (internal citation and quotation marks omitted).

On the other hand, Connecticut's corporations law provides for shareholder derivative suits where they are warranted, and thus is intended to protect minority shareholders against corporate overreaching and abuse. The statutory standard of good faith and reasonableness creates a floor below which the board's

13

actions and procedures cannot fail to be considered reasonably acceptable under the business judgment rule.  Thus Frank's burden here is not just to show that the SLC's inquiry and report were flawed, or that someone else might have reached a different conclusion, but that the SLC's "inquiry and ... conclusions [do not] follow logically."  Official Commentary (2), MBCA § 7.44.

From the discovery taken in this case concerning the SLC's investigation, the Court concludes that plaintiff lacks support for his generalized allegations that the SLC's investigation was conducted unreasonably and in bad faith.

### 2.    Reasonableness of SLC's Inquiry

Plaintiff contends that the SLC's inquiry was unreasonable because the SLC failed to interview relevant witnesses, review relevant documents, or conduct sufficient financial analyses, and its report was written and adopted hastily.  See Pl. Opp. [doc. #70] at 29.[6]   At bottom, plaintiff points to two major shortcomings of the SLC's investigation, the first being the fact that the SLC did not interview David McDonald, a former Reflexite

_____

[6]Plaintiff specifically argues that the SLC inquiry was unreasonable because the SLC's meetings were brief and infrequent, the entire investigation only lasted one month, the SLC's counsel reviewed documents on their own and generally directed the investigation, and Defendant Ursprung interfered with the SLC's work by limiting the amount of attorneys fees and refusing to reschedule the May 2003 board meeting to allow SLC member Peter Eio to be present.  See Pl. Opp. at 28-34.  However, plaintiff offers no evidence that the length of the inquiry or the amount of assistance received from counsel impaired the SLC's inquiry or impacted its recommendation.

14

executive and a key person identified by Frank as having information concerning the allegations in the demand letter. McDonald has stated in an affidavit accompanying plaintiff's opposition that Defendant Ursprung told him: "'as long as I am CEO of this company, [Jonathan Frank] will never get his equity out of here.' When [McDonald] asked why, Cecil [Ursprung] responded that Jon Frank is not a friend of this company. ... [McDonald] then asked what would happen to their shareholdings if Gerry Robinson [another former employee] or Jon [Frank] were to pass away. Cecil responded that he would take care of Gerry Robinsons' estate, but that he would deal very differently with Jon Frank's estate." Decl. of David McDonald [doc. #72] ¶ 5. The notes of the SLC reflect several instances in which efforts were to be made to obtain contact information for McDonald, see Gallagher Aff. [doc. #74] Ex. 3 at CL01043, CL01046, CL01048, but McDonald was never interviewed.[7]

At oral argument, Reflexite's counsel offered what seems like a post hoc rationalization for the committee's failure to interview McDonald, since the explanation is not contained in the

---

[7]Reflexite argued in its brief that it was unable to contact McDonald, but the testimony of James Lotstein, counsel to the SLC, was that he could not recall the efforts his firm made to contact McDonald, see Lotstein Dep. at 66-67, and Peter Eio testified that the only attempt he made to find McDonald extended to asking Defendant Ursprung's secretary whether she knew McDonald's current address. Eio Dep. at 63-64.

record of the SLC's proceedings.[8]  Regardless, it is clear that

the SLC was aware of a serious rift between Frank and Ursprung.

The SLC's notes from March 6, 2003, reflect its knowledge of the

existence of "bad blood" between Ursprung and plaintiff,

Gallagher Aff., Ex. 3 at CL01073.  Frank's demand letter and his

supplemental written submission provided to the SLC in April 2003

repeat this statement allegedly made by Ursprung.  The SLC

therefore knew the essence of what McDonald's testimony would be

if he were interviewed, and it knew Ursprung denied the

statement.  While plaintiff has demonstrated that McDonald could

be found to be interviewed, plaintiff has not shown how

McDonald's additional testimony, beyond the statements plaintiff

quoted in his demand, would have provided new information that

would have changed the reasonableness of the SLC's decision.

The second deficiency in the SLC Report that plaintiff

identifies is the absence of any independent financial analysis.

The report simply concludes that "the Rowland Transaction and the

other redemptions ... were consummated in accordance with

applicable law and were in the best interests of the

---

[8]The rationale offered was that McDonald's allegations were
insignificant in the face of the SLC's information that Jonathan
Frank had in fact been given opportunities to sell back shares to
Reflexite.  The SLC documented that in 1997, 1998 and 2001 he
sold back shares with a total value of $840,384.  He declined to
sell shares in 1999, 2000 and 2002.  Report of SLC at 12.  Frank
argues that the latter buyback offers were tiny and not worth
pursuing, and that he was not even notified of the 2002 offer.

Corporation."  Report of SLC at 17.  Other than interviewing

Reflexite Vice President-Finance Philip Ferrari, who described

his financial analysis of the Rowland transaction in 1997-98, the

report does not show that the SLC actually undertook its own,

independent financial investigation of the economic impact on the

company of $2.3 million cash and $4 million loan plus interest

required for the Rowland redemption.  See Report of SLC at 10.

The SLC log of reviewed documents, attached to the Report as

Exhibit B, does not contain any document dating from the 1997-98

time period.

While some independent analysis of the financial impact of

the Rowland transaction on the company would be optimal where

cost was no obstacle, none is required.  The SLC's inquiry cannot

be found to be unreasonable simply because it relied only on

Ferrari's knowledge and explanation of the terms and consequences

to the corporation of the Rowland transaction.  Ferrari's

interview provided the information that the price Reflexite paid

for Rowland's shares was the fair market value established by an

independent appraisal completed for the ESOP.  Report of SLC at

3.  Ferrari also represented that the interest rates on the

promissory notes issued to Rowland were favorable to the

corporation compared to similar types of debt and that the

transaction permitted the corporation to discontinue the buy-sell

life insurance it had maintained for Rowland (with $30,000 annual

17

premiums).  Id.  Additionally, Ferrari also echoed the theme of
the other participants that Rowland deserved special
consideration because he "was the creator of the Corporation's
core technology and ... a continuing contributor to the growth of
the Corporation."  Id.[9]

Plaintiff points to no authority or policy reason why it
would be unreasonable as a matter of law for the SLC to rely on a
knowledgeable corporate official's expertise derived from his own
involvement with the transaction when it occurred.  Id.[10]
Ferrari had studied "the impact of the Rowland Transaction on the
Corporation's future cash flows, debt covenants, earnings per
share and balance sheet."  Id.  The SLC was required to make a
reasonable and good faith inquiry into these matters, but not to
reinvent the wheel by retaining outside accountants or financial
analysts on this issue.  Plaintiff's evidence does not show that

_____

[9]The SLC's notes reflect information from Defendant LoVetere
and discussion among the SLC that because of Rowland's technical
expertise, the company wanted to continue a consulting
relationship with him, which presumably would be advanced by
assisting him with his estate planning needs at the time.
Meeting Notes, Gallagher Aff., Ex. 7 at CL01079.

[10]The MBCA uses the "word 'inquiry' rather than
'investigation' ... to make it clear that the scope of the
inquiry will depend upon the issues raised and the knowledge of
the group making the determination with respect to the issues.
In some cases, the issues may be so simple or the knowledge of
the group so extensive that little additional inquiry is
required.  In other cases, the group may need to engage counsel
and other professionals to make an investigation and assist the
group in its evaluation of the issues." Official Commentary (2),
MBCA § 7.44 (1999)

18

Ferrari was personally biased or not disinterested, and suggests no reason that the SLC should not have relied on the information or credited the statements of this corporate officer.

Frank further argues that the inquiry into the Rowland transaction was unreasonable because the SLC did not examine Reflexite's failure to disclose the existence of transaction to shareholders in advance, or fully disclose its terms to shareholders after the fact. Frank is correct that the Reflexite 1998 Annual Report merely stated that the company "also made a significant purchase from an individual shareholder," Baccei Dep. Ex. 11 at WPR015, without stating the amount of the sale or that the seller was a member of the Reflexite board. Frank points to no applicable statute or rule that would have required a more detailed disclosure by a non-public corporation, and the Court has found none.[11]  In any event, the substance of the disclosure was known to the SLC, and plaintiff offers nothing from which it can be inferred that the SLC's conclusions would have been different had it further explored the circumstances of the board's disclosure of the Rowland transaction.

It is also notable that, despite his allegations of "a continuing course of self-interested transactions," Am. Compl. ¶ 74(a), plaintiff did not present evidence to the SLC or the Court

---

[11]As discussed <u>infra</u>, § III.C, the applicable Stockholder Agreement did not require advance disclosure of the Rowland transaction to the Reflexite shareholders or their consent.

that the mistreatment he alleged against him was extended to any

other shareholder.  See Letter from Strassbert to Lotstein,

Reflexite Reply Br. [doc. # 76] Ex. 2.  Frank also presented no

evidence supporting his contention that Reflexite repurchased

shares from Rowland or other insiders at discounted prices.

Finally, plaintiff presented no evidence of the existence of

other large shareholders who were disadvantaged by Reflexite's

buyback formulas.  Without particularized allegations on these

issues, it was not unreasonable for the SLC to limit its inquiry

to the specific transactions challenged by Frank.[12]  The

shareholder demand process does not require an SLC to do

litigation-type discovery before arriving at its conclusions.

Further, that the SLC Report lacked discursive explanations

and independent financial analysis does not show that the SLC's

conclusion that the plaintiff's demands should be rejected was

not based on a reasonable and good faith inquiry.  The SLC and

its counsel interviewed the central players and examined relevant

documents.  A legal analysis was undertaken and a conclusion

formulated based on the inquiry's findings.  Because plaintiff

has not met his burden of offering a factual predicate for his

"on information and belief" allegations, see Am. Compl. ¶¶ 38-48,

55-57, the Court finds no basis for concluding that the SLC acted

---

[12]To the extent Frank alleges he was denied access to
corporate information to bolster his claims, this argument is
addressed infra, § III.B.3.

20

unreasonably or in bad faith, and Count One must be dismissed

pursuant to Conn. Gen. Stat. § 33-724.[13]

### B.    Count Two: Direct Claim for Breach of Fiduciary Duty

#### 1.    Standing

The second count of the Amended Complaint alleges that the

individual defendants breached their fiduciary duty to plaintiff

by treating him unfairly compared to other Reflexite

shareholders.  Defendants move to dismiss this individual claim

as to Plaintiff Jonathan Frank on the ground that he lacks

standing as a shareholder, having transferred all his Reflexite

shares to the Frank Family 1996 Trust before the challenged

conduct took place.  Defendants acknowledge that Frank may

"pursue fiduciary claims against the defendants in his capacity

as Trustee" of the Frank Family Trust.  Reflexite Mot. to Dismiss

[doc. #40] at 7.  However, they maintain that Frank in his

------------------

[13] It is unnecessary to reach the issue of the independence
of the SLC, since it is plaintiff's burden of proof to allege
with particularity that all three requirements--a proper group,
good faith, and a reasonable inquiry--were lacking.  Conn. Gen.
Stat. § 33-724(a).  Although Conn. Gen. Stat. § 33-724(d)
alternatively allows the plaintiff to meet his pleading burden
by alleging "that a majority of the board of directors did not
consist of independent directors at the time the determination
was made" to reject the demand, plaintiff has neither pled nor
presented evidence that a majority of the board, as opposed to
the SLC, lacked independence.
    In addition, because Count One is dismissed pursuant to
Conn. Gen. Stat. § 33-724, it is not necessary to reach
defendants' argument that Jonathan Frank is an improper
derivative plaintiff because his individual claims conflict with
the derivative claim.

individual capacity must be dismissed as a plaintiff.

At oral argument, plaintiff's counsel urged that in addition to his standing as trustee, Frank has standing in his own right because he is the "beneficial owner" of the stock he placed in trust and the trust is merely a "placeholder." Counsel advised, however, that Jonathan Frank's standing as an individual plaintiff was only necessary for Claims Three (Breach of Contract), Four (Promissory Estoppel) and Five (Tortious Interference). Because defendants concede Jonathan Frank's standing as trustee, because Counts Three, Four and Five will be dismissed, infra § III.C-E, and because Frank's individual standing is, at a minimum, superfluous to maintenance of Count Two, the Court will not determine whether Frank's claim of individual standing as a "beneficial owner" of stock is viable. For purposes of this count he has standing to sue as trustee of the Frank Family 1996 Trust, into which he placed his Reflexite shares.

### 2.  Right to Equal Treatment

Defendants assert that the individual ("direct") claim in Count Two--that Frank (as trustee for his family trust) was treated unfairly when individual defendants were allowed to sell shares of Reflexite stock while he was denied "comparable opportunities," see Am. Compl. ¶ 89(a)--fails to state a claim upon which relief may be granted. Defendants argue that a

22

"shareholder has no right to be treated identically to other shareholders," and that the business judgment rule protects the Board's decision to repurchase stock from some shareholders but not others.  Reflexite Mem. of Law at 23, 25.  Plaintiff responds that his "claim is not about an 'equal opportunity for liquidity,' as Defendants suggest."  Pl. Mem. in Opp. 26. Rather, plaintiff states that his claim is that the individual defendants were "motivated by ill will" against him, id., and that decisions taken in bad faith or with malice or ill will are not protected by the business judgment rule.

The parties agree that the individual defendants, as directors of Reflexite, owed a fiduciary duty to minority shareholders such as plaintiff.  A director must "discharge his duties ... in good faith ... with the care an ordinarily prudent person in a like position would exercise under similar circumstances ... and in a manner he reasonably believes to be in the best interests of the corporation."  Conn. Gen. Stat. § 33-756.

Different classes of shareholders are "entitled to be treated fairly but not necessarily to be treated equally."  Nixon v. Blackwell, 626 A.2d 1366, 1379 (Del. 1993).  "[W]hen minority stockholders in a close corporation bring suit against the majority alleging a breach of the strict good faith duty owed to them by the majority, [the court] must carefully analyze the

23

action taken by the controlling stockholders in the individual
case.  It must be asked whether the controlling group can
demonstrate a legitimate business purpose for its action."
Wilkes v. Springside Nursing Home, Inc., 353 N.E.2d 657, 663
(Mass. 1976) (emphasis added); see also Smolinsky v. 46
Rampasture Owners, Inc., 230 A.D.2d 620, 622 (N.Y. App. Div.
1996) (holding, in context of a building cooperative, that "[a]ny
departure from uniform treatment of shareholders must be in
furtherance of a justifiable and bona fide business purpose.")
(emphasis supplied); Crosby v. Beam, 548 N.E.2d 217, 221 (Ohio
1989) ("Where majority or controlling shareholders in a close
corporation breach their heightened fiduciary duty to minority
shareholders by utilizing their majority control of the
corporation to their own advantage, without providing minority
shareholders with an equal opportunity to benefit, such breach,
absent a legitimate business purpose, is actionable.") (emphasis
supplied).

The "legitimate business purpose" standard is fact-specific
and not appropriate for review on a motion to dismiss.  Stone v.
R.E.A.L. Health, Inc., CV-98-0414972, 1999 Conn. Super. Lexis
2016 at *3 (Conn. Super. July 27, 1999) ("where the plaintiff ...
alleges an absence of good faith and a breach of fiduciary duty,
it is particularly inappropriate for the court to find as a
matter of law that the plaintiff's allegations do not support

24

such an inference."). Defendants point to no decision in which a trial court properly rejected a bad faith unequal treatment claim on a motion to dismiss, and the Court has found none.[14]

Here, plaintiff alleges that defendants "act[ed] with malice and oppression towards the Franks in refusing to provide them with information and refusing to treat them in a fair manner." Am. Compl. at ¶ 89(b). He also alleges that Defendant Ursprung verbalized ill will toward him and his estate. Am. Compl. ¶ 57.[15]

---

[14]See Clagett v. Hutchison, 583 F.2d 1259 (4th Cir. 1978) (affirming dismissal on grounds that Maryland law does not recognize strict "equal opportunity rule," but no bad faith or malice was alleged; Butzner, J., dissented on basis that it was premature to dismiss plaintiffs' discrimination claim on a 12(b)(6) motion); Grato v. Grato, 639 A.2d 390 (N.J. Super. Ct. App. Div. 1994) (appeal after bench trial); Nixon, 626 A.2d at 1379 (appeal after bench trial); Delahoussaye v. Newhard, 785 S.W.2d 609, 611 (Mo. Ct. App. 1990) (rejecting per se equal opportunity rule, but no bad faith or malice alleged); Daniels v. Thomas, Dean & Hoskins, Inc., 804 P.2d 359, 360 (Mont. 1990) (appeal after bench trial); Crosby v. Beam, 548 N.E.2d at 222 (reversing trial court's order of dismissal); Toner v. Baltimore Envelope Co., 498 A.2d 642, 643-45 (Md. 1985) (answering certified question from U.S. District Court and rejecting strict equal opportunity rule; no bad faith or malice alleged); Tillis v. United Parts, Inc., 395 So. 2d 618, 619 (Fla. App. 1981) (reversing trial court's order of dismissal).

[15]Defendants assert that because "only the Trust is a plaintiff in this action... this claim must be limited only to allegations of unfair and malicious actions directed at the Trust." Outside Directors' Reply Mem. [doc. # 55] at 5. The plaintiffs allege that "the Defendants have acted oppressively and with malice toward the Franks," thereby including the Trust in this claim. Am. Compl. ¶ 88 (emphasis supplied). Moreover, malice toward Jonathan Frank as Trustee of the Trust is indistinguishable from malice toward Jonathan Frank in his individual capacity.

The claim of a legitimate business purpose is undermined if the challenged action was motivated by malice or personal animosity.  See Smolinsky, 230 A.D.2d at 621 (holding that jury could properly have found that denial of permission to transfer shares based on board of directors' anger about previous litigation lacked a legitimate business purpose).  At this early stage, the pleadings contain no allegation of any legitimate business purpose for refusing to buy back large amounts of the Frank Family Trust's stockholdings, failing to inform them that a stock buyback program was reinstated in October 2002 when other stockholders were so informed, or threatening that Jonathan Frank's shares would never be liquidated (even if they allowed Frank to sell "minimal quantities" of shares, see Am. Compl. ¶ 50).  Counsel for the Outside Directors urged at oral argument that because a corporation is presumed to act with a proper purpose, defendants were not required to state their purpose and the court should defer to the corporation under the business judgment rule.  Despite this presumption, however, where the plaintiff has alleged malice and ill will, the presumption itself is insufficient to warrant dismissal.  Drawing all inferences in favor of the plaintiff, as required at this stage, Frank has stated a valid claim for unequal treatment based on the malice or ill will of the individual defendants.

### 3. Denial of Information Requests

The Outside Directors (LoVetere, Baccei, Loomis, Patlovich, Raffay and Eio) move to dismiss the portion of Count Two that alleges that Frank was denied access to corporate information. This claim is governed by Conn. Gen. Stat. § 33-946(c), which provides in part: "A shareholder may inspect and copy [certain corporate] records ... only if: (1) His demand is made in good faith and for a proper purpose; (2) he describes with reasonable particularity his purpose and the records he desires to inspect; and (3) the records are directly connected with his purpose." Records subject to shareholder inspection include: "(1) Excerpts from minutes of any meeting of the board of directors, ... (2) accounting records of the corporation..." Conn. Gen. Stat. § 33-946(b).

Defendants argue that the "amended complaint does not allege that the plaintiffs satisfied the good faith, particularity, and direct connection requirements of § 33-946(c)." Outside Dir. Mem. in Support [doc. #43] at 21. The Amended Complaint alleges that the "requested records included, among other things, documentation concerning the Corporation's ESOP plan, records concerning the Strategic Minority Investor Program and records concerning the Corporation's repurchase of shares from its large shareholders, including Board members and insiders." Am. Compl. ¶ 58. Plaintiff's demand letter of February 10, 2003,

incorporated in the complaint by reference, specifically requests "all minutes of the meetings of the Board of Directors and all accounting records of the Corporation concerning" the issues above.  Reflexite Mem. of Law [doc. #69] Ex. A at 2.

Reading the demand letter and amended complaint in the light most favorable to plaintiff, as required at this stage, it can be inferred that the purpose of the document inspection request was to investigate allegedly improper stock sales such as the Rowland transaction and the operations of the ESOP, including Reflexite's stock repurchases.  "[A] shareholder who alleges a purpose ... to determine whether improper transactions have occurred, has been held to allege a proper purpose." Pagett v. Westport Precision, Inc., 845 A.2d 455, 461 (Conn. App. 2004) (quoting Official Commentary to MBCA).  The request for Board meeting minutes and accounting records concerning specific corporate transactions is sufficiently particular and within the enumerated documents subject to Conn. Gen. Stat. § 33-946(b).  Finally, there is an obvious connection between the minutes and accounting records regarding Reflexite's approval of these transactions and the Franks' desire to review the propriety of the transactions.  The argument that this allegation should be dismissed because the plaintiff did not actually plead compliance with the terms of Conn. Gen. Stat. § 33-946(b) in his complaint is unpersuasive. The system of notice pleading requires a plaintiff only to set

28

forth facts showing that he is entitled to relief, see Fed. R. Civ. P. 8(a); it does not require a plaintiff to allege the specific statutory basis for that claim. Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 712 n.4 (2d Cir. 1980) ("a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim.").[16]

Defendants also argue that this claim should be dismissed because the Amended Complaint alleges that "Morgan Frank, on behalf of the Frank Family 1996 Trust, requested access to the Corporation's records...," Am. Compl. ¶ 58, and there is no allegation that Morgan Frank (Jonathan Frank's son) is a stockholder. Any such defect is obviated by the subsequent demand letter of February 10, 2003 sent behalf of Jonathan Frank and the Frank Family 1996 Trust and requesting the same records.

For these reasons the outside directors' motion to dismiss the denial-of-information claim will be denied.

_____

[16]See also 61A Am. Jur. 2d Pleading § 147 (Notice pleading requires a plaintiff to "allege facts which clearly bring him or her within prescribed requirements necessary to confer the right of action," but "under modern procedural rules, a plaintiff is under no procedural obligation to state in a complaint whether or not there has been compliance with a statute.") (internal footnotes omitted).

### C.  Count Three: Breach of Contract

Count Three of the amended complaint alleges that Defendant
William Rowland breached a January 5, 1979 contract and a 1986
Stockholders Agreement when he entered into the $8.1 million
stock repurchase arrangement in 1998.  The 1979 contract is a
letter addressed to Jonathan Frank and signed by Hugh Rowland,
William Rowland, and Frederick W. Haffenreffer, the founders of
Reflexite.  It states:

> Dear Jon:
>
> In connection with your proposed purchase of Reflexite
> Corporation stock, we agree to keep you informed about
> any possible future sale of our stock in the company.
>
> Before actually selling stock now owned by us that
> <u>would result in a transfer of voting control to a third
> party</u>, we will use all efforts that are reasonable to
> assure you the opportunity of selling your shares at
> the same price per share being offered to us.

Rowland Mem. of Law [doc. #41] Ex. A (emphasis supplied).  The
Amended Complaint alleges that William Rowland breached the
second paragraph of the 1979 agreement "by failing to make all
reasonable efforts to obtain comparable opportunities for Jon
Frank ... to sell [his] shares of Reflexite stock."  Am. Compl. ¶
98.  Notably, the complaint does not allege that Rowland violated
the first paragraph of the agreement requiring the signatories to
keep Frank informed of their stock sales.

The 1986 Stockholders' Agreement states:

> 1.  <u>Restrictions on Transfer of Shares; Exceptions</u>
> None of the Stockholders shall sell, assign,

30

transfer, pledge, encumber or otherwise dispose of all
or any shares of stock of the Corporation, <u>except in
the case of a transfer of such shares to the
Corporation itself,</u> without first obtaining the prior
written consent of each of the other Stockholders then
owning, or having options to acquire, at least five
percent (5%) of the outstanding shares of stock of the
Corporation... .
    10.  <u>Binding Effect of Agreement</u>
    This agreement shall be binding upon the [sic]
inure to the benefit of each of the Stockholders, and
his respective heirs, legatees, personal representa-
tives, successors and assigns...
    11.  <u>Entire Understanding</u>
    This agreement contains the entire understanding
and agreement among the parties with respect to the
subject matter hereof.  There are no representations,
warranties, promises, covenants or understandings other
than those herein expressly set forth.__

<u>Id.</u>, Ex. B at 1-2, 8 (emphasis supplied).

Defendant Rowland argues that the Frank Family Trust does

not have standing to assert breach of the 1979 agreement because

the contract does not run with the stock and the Trust was not

then in existence.  He also argues that the 1986 agreement

superceded the 1979 agreement because it contains an integration

clause, and even if the 1979 agreement remains in effect, Rowland

did not breach it because the stock buyback did not "result in a

transfer of voting control to a third party."  Finally, he

argues that the Stockholders Agreement exempts transfer of shares

to the corporation from the notice requirement.

Plaintiff responds that the 1979 agreement aimed to prevent

a situation where corporate insiders such as William Rowland took

advantage of their insider position to the detriment of outside

31

shareholders such as Jonathan Frank.  This, he argues, is exactly
what happened during the 1998 buyback transaction.  Plaintiff
argues that Rowland violated the 1979 agreement because the 1998
transaction involved sale of stock to Reflexite, which is not a
signatory to the contract and therefore is a "third party,"
without affording him a comparable opportunity.

A sale of stock back to the corporation could not reasonably
have been intended to be included in the definition of a sale to
a "third party" under the agreement.  First, Reflexite cannot be
considered a "third party" with regard to the sale of its own
shares.  Second, the phrase "third party" must be read in
context: the agreement is directed at a transfer of "voting
control to a third party."  A stock buyback does not result in a
change of voting control.  As plaintiff acknowledged at oral
argument, the reacquired shares were "retired" by Reflexite, and
therefore were not entitled to vote.  See generally Conn. Gen.
Stat. § 33-667(a) ("Shares that are issued are outstanding shares
until they are reacquired, redeemed, converted or cancelled.");
id. § 33-705 ("each outstanding share ... is entitled to one
vote...") (emphasis supplied).  Plaintiff's argument that "voting
control" of the shares changed because William Rowland no longer
voted them is unpersuasive.  The plain language of the contract
is directed to a situation where a non-signatory third party
acquires and votes shares originally owned by the signatories to

the agreement.  In fact, once the Rowland shares were retired,
Frank necessarily owned a greater percentage of the voting
shares, since there were fewer total shares outstanding.  See Am.
Compl. ¶ 31 (Frank bought 10% of Reflexite's shares in 1979 and
now owns 11%).  As such, the contract was not violated when
Rowland failed to make reasonable efforts to obtain a similar
sales opportunity for Frank because the Rowland transaction was
not a "transfer of voting control to a third party."

Likewise, plaintiff cannot make out a claim for breach of
the Stockholder Agreement.  That agreement requires the consent
of shareholders owning more than 5% of Reflexite's stock, "except
in the case of a transfer of such shares to the Corporation
itself."  Thus the 1998 Rowland transaction, a sell-back to the
corporation, is expressly excluded from the consent requirement.
This claim therefore is dismissed.

### D.   Count Four: Promissory Estoppel

Count Four of the Amended Complaint asserts that Rowland is
liable to Frank on a theory of promissory estoppel.  Although he
did not brief this claim, plaintiff's counsel stated at oral
argument that it was not being abandoned.

Rowland argues that this claim cannot be maintained because
one who alleges that a valid contract exists cannot also maintain
an equitable promissory estoppel claim.  There is a split of
authority in the Connecticut Superior Court on this question.

33

<u>Compare</u> <u>Crist v. O'Keefe & Assocs.</u>, No. CV0387651, 2002 WL
1042152 at *3 (Conn. Super., May 01, 2002) (permitting pleading
in the alternative) <u>with</u> <u>Moukarzel v. Oxygen Electronics, LLC</u>,
No. CV 990359965S, 1999 WL 643370 at *4 (Conn. Super., Aug. 12,
1999) (disallowing alternative claims).  The Connecticut Supreme
Court has not addressed the issue.

Even if it is permissible to plead these claims in the
alternative, the promissory estoppel claim here alleges the same
facts as the contract count, which has been dismissed as failing
to state any breach.  The Amended Complaint sets forth the
initial discussions between Jonathan Frank and Hugh Rowland,
Defendant William Rowland's brother, concerning Hugh Rowland's
request that Frank purchase 10% of the company's shares.  Am.
Compl. ¶ 29.  It states that after these discussions, "William
Rowland, Hugh Rowland and Fritz Haffenreffer executed an
agreement dated January 5, 1979 ... reflecting this agreement and
understanding."  <u>Id.</u> ¶ 30.  It is then alleged that Frank
purchased the stock "[i]n reliance on this January 5, 1979
Agreement and Mr. Rowland's assurances that Mr. Frank would be
afforded the same opportunities as Mr. Rowland to sell shares of
Reflexite stock..." <u>Id.</u> ¶ 31.

In other words, Plaintiff alleges that the 1979 agreement
embodies William Rowland's promises to him.  <u>Id.</u> ¶ 30. Because
the 1979 agreement did not require William Rowland to make

34

reasonable efforts to obtain a similar offer for Frank before selling shares back to Reflexite in the 1998 transaction, <u>supra</u> § III.C, Frank does not state a viable claim that such promises were broken.

Even if there were additional "assurances," <u>see</u> Am. Compl. ¶ 31, made to Jonathan Frank outside the written agreement, the complaint states that the negotiations took place between Frank and Hugh Rowland.  Am. Compl. ¶ 29 ("In 1979 <u>Hugh</u> Rowland approached Jon Frank and asked if he would be willing to purchase 10% of Reflexite Corporation.") (emphasis added).  Thus, based on Paragraph 29 of the Amended Complaint, the "Mr. Rowland" who allegedly made "assurances" to Frank must be Hugh Rowland, who conducted the negotiations, not William Rowland.  Since Hugh Rowland is no longer named as a defendant in this action, and is now deceased, any promises made in the course of the negotiations preceding the 1979 agreement cannot give rise to a promissory estoppel claim against William Rowland.  Thus Count Four must be dismissed.

### E.    Count Five: Tortious Interference with Contractual Relations

Count Five alleges tortious interference with contractual relations by all individual defendants except William Rowland and alleges that the defendants were aware of the 1979 agreement and 1986 Stockholder Agreement described above, and "intentionally acted ... as to deprive the Franks of their contractual benefits

35

and to induce the breach" of these agreements.  Am. Compl. ¶ 110.
The Outside Directors move to dismiss this count, among other
reasons, on the ground that it is time-barred by the applicable
three-year statute of limitations under Conn. Gen. Stat. § 52-577
("No action founded upon a tort shall be brought but within three
years from the date of the act or omission complained of.").
Plaintiff argues that his claim is not time barred because "the
breach of contract was <u>not</u> that [Rowland] sold his shares [in
1998], but rather that after doing so he failed to ... make 'all
efforts that are reasonable' to provide the Franks with
opportunities to sell their shares on comparable terms."  Pl.
Mem. of Law. at 32.  At oral argument plaintiff also argued that
because the Rowland transaction involved a series of four
installment payments between 1998 and 2001, the tort was ongoing
through 2001.

    The 1979 agreement, however, requires signatories to "use
all efforts that are reasonable" to obtain a comparable offer
"<u>[b]efore</u> actually selling stock."  Similarly, the 1986
Stockholder Agreement requires a seller in certain circumstances
to "<u>first</u> obtain[] the prior written consent of each of the other
Stockholders..."  These agreements plainly require compliance
before the sale of stock.  The breach of such provisions would be
accomplished at the time a signatory sold stock without having
given the required notice or obtained the requisite consent prior

36

to the sale.  Rowland's sale agreement was finalized in 1998 even if payments were made subsequently.  Plaintiff's suggested reading of the 1979 agreement -- that notice is required "before the last part of the stock is sold" -- would import language into the agreement that simply is not there.

Plaintiff's complaint was brought in June 2003.  Rowland's breach of contract, if any, took place in 1998.  Therefore plaintiff's tortious interference claim is barred by the three-year statute of limitation and Count Five will be dismissed.

**F.    Count Six: Accounting**

Defendants move to dismiss Count Six, which demands an accounting "concerning all wrongfully diverted and misused corporate assets and resources..."  Am. Compl. ¶ 115.  Plaintiff has also demanded an accounting in subsection (h) of his request for relief.  At oral argument plaintiff agreed that an accounting could be considered a remedy rather than a claim, and consented to dismissal of Count Six as an independent cause of action.

**IV.    CONCLUSION**

For the foregoing reasons, defendants' motions to dismiss [docs. ## 40, 41, 42, 49, 68] are GRANTED IN PART as to plaintiff's derivative claim for breach of fiduciary duty (Count One), and plaintiff's individual claims for breach of contract (Count Three), promissory estoppel (Count Four), tortious interference with contractual relations (Count Five), and the

37

demand for an accounting (Count Six).  The motions are DENIED IN

PART as to the individual claim for beach of fiduciary duty

(Count Two).

IT IS SO ORDERED.

_____
JANET BOND ARTERTON, U.S.D.J.

Dated at New Haven, Connecticut, this 31st day of March, 2005.

38