# EXHIBIT D

PART II

**41**

1    THE COURT: From your telling it hasn't
2  even run yet.
3    MR. STASSBERG: I would say up until the
4  time of the filing of the complaint it would not have
5  run. I'm not suggesting that -- well, but certainly
6  that would be my position, and that is, I suggest,
7  your Honor, in fact very appropriate because statute
8  of limitations is directed to a full record developed
9  about what in fact was done and what was known by
10  who, when, before a determination can properly be
11  made by you as to whether the limitations bar should
12  apply and throw an otherwise valid and meritorious
13  claim out of court.
14    Now, I understand that defendants and
15  their counsel seek to advance that process and do it
16  now, and that there are some, and I submit to you
17  very limited, circumstances where that is
18  appropriate, but those circumstances are where the
19  face of the complaint allows for no other inference,
20  and again, taking all of those inferences in our
21  favor, the standard of no other possible inference is
22  one that the defendants here just can't meet, and I
23  submit to your Honor it would be inappropriate to
24  allow that kind of technical defense to be applied on
25  a record that's undeveloped completely because we

**42**

1  haven't had discovery yet to begin to explore that.
2    The statute of limitations argument, if
3  they believed it was appropriate, certainly would be
4  the subject of a summary judgment motion. I believe
5  the facts that we've already seen suggest that that
6  statute of limitations argument is not going to fly
7  no matter what because we already see the Rowland
8  transaction has gone on for a number of different
9  years. Certainly notification before almost more
10  than a million and a half dollars was paid out would
11  have been a significant aspect of compliance with the
12  agreement; perhaps not full compliance, but certainly
13  compliance in a manner that would have mattered.
14    So, you know, again, I submit at this
15  stage we don't have an ability to fairly decide the
16  statute of limitations questions that have been
17  raised by the motions.
18    Really with respect to the next count,
19  the tortious interference claim, the arguments are
20  ones that are the same as applicable to the prior
21  counts, and I won't repeat them unless your Honor
22  wants me to. The standing arguments are the same
23  with respect to tortious interference as with respect
24  to the contract. I've just done the statute of
25  limitations argument, it is -- frankly, that was the

**43**

1  argument I was just doing, even though I hadn't moved
2  to this count yet.
3    And there is one other piece that was
4  raised in the reply brief, and I want to make sure
5  that that's clear because there was an allegation
6  that we didn't reply to certain arguments that were
7  made, and so we waived them. Again, your Honor, I
8  think that is not a fair reading of our position or
9  the arguments that were made.
10    The first was that the complaint did not
11  give fair notice. Your Honor, I think that argument
12  is responded to in our opposition on pages 33 and 34,
13  but the complaint itself gives ample notice about
14  what the tortious interference claim is all about.
15    THE COURT: When is the first purchase
16  money received by Rowland from the sale of his stock?
17    MR. STASSBERG: Your Honor, there is an
18  exhibit to the SLC motion to dismiss opposition that
19  we submitted which indicates this -- it indicates
20  much of the information with respect to the Rowland
21  transaction. It was a document that was only
22  obtained in the course of SLC discovery. I don't
23  know the answer off the top of my head to your
24  question as to when the first payment went out. I
25  know that there are --

**44**

1    THE COURT: Somebody else does.
2    MR. STASSBERG: Perhaps I'll have it.
3  Just a second. It appears there are annual payouts,
4  according to what is attached as Exhibit 13 to
5  Exhibit 12 in our opposition to the SLC motion to
6  dismiss, and that provides the structure for how this
7  transaction is going to be carried out. The first
8  payment would occur in '98, the second in '99, the
9  third in 2000, and 2001. So, you would have in fact
10  four payments, all of -- you know, more than $1.6
11  million, one is of 3.3, but all of substantial
12  amounts that go over the entire four-year period.
13    The final piece on this tortious
14  interference, before I move back I think, your Honor,
15  to our first counts, is that they claim that there is
16  no allegation for damages with respect to this count,
17  and again, I think that allegation is refuted by
18  the amended complaint. We didn't need to say "Look
19  at our amended complaint in our opposition" to have
20  it still be refuted. The amended complaint alleges
21  damages with respect to tortious interference. The
22  claim that it doesn't is just belied by the language
23  of the complaint itself. So, again, there has not
24  been any waiver.
25    There is one other piece about waiver

45

```
 1   that comes up in the reply briefs, and your Honor,
 2   we're cognizant of your Honor's rules not to submit
 3   surreplies and documents.  We're happy to do that if
 4   there is anything your Honor wanted us to submit in
 5   writing.  We didn't do that because we understand
 6   your Honor's rules that that was a frowned-upon
 7   practice, but again, in the reply, for the first time
 8   they argue that we have somehow waived a response to
 9   their argument that the Injunctive relief allegation
10   should be dismissed.  Your Honor, it wasn't replied
11   to because it wasn't a proper motion at this stage.
12   There is no motion to dismiss a type of relief that
13   you are asking for.
14           THE COURT: Can I go back to your
15   information that the first Rowland payment was in
16   '98.  Why does that -- if the efforts to give Frank
17   the opportunity he says he was denied had to take
18   place before the stock was sold, it sold first in
19   '98, why is that not -- does that not make tortious
20   interference time barred by the three-year statute of
21   limitations?
22           MR. STASSBERG: Well, your Honor, because
23   it is not the only aspect of this transaction that
24   controls for when the statute of limitations period
25   runs or when the offense itself occurs.  So, again,
```

46

```
 1   you have two aspects here.  You have the first aspect
 2   that this sale transaction occurs over this four-year
 3   period, and so well within the three-year statute of
 4   limitations by the last transaction that occurred
 5   with respect to the sale.
 6           THE COURT: Why wouldn't -- why would you
 7   look to the last transactions when this says before
 8   the stock is sold?
 9           MR. STASSBERG: Well, your Honor, because
10   I think a fair reading is to look -- at the very
11   least, to look at before the last part of the stock
12   is sold.
13           In addition, your Honor, I think a fair
14   view of it, again on a statute of limitations
15   argument, is to look at the transaction as a whole.
16   You have a transaction that is going over a four-year
17   period for the payout.  In fact, it's kind of -- you
18   know, it's a theoretical, perhaps, discussion as to
19   when is the beginning, when is the end, you have a
20   transaction that's continuing, and the statute of
21   limitations addresses continuing types of offenses
22   and transactions, and makes it very clear that if
23   it's continuing, anytime within that process is an
24   appropriate time to bring an action that arises out
25   of those facts.
```

47

```
 1           THE COURT: Is that what's meant by a
 2   continuing violation?
 3           MR. STASSBERG: Well, yes, your Honor.  I
 4   think that would be the fair reading what is meant by
 5   a continuing violation.  In addition, you have the
 6   tolling issues which we have talked about already.  I
 7   know that's not exactly your Honor's point, but it is
 8   certainly our position that the limitation period
 9   continues -- excuse me, the limitation period is more
10   than satisfied because of the nature of this
11   transaction continuing, and also because their
12   activities tolled the limitations period.  So, it
13   would not have started until well within the time
14   frame in which we filed the complaint.
15           THE COURT: All right, why don't I get
16   some response from the defendants to your various
17   arguments, and then you'll have an additional
18   opportunity to respond to them.
19           Mr. Raabe, I started out with Mr.
20   Stassberg on dividing up the allegations.  Tell me
21   why that doesn't work, or does it work, and with that
22   construction can we move on?
23           MR. RAABE: I would say, first, it
24   doesn't work because I don't think you can fairly
25   read the allegations in that form.  I'm going to say
```

48

```
 1   I'm more confused now than I was coming in as to what
 2   claims are being made against the company.
 3           THE COURT: Well, against the
 4   corporation.
 5           MR. RAABE: Yes.
 6           THE COURT: He says neither as to the
 7   first two counts.
 8           MR. RAABE: Yes, that's what I gathered
 9   now.  I didn't realize that until those words came
10   out of Mr. Stassberg's mouth, and I guess to the
11   Court, your Honor, I wonder whether there are any
12   claims against the company because in the absence of
13   the derivative claim, the other claims, while again
14   in the heading one of them says "against all
15   defendants," it doesn't appear to be based on the --
16           THE COURT: I think that's the correction
17   he's making today.
18           MR. RAABE: I guess I'm still confused,
19   your Honor, with some of the subsequent counts after
20   the first two counts.  The third count clearly is
21   against Mr. Rowland.  The fourth count is against Mr.
22   Rowland.  The fifth count, the tortious interference
23   count, says it's against all defendants except Mr.
24   Rowland.  But based on the plaintiffs' comments, I'm
25   not sure whether that count is in fact directed
```

49

1  against the corporation.  The sixth count, your
2  Honor, the accounting count, we briefed and moved for
3  its dismissal.  The plaintiffs did not respond to the
4  briefing and motion in that regard, and I'm also
5  wondering whether that count still exists.
6       THE COURT: Mr. Stassberg makes the
7  argument on the injunctive relief, and I thought
8  perhaps it might apply to the accounting, that this
9  is a remedy -- it's set out as a sixth cause of
10 action.  But isn't accounting a remedy?
11      MR. RAABE: I know it can be, but I also
12 know through state court practice you can sue for an
13 accounting, that that can be a stand-alone cause, but
14 you have to -- I believe it's an equitable cause, but
15 you have to have some balance of equities to get
16 there, and what we've argued in our motion to dismiss
17 is there is no basis, equitable or otherwise, for an
18 accounting here.
19      THE COURT: So how do we differentiate
20 whether it's a cause of action or remedy sought?
21      MR. RAABE: I suppose, your Honor, is to
22 ask the plaintiffs.
23      THE COURT: All right, we will do that
24 momentarily.  So, you raise an interesting issue
25 then, and that is, what counts lie against the

50

1  corporation, and the only one that would seem to be
2  pled is the fifth, the tortious interference, which
3  in its allegations doesn't seem to include the
4  corporation.
5       MR. RAABE: That's my reading, your
6  Honor.
7       THE COURT: Well, let's put the ball back
8  in Mr. Stassberg's Court.
9       What's wrong with Mr. Raabe's reading?
10 One and two you told me don't relate to the
11 corporation.  Three obviously doesn't.  Four doesn't.
12 Tortious interference, is that against the
13 corporation?
14      MR. STASSBERG: Your Honor, if I may.
15      THE COURT: Yes.
16      MR. STASSBERG: The tortious
17 interference, I think the fair reading of the
18 complaint is that it is alleged against the defendant
19 as well as the other defendants.
20      THE COURT: The corporation?
21      MR. STASSBERG: Yes, against the
22 corporation.  I think that --
23      THE COURT: So how could it be tortious
24 interference lies against the corporation if counts
25 one and two don't?

51

1       MR. STASSBERG: Well, your Honor, the
2  piece on count five that is different is the sort of
3  knowledge and assistance of the individuals charged
4  in count five, which can be, and which I think fairly
5  is, the company, in assisting with respect to the
6  breach of the contract between the Franks and Mr.
7  Rowland.
8       THE COURT: Can a corporation do that?
9       MR. STASSBERG: I think the corporation
10 can, your Honor, just as any -- any entity can,
11 whether it's an individual entity or a corporate
12 entity.  You'd have to act through its members, of
13 course.  I will say this, your Honor, that to the
14 extent the tortious interference claim against the
15 company is the determining factor with respect to the
16 derivative claim and whether the plaintiffs are
17 appropriate parties to bring the derivative claim,
18 that the plaintiffs would be willing to withdraw the
19 corporation as a defendant with respect to the
20 tortious interference claim, but we have not done
21 that, and I think we haven't done that at this point,
22 and what we've tried to do, your Honor, as I may have
23 articulated before, is we have attempted to plead in
24 such a way to bring to light what appears to be
25 substantial self-interested transactions and

52

1  substantial involvement and harm to the Franks.
2       We've done that in a manner of
3  alternative pleadings here, but the idea is to bring
4  to light what it is that's happened through the court
5  process, and one part I forgot to mention, your
6  Honor, maybe it will come up later, but since I have
7  the floor now, if you'll indulge me, I think it may
8  be helpful to, again, put these things in context.
9       One of the things, one of the factors in
10 are the plaintiffs suitable plaintiffs to bring a
11 derivative action is do they have animosity towards
12 other shareholders, and Mr. Raabe and the defendant
13 company has argued that the Franks are inappropriate
14 because they have animosity, but I submit to you the
15 facts don't support that at all.
16      We have allegations, and now we have
17 discovery from the SLC, that suggests that there was
18 substantial animosity, and in fact a scheme designed
19 to harm the Franks, perhaps based on personal
20 animosity, perhaps based on their attempt to go find
21 information.  We have also the evidence of their
22 interactions with this company where it's not filing
23 suit, never filed a suit before this one, attempting
24 to deal amicably, attempting to send letters, talk,
25 "Give us information." "What's happening?" They were

53

1  waiting to hear, not being told, and really,
2  attempted to act perhaps beyond a reasonable way,
3  perhaps being taken for granted or as someone who
4  won't attempt to enforce their rights because they
5  were so accepting and so, frankly, amenable to
6  working with the other shareholders and working with
7  the management, and I think it's important to keep
8  that in mind when we are assessing this, and when
9  we're looking at some of the cases that the
10 defendants' cite, frankly, almost all of the cases
11 they cite is where you have a very, very different
12 situation in terms of the background.
13         THE COURT: Okay, we're getting a little
14 afield of why you got the floor back.
15         MR. STASSBERG: You're right, I should
16 probably sit down.
17         THE COURT: But you do -- your
18 willingness to withdraw the tortious interference
19 claim against the corporation if you have standing
20 for both counts one and two, does that mean that in
21 the derivative claim the corporation doesn't have to
22 be a nominal defendant?
23         MR. STASSBERG: I think, your Honor, that
24 in terms of the nominal sense of the word, they are.
25 You know, you asked me, your Honor, are they a

54

1  defendant. They are in a nominal sense involved in
2  count one, they are not involved in count two at all.
3         THE COURT: But now you've got me very
4  confused because count one says, I thought, only the
5  individual defendants.
6         MR. STASSBERG: That's right. I didn't
7  mean to suggest that they are a nominal defendant,
8  but they are nominally the party in interest.
9  Frankly, the plaintiff will be -- the plaintiff, the
10 Franks, will be standing in their shoes to sue on
11 their behalf.
12         THE COURT: Under a derivative action the
13 corporation is not routinely named as a nominal
14 defendant.
15         MR. STASSBERG: Well, you know, I think,
16 again, on the pleading standards it can be or it
17 doesn't -- it might not need to be. The claim as
18 being asserted is not a claim against the
19 corporation. There is no recovery sought against the
20 corporation. The corporation can only benefit in the
21 derivative claim if it is successful as prosecuted by
22 the Franks. So there is no aspect of being a
23 defendant that it encompasses, goes along with the
24 derivative claim, your Honor.
25         THE COURT: Are you claiming the

55

1  accounting as a separate count or a remedy?
2         MR. STASSBERG: Your Honor, the
3  accounting is a remedy, and that --
4         THE COURT: So we can dismiss it as a
5  count and just stick it over in the damages part of
6  the complaint?
7         MR. STASSBERG: That would be fair, your
8  Honor. It is connected to the other counts, but it
9  is being sought as a remedy.
10         THE COURT: All right, Mr. Raabe, does
11 that leave you with anything to talk about?
12         MR. RAABE: I think it does, your Honor.
13 Simply as a pragmatic matter, I had come here today
14 prepared to argue on count one on behalf of the
15 company. I gather they're not here now. As the
16 lawyers divided up the tasks to try to be efficient
17 here, I've taken on that burden, so if the Court will
18 indulge me, I will continue.
19         THE COURT: That's fine.
20         MR. RAABE: First, your Honor, on the
21 standing issue, with Mr. Frank himself as a
22 plaintiff, I'm perhaps far out on the limb when I
23 start debating trusts and estates law, but it seems
24 to me it's rather elementary that if you place assets into
25 a trust you then cannot sue individually in relation

56

1  to those assets. I would think that the IRS, for
2  instance, would take a very dim view of doing that,
3  presuming that you place the --
4         THE COURT: You've given up the control.
5         MR. RAABE: You've given up control, and
6  presumably for estate planning or tax purposes you've
7  done that, and I don't think you can use that for
8  estate planning tactics as a shield and then turn
9  around and use the assets as a sword in an action
10 such as this.
11         THE COURT: So you don't dispute that he
12 has standing as the trustee of the trust.
13         MR. RAABE: If the trust --
14         THE COURT: To assert the derivative
15 claim for breach of fiduciary duty.
16         MR. RAABE: Yes, your Honor. If the
17 trust is going to bring an action it would be brought
18 through the trustee. Presumably, while that's not
19 alleged here, perhaps we can presume that's what was
20 meant. And then that gets to the issue of is the
21 trust a proper derivative plaintiff, which gets to
22 the Fink factors that we have briefed.
23         THE COURT: So, if, and Mr. Stassberg
24 said it didn't really matter whether Frank was there
25 as the trustee or, as having a beneficial interest in

57

```
 1  the trust, if we were to look at Frank as claiming
 2  his standing as trustee of the family trust, you
 3  don't claim that he lacks standing to do that in that
 4  capacity?
 5        MR. RAABE: No, your Honor, we would
 6  claim that he as trustee on behalf of the trust are
 7  not a proper derivative plaintiff, but that they have
 8  standing to bring that claim.
 9        THE COURT: Okay.  So, that the standing
10  issue, if it's as a trustee, is not in dispute, and
11  now we're going to talk about proper plaintiff.
12        MR. RAABE: Right, and I suppose you
13  could also characterize it as standing.  The trust
14  through its trustee does not have proper standing to
15  bring this case under 12(b)(1).  It should,
16  therefore, be dismissed.  And this gets to the Fink
17  factors, and I think it makes sense to just take a
18  global view of what this case is about.
19        First, contrasting count one and count
20  two, as your Honor said when you first took the bench
21  this morning, they in essence are the same claims,
22  the same substantive claims, the same substantive
23  wrong.  The difficulty you have is in count one the
24  trust would be claiming damages for the corporation
25  and in count two on that same substance be claiming
```

58

```
 1  damages against the corporation.
 2        THE COURT: Now, is that really
 3  necessarily so?  If the first count is for Rowland
 4  and other insider director improprieties is one
 5  count, and their damages from that, and then the
 6  other count is you didn't give me the opportunity to
 7  liquidate mine, aren't those two separate things?
 8  And without trying at this very early stage to tease
 9  out what damages would go where, it just sounds to me
10  as if they may be different damages.
11        MR. RAABE: I don't think they are, your
12  Honor, for this reason.  In count one the trust would
13  be arguing that there were these self-interested
14  improper transactions, and therefore, all of the
15  shareholders have been damaged.  And in count two,
16  they're alleging those same self-interested
17  transactions hurt me individually as a shareholder.
18        So, it's a kind of a finer point, but
19  it's inconsistent because the damages are going to be
20  flowing in exactly different directions.  I think as
21  pled that's the only fair reading.  It is, in fact, a
22  different spin on the same claimed harm, which I
23  think is one of the critical Fink factors, perhaps
24  the most critical Fink factor, you cannot have
25  inconsistent claims, have individual claims and also
```

59

```
 1  claim on behalf of other shareholders.
 2        I think what that has led to is another
 3  Fink factor, that there is no evidence of any support
 4  from any others here.  This is a personal claim of
 5  the Frank trust, I guess as refined against the
 6  company, and it's driven by animus, by emotion.  That
 7  has been pled and has been briefed, and I don't think
 8  there can be any dispute about it.  In the complaint,
 9  and in the demand, the Franks noted that according to
10  them Mr. Ursprung has said as long as he is president
11  the Frank family will not become liquid.  Mr. Frank
12  was terminated from his position, and I think a fair
13  reading of all of the documents in this case,
14  starting with the demand letter, show a disgruntled
15  terminated former employee.
16        They've specifically alleged malice in
17  paragraphs 49 and 57 of the complaint.  They've
18  alleged unequal treatment in paragraph 33 of the
19  complaint.  They've alleged that their termination
20  benefits were held hostage, "hostage" their word, in
21  paragraph 34.  In the opposition brief they allege
22  bad faith, malice and ill-will towards the Franks.
23        The reason that that's important is
24  because it can cloud the view of the plaintiffs,
25  where a derivative claim is supposed to be an
```

60

```
 1  unemotional, objective claim on behalf of all
 2  shareholders, when there is animus of that sort it
 3  clouds the judgment of the plaintiff.
 4        THE COURT: Are there other nonemployee,
 5  nondirector shareholders?
 6        MR. RAABE: I believe that there are,
 7  your Honor.  If you want, there are representatives
 8  of the company, I can step back and check with them,
 9  but I believe that there are.
10        THE COURT: Well, I was just thinking
11  that if there are, then there might be some argument
12  for his representative capacity to bring the
13  derivative suit.  If there are not, then we don't
14  have to go down that route.
15        MR. RAABE: Well, I think the issue is if
16  there are, would this plaintiff be representative of
17  those claims, or are the claims --
18        THE COURT: If there aren't any, then we
19  don't have to inquire.  Do you want to make that
20  inquiry?
21        MR. RAABE: Yes, your Honor.
22        Your Honor, there are nondirector,
23  nonemployee shareholders, and the claim would be that
24  the Frank trust is not representative of their
25  interest because of the high emotion that the Franks
```

61

```
1   make.
2            THE COURT: But absent the emotion that
3   Mr. Frank feels, can a trust have emotions?
4            MR. RAABE: Good question.  The trustee
5   who directs the trust certainly can.
6            THE COURT: But he acts in a fiduciary
7   capacity.
8            MR. RAABE: But if the motivation for
9   acting, even in a fiduciary capacity, is to vindicate
10  individual claimed harms, which are clearly alleged
11  in this complaint, I think it's a fair analysis under
12  the Fink factors to take that into consideration to
13  determine whether Mr. Frank would be a fair
14  representative of the others.  And that's why I think
15  that the Court also asks are other shareholders --
16  now that we know there are other nondirector,
17  nonemployee, nonshareholders -- supporting this action,
18  and there is no evidence that they are.
19           THE COURT: Aren't we a little premature
20  for that, though?
21           MR. RAABE: I would presume, your Honor,
22  that the plaintiffs would have come forward if they
23  had such support.  The plaintiffs would have come
24  forward in addressing these Fink factors to show that
25  there is widespread support that other people felt
```

62

```
1   wronged by this transaction.
2            I think, going back to the animus, the
3   inconsistency that makes the Frank Family Trust an
4   inappropriate derivative plaintiff, again, if you
5   look at this globally, what they're arguing is that
6   the Rowland transaction in providing liquidity to Mr.
7   Rowland was inappropriate, was not in the best
8   interest of the shareholders, was not in the best
9   interest of the corporation.  At the same time, in
10  count two and throughout the complaint, and
11  throughout the demand and the briefing, they claim
12  right to the same thing.
13           What this case really is about is a
14  demand for liquidity, bringing a federal court action
15  to demand liquidity where there is otherwise no right
16  to do that, and to allege on one hand Mr. Rowland's
17  transaction in providing him liquidity is not in the
18  company's best interest, not in the shareholders'
19  best interest, but then to demand the exact same
20  result is inconsistent and indicative of their poor
21  standing as a derivative plaintiff.
22           I think if you fast forward this case,
23  we have even more evidence of it.  Your Honor could
24  take judicial notice of the recent PJR application
25  that the plaintiffs filed seeking to get a
```

63

```
1   prejudgment remedy for the trust's interests, not for
2   the shareholders' interest, and I think the Court
3   should take note that after having to expend the time
4   and money to brief the PJR proceedings, the
5   plaintiffs then withdrew it, and I would suggest that
6   if the Court were to take the time, and I can't
7   expect it would want to, to review the tender offer
8   for the redemption that was proposed to which the PJR
9   related, and look at the PJR opposition papers, the
10  Court would quickly come to the conclusion that the
11  opposition was based on all of the information that
12  the plaintiffs had before the tender was effected.
13           So, where they're claiming they have had
14  a prejudgment remedy against this redemption that
15  would provide them liquidity, curiously enough, the
16  company had to expend time and money to brief an
17  opposition to that to simply say "If you read the
18  tender offer, you are getting what you asked for.
19  You are getting liquidity.  You are reducing your
20  share of the company.  This is exactly what you've
21  been asking for, this is what is in your interest."
22           And I suggest on a couple of other Fink
23  factors that becomes relevant, whether these
24  plaintiffs are paying proper attention to the case
25  and whether through their counsel they are able to
```

64

```
1   digest the emotion, separate the emotion and move the
2   case forward appropriately.  Literally tens of
3   thousands of dollars were spent on this PJR
4   application and it went nowhere, and it should have
5   never been filed because the tender materials in
6   relation to the redemption clarified all of the
7   issues that the plaintiffs had.
8            One of the other Fink factors is who is
9   the real party in interest.  I guess we've cut
10  through that to some extent, if we are going to
11  assume for our purposes today that the trust is the
12  only party in interest and not Mr. Frank himself.
13           Another factor is the familiarity with
14  the suit.  I would urge the Court to look through the
15  complaint.  So many of the critical allegations in
16  this complaint are alleged on information and belief,
17  and surely the plaintiffs would get up and say,
18  "Well, we have to take discovery, that's why they're
19  based on information and belief."  But it's
20  elemental.  The allegation of the SLC as a Special
21  Litigation Committee's lack of independence, the
22  critical allegation in this case, is based on
23  information and belief in the complaint, and I would
24  suggest that that is not -- does not show a
25  familiarity with the suit that's necessary to proceed
```

65

1    as a derivative plaintiff.

2         THE COURT: So, you don't think that the

3    fact that he had a long history with the corporation

4    as an employee and long history of investment, that

5    he -- of this closely-held corporation, that he can

6    be deemed familiar with the subject matter?

7         MR. RAABE: I think he can be deemed

8    familiar with the subject matter of the company

9    generally. I don't think when you look at the

10   specific facts that it shows a familiarity with the

11   allegations in this case, and frankly, I would

12   suggest, your Honor, that much of the debate we've

13   had today has shown a fair bit of confusion on the

14   plaintiff's part about what the case is really about.

15        I would think it's perhaps a fair

16   assumption that -- well, it was fair for me to assume

17   coming down here today I would be arguing against

18   count one on behalf of the corporation, but I find

19   out today I'm not, and I think that's curious in a

20   derivative case, and I would suggest perhaps the

21   plaintiffs haven't thought fully through what they're

22   trying to do here, that it is in fact leveraging a

23   federal court action to obtain liquidity when

24   otherwise they do not have a right to that liquidity,

25   and Ms. Merriam will argue in more detail on that

66

1    issue.

2         Let me turn to the Special Litigation

3    Committee and another reason why this case should be

4    dismissed. What this case is really about in the

5    question for liquidity is second guessing the inner

6    workings of a corporation, and the Connecticut

7    legislature, like most legislatures across the

8    country, have been clear that courts should not be

9    used, federal courts or state courts, should not be

10   used to second guess the sound business judgments of

11   a corporation.

12        And with particular regard to a

13   shareholder claiming relief on behalf of other

14   shareholders, we've had our derivative statute

15   enacted, which is, from my way of thinking, kind of a

16   finer point on the business judgment rule, and what

17   that statutory scheme says is that if a shareholder

18   claims to be aggrieved through the action of the

19   corporation, the corporation can take certain steps

20   to objectively determine whether there is cause for

21   the complaint, and if there is, to proceed with it,

22   if there is not, to reject it, and the courts should

23   engage in a practice of judicial non-interference

24   with regard to those decisions.

25        THE COURT: The decision was not made by

67

1    the Special Litigation Committee itself, it just made

2    a recommendation.

3         MR. RAABE: That's right, your Honor, and

4    that's a very important point because all of the

5    allegations regarding a lack of independence in the

6    complaint are directed to the Special Litigation

7    Committee. It's important in two respects. In order

8    to buy into the plaintiffs' claim in this case, the

9    Court would have to presume at this stage that the

10   reputable law firm of Cummings & Lockwood charged

11   $75,000 to do an investigation and then engaged in a

12   sham, which is one of the words used in the case law

13   interpreting these issues, engaged in a sham to

14   reject the claim of the plaintiffs. On the state of

15   these pleadings, I don't believe there is anyway that

16   the Court should do that, and a review of the special

17   litigation report I think clinches that issue.

18        What the corporation did in this instance

19   is set up a Special Litigation Committee with the

20   counsel of Cummings & Lockwood. That firm then did

21   an independent investigation with the assistance of

22   two independent directors, and then reported to the

23   board as a whole, and then the independent directors

24   of the board adopted the recommendation of the

25   Special Litigation Committee not to proceed and, in

68

1    fact, reject the plaintiffs' claim.

2         THE COURT: That means only the

3    independent directors voted.

4         MR. RAABE: That is correct, your Honor.

5    What our statutory scheme says is in that instance

6    the courts should not review that decision, and in

7    fact the statute is pretty clear, a derivative

8    proceeding shall be dismissed by the court on a

9    motion of the corporation, if those events happened.

10   That's in 33-724(a).

11        Because the only attack on the

12   independence here has been on the independence of the

13   Special Litigation Committee, I would suggest to your

14   Honor that first on the state of the pleadings, the

15   Court can reject that claim, can review the special

16   litigation report, can review the briefing, and

17   reject that claim, but even if it were to say, well,

18   maybe there is some question of independence there,

19   there is no claim that the board as a whole and its

20   independent directors were not independent, and in

21   fact by making the demand on the corporation, it is

22   presumed that the plaintiffs believed that the board

23   could act independently. If they did not so believe,

24   they could claim futility and skip the demand stage.

25        THE COURT: There has -- has Connecticut

69

1  addressed the issue of whether the ALI proposal --

2          MR. RAABE: Offhand, your Honor --

3          THE COURT: -- which seems to go to the

4  merits of the claim as well as the statutory factors.

5          MR. RAABE: Offhand, your Honor, I'm not

6  sure.

7          THE COURT: Massachusetts Supreme

8  Judicial Court has held that evaluative factors for

9  this review include likelihood of a judgment in the

10 plaintiff's favor.  What's Connecticut going to do?

11         MR. RAABE: Connecticut so far has

12 followed Delaware law, which we have cited in the

13 brief.  I don't believe that it's simply -- based on

14 my reading of the cases, the law according to Raabe,

15 I don't believe it would follow the Massachusetts

16 rule.  You will note from the briefing, Massachusetts

17 courts have put a bit of a gloss on the issues that

18 Ms. Merriam will address with whether all

19 shareholders have to be treated equally in all

20 respects, and in this case they've talked about there is a

21 majority controlling shareholder director, that

22 perhaps there needs to be different analysis in that

23 case.  That's not what we have here.  So, it seems to

24 me that the Massachusetts court takes a slightly more

25 progressive stance than Connecticut courts.  So, I'm

70

1  not sure the Court would adopt that.

2          THE COURT: Aren't we sort of in between

3  there?  Because we allow discovery and Delaware I

4  think does not allow discovery.

5          MR. RAABE: Perhaps, your Honor.

6          THE COURT: And so having done discovery,

7  why shouldn't we address the merits?

8          MR. RAABE: One, because it's not called

9  for by our statutes.  Two, I would suggest that based

10 on the discovery, the plaintiffs have not adduced any

11 evidence to get over the business judgment rule and

12 to get over the derivative statute.

13         THE COURT: Let me ask you a couple of

14 things.  The time period in which the investigation

15 took place looked short.  Why is that not a factor

16 that augers in favor of not dismissing -- the timing

17 of the thing, they had had something like a month to

18 do it in?

19         MR. RAABE: I suggest, your Honor, the

20 timing in this case was reasonable.  It is not a

21 particularly complicated story to investigate.  There

22 were a few claimed transactions that the committee

23 was pretty quickly able to get to the bottom of.  The

24 documents that were reviewed that are listed in an

25 appendix to the SLC report were not overwhelming.

71

1          THE COURT: Now, on the issue of document

2  review, why is it reasonable that the board would

3  just have the attorneys review the documents and the

4  board members wouldn't review them themselves?

5          MR. RAABE: I presume that the thinking

6  is if we're going to pay Cummings & Lockwood that

7  much money, people who are familiar with these kinds

8  of documents, let's have them review them.  The

9  reason that you set up the committee is to create

10 some efficiency so they don't have to have the entire

11 board conducting the investigation.  I think that's

12 exactly what the purpose of the subheading (f) of

13 Section 724 is.

14         THE COURT: What about the claim that the

15 investigation was impaired by the failure or refusal

16 to interview MacDonald who made the claim about what

17 defendant Orsprung said about Jon Frank?

18         MR. RAABE: I believe that report

19 indicates that the members of the committee had

20 familiarity with that circumstance, knew that

21 MacDonald's separation from the company was perhaps

22 not on the best terms, and understood what was

23 impacted there.

24         And I think that also raises another

25 interesting point for the Court to consider.  Where

72

1  predominately the claim is in relation to the Rowland

2  transaction, these other transactions that the Frank

3  trust has brought to the Court's attention, each one

4  of those related to a separation from the company,

5  and it is, I would suggest, fairly common when you

6  are separating someone from the company, particularly

7  under not the best of circumstances, to break all

8  ties with that individual.

9          Somewhat related to that, while the

10 Frank family claims a need for liquidity, which is

11 the foundation of this suit, in the special

12 litigation report it lists the number of times that

13 the -- Frank, Mr. Frank individually, or Frank trust,

14 had the opportunity to get liquidity, and on at least

15 three occasions after the Rowland transaction he

16 declined liquidity.  Now, it's speculation on my

17 part, but my cynical sense is that now the Frank

18 trust wants liquidity so they brought this action to

19 try to force it in the absence of another right, but

20 it is, again, inconsistent because in other

21 opportunities to get liquid the trust has chosen not

22 to.

23         THE COURT: So, the reason for not

24 interviewing someone who had made a statement of

25 malice was that they wouldn't have believed him

73

1 anyhow?

2     MR. RAABE: I don't think it's so much

3 they wouldn't have believed him, but they already

4 knew what his complaint was.  I'm trying to find the

5 reference to it, your Honor.  Yeah, "As a result of

6 their investigation, they determined that the

7 redemption for Mr. MacDonald related to a separation

8 from the company and was in exchange for a one-year

9 noncompetition restriction and indefinite

10 confidentiality restriction as well as a claim against

11 the company."

12     THE COURT: So, why would that mean you

13 -- I mean, isn't this a pretty important statement?

14     MR. RAABE: I think it could be, but I

15 think the independent directors on the committee were

16 already aware of the circumstances.  So, they didn't

17 see a need to again interview him.

18     THE COURT: What were the circumstances?

19     MR. RAABE: Of his termination?

20     THE COURT: No, of his claiming to have

21 heard Ursprung say, "As long as I'm CEO of this

22 company Jon Frank will never get his equity out of

23 here."

24     MR. RAABE: I think there could even be a

25 presumption that that was in fact said.  The greater

---

74

1 point, your Honor, is the statutory scheme is set up

2 so if the committee goes through the exercise that

3 they went through, the courts are then not going to

4 step in and say "Why didn't you interview this

5 person?  Why didn't you look at that piece of paper?"

6     You need to assess the report and the

7 investigation as a whole, and our motion is based on

8 the fact that when you do that, when you review this

9 report and take the context of it and the law firm

10 that was involved, that the fair conclusion is that

11 it was made in good faith and independently and,

12 therefore, dismissal is required.  I don't debate the

13 point --

14     THE COURT: Why didn't they review

15 documents from the '98 to '99 period when the Rowland

16 transaction was approved?  And I guess we -- the

17 first payment was paid out in '99 -- '98.

18     MR. RAABE: With hindsight I would ask,

19 your Honor, what documents and to what end?  I don't

20 think there is any dispute about the transaction,

21 about what happened, about the purposes of it.  There

22 is a claim that it shouldn't have happened by the

23 plaintiffs, but I don't believe that what was at

24 issue were -- you know, was there proper documentary

25 record of it.

---

75

1     THE COURT: So you say the failure to

2 review certain things doesn't get you into the

3 category of unreasonable because there is no showing

4 of what they would have shown.

5     MR. RAABE: I would say it a little

6 differently than that, your Honor.  As a whole, when

7 you look at the report, when you look at the work of

8 the committee as a whole, you need to assess whether

9 it was reasonable and done in good faith, and the

10 fact, someone might dispute, should you have looked at

11 this, should you have interviewed someone, will not

12 then invest this Court with jurisdiction to go back

13 and redo what has already been done under the

14 statutory scheme.  I would think in any

15 investigation, and I know investigations I do, you

16 could always do some things differently, and what the

17 statute was set up to do was to avoid having the

18 court go back and force litigation over those issues.

19     THE COURT: So you make that same

20 argument about this Mr. Smith who wasn't interviewed,

21 Mr. Smith who had apparently sold his shares back to

22 the corporation on terms disadvantageous to the

23 corporation.

24     MR. RAABE: That's the plaintiffs'

25 allegation, that there were disadvantageous terms.

---

76

1 The company, presumably the board, maintains every

2 transaction, including the Rowland transaction, were

3 in the best interest of the corporation, and that's

4 in fact what the committee found.

5     Simply put, your Honor, I think the test

6 under the statutory scheme is not could you have done

7 things differently, should you have looked at this

8 document or that document; it is did the committee,

9 and then the board, act with independence and act

10 with good faith.  And indeed, the committee spent

11 some time in the report talking about the committee's

12 independence and the care they exercised in doing the

13 work that they did.

14     That goes back to what I said before.  I

15 think for the Court to find this case should not be

16 dismissed it would have to find that Cummings &

17 Lockwood engaged in a sham and charged $75,000 for

18 it.

19     THE COURT: All right, anything further?

20     MR. RAABE: Your Honor, I know there are

21 some other points to be raised by counsel, so I'll

22 step back.

23     THE COURT: We'll take a brief recess and

24 we'll be back at one o'clock, if that's enough time.

25 We don't have too much time after that.  How much

77

1  more time do we need?
2          We need to hear your position, Ms.
3  Merriam.
4          MS. MERRIAM: On count two, your Honor,
5  and the tortious interference claim.
6          THE COURT: Okay.  Mr. Shearin, are you
7  going to address --
8          MR. SHEARIN: I'm counts one, three and
9  four, your Honor, and my -- one will be brief, and
10 I'm focusing my comments on counts three and four on
11 your Honor's questions.
12         THE COURT: So Mr. Raabe has not covered
13 count one?
14         MR. SHEARIN: Your Honor asked a question
15 of both counsel on why can't I just situate one and
16 two this way, and I have a viewpoint on that matter
17 that I don't think has been made yet.
18         THE COURT: All right.
19         MR. STASSBERG: And then, your Honor, I
20 guess just a brief reply, if your Honor feels that
21 would be appropriate.  And perhaps before we break,
22 just so Mr. Raabe knows, my co-counsel tells me that
23 I may have been not as articulate as I would have
24 hoped about your Honor's question as to the nominal
25 status of the corporation on count one.  I think I

78

1  was certainly attempting to articulate our view that
2  they are a nominal defendant, but with respect to
3  count one, they are acting -- in fact, if the
4  derivative claim is allowed to go forward, all of the
5  benefits of any recovery flow to the company.
6          THE COURT: But they're not a nominal
7  defendant because they're not named as a defendant.
8          MR. STASSBERG: Well, your Honor, they
9  are -- the claim as asserted is against the
10 individual defendants, that is 100 percent correct.
11 I don't know that it matters, but to the extent it
12 does matter, as it may for pleading purposes under
13 the statute, I think that they are a nominal
14 defendant.  I just wanted to make that clear, and
15 then let Mr. Raabe know, to the extent he has
16 something to address about it, he can.  I argue, your
17 Honor, and I think it's very -- for our purposes none
18 of that matters with respect to what the issues are,
19 and the issues are before your Honor on the various
20 counts, and especially on count one.
21         THE COURT: Thank you.
22         (Recess)
23         THE COURT: All right, Mr. Raabe, you
24 make the claim that in considering the SLC's work,
25 you consider it as a whole and you don't pick at the

79

1  different parts of it, but what was the SLC's basis
2  for recommending that the Rowland transaction had a
3  legitimate business purpose other than adopting Mr.
4  -- is it Fiorello's analysis, the --
5          MR. RAABE: Ferrari (phonetic spelling).
6          THE COURT: Ferrari.
7          MR. RAABE: I think first, your Honor --
8          THE COURT: Don't they have -- if there
9  isn't an independent analysis that can be determined
10 from the report, why should the Court give deference
11 to it?
12         MR. RAABE: The role of the committee is
13 first to address the demand.  So, I think you always
14 have to make reference back to the demand.
15         THE COURT: And there were two parts to
16 this.  One was we weren't treated fairly, or equally,
17 and the other was that this other transaction was
18 disadvantageous for the corporation.
19         MR. RAABE: Correct.  Taking them in that
20 order, I think on the issue of were they treated
21 unfairly, I think it's fair from a review of the
22 report that the committee looked at each of those
23 transactions, and as importantly, looked at the
24 Franks' opportunities to partake in redemptions, and
25 in a number of instances, in fact, they did redeem,

80

1  and in other instances, they declined.
2          I think a fair inference from that is if
3  there are times when you have a chance to increase
4  your liquidity, if that is your complaint, and you
5  choose not to do it, your claim that other events of
6  liquidity are unfair to you is not well heard.
7          THE COURT: But how -- is that what the
8  SLC said?
9          MR. RAABE: I think that's part of it.
10 Because it did go through each of the other
11 transactions and went through the Franks'
12 participation in liquidity events.  I don't think
13 they came out and used those words that I just used,
14 but on the whole I think that they did look at that.
15         THE COURT: Because it seemed, I thought,
16 that the analysis of the unequal treatment claim was
17 that there just wasn't any right to equal treatment
18 and that they had not stated a claim as opposed to
19 some evidentiary analysis.
20         MR. RAABE: I believe that's right, your
21 Honor.  The overreaching conclusion of the SLC was
22 that when you examine the applicable case law, the
23 trust, or Mr. Frank, did not have a right to be
24 treated identically to other shareholders, be it Mr.
25 Rowland or anyone else.

81

1      THE COURT: But the cases that the SLC
2  referred to were not cases that were dealt with at
3  the motion to dismiss stage, they were all summary
4  judgment or post-trial cases. So, why should that
5  analysis be one that seems to be entitled to
6  deference?
7      MR. RAABE: I think for two reasons, your
8  Honor. First, the principle of law I think is the
9  same, whether it's motion to dismiss or summary
10 judgment. Here we have to assume at the motion to
11 dismiss level that the facts as pled are true, but
12 the principle of law remains the same.
13     If I can find the language here. They
14 relied on the Nixon case that talked about being well
15 established in our jurisprudence that stockholders
16 need not always be treated equally for all purposes,
17 and in applying that principle to Franks' claim,
18 particularly in light of the fact that there were
19 other liquidity events that the Franks chose not to
20 participate in, undermines their claim, undermines
21 their demand.
22     The other thing I think is important to
23 consider here when this Court is examining what the
24 SLC did, is your Honor permitted discovery on that
25 issue, and while we're here on a motion to dismiss,

82

1  the plaintiffs have had a full opportunity to conduct
2  discovery and make whatever attacks they deemed
3  appropriate on the Special Litigation Committee.
4      THE COURT: So, the Nixon case says that
5  you don't have to treat everybody the same, but that
6  doesn't refer or encompass claims that the treatment
7  was maliciously made, and here the plaintiffs have an
8  affidavit from Mr. MacDonald attributing a statement
9  to the CEO that fairly construed expresses malice.
10 Why does simply discrediting that, which is what I
11 gather they did, and use cases that didn't deal with
12 allegations of malicious treatment, mean that this is
13 the kind of a committee analysis that should be
14 deferred to?
15     MR. RAABE: I'm not sure that they
16 rejected that claim, the claim by Mr. MacDonald cited
17 to Mr. Frank about Mr. Ursprung. I'm not sure it was
18 rejected. It was considered and did not stand in the
19 way of the committee's recommendation that Frank's
20 claim of unfair treatment was not valid.
21     THE COURT: Well, the first draft said
22 that he didn't remember saying that, and then the
23 final draft said he denied saying it. Isn't that
24 somewhat peculiar?
25     MR. RAABE: I think that that could be

83

1  peculiar, but again, I think you can even assume that
2  that was said.
3      THE COURT: If I assume that it was said,
4  don't I then have a case of malice, malicious
5  treatment, not the issue of unequal treatment,
6  similarly situated, but in fact a singling out?
7      MR. RAABE: I don't think so because I
8  think you have to look at the claim that the SLC was
9  not independent in assessing the claim that Mr.
10 Ursprung had it out for Mr. Frank; and therefore, the
11 transaction or the treatment was unfair.
12     THE COURT: But isn't there lack of
13 independence demonstrated by the fact they never
14 interviewed him and they never stated what their
15 legitimate business purpose was that they concluded
16 for the Rowland transactions?
17     MR. RAABE: If the committee assumed that
18 that statement was in fact made, I don't think that
19 that would then lead to a claim of independence, an
20 independence determination, that that statement in
21 and of itself would not lead them to accepting the
22 demand on the corporation. Basically they heard
23 evidence and on the body of the evidence that they
24 heard, they rejected the plaintiffs' claim. Part of
25 that evidence included the Franks' claim that Mr.

84

1  Ursprung had made that statement.
2      THE COURT: So, where is the line between
3  judicial deference and just no consideration by the
4  Court at all?
5      MR. RAABE: I would concede that it's a
6  fuzzy line. I would suggest that the deference needs
7  to be highly in favor under the statutory scheme to
8  the committee and/or the Board, in this case both. I
9  think that the Court needs to be focused on here is
10 did the plaintiffs allege facts that show that the
11 board's determination to accept the committee's
12 report was not independent or was biased, and I don't
13 think there is any evidence to support that.
14     THE COURT: But can't that be
15 demonstrated, at least at this stage, by evidence
16 that would give the Court significant pause as to how
17 the conclusion could have been reached? In other
18 words, if you had the CEO making statements about
19 what I would assume is undeniably improper treatment
20 of a shareholder, and the board chooses to accept the
21 CEO's denial of having said that over -- without
22 interviewing the proponent of the statement, isn't
23 that sufficient for the Court to think this ought to
24 move to the next stage? Why should the fact that
25 they took -- were given, I guess, other liquidation

85

1  opportunities and took advantage of them, how does
2  that mesh with evidence of malice?
3      MR. RAABE: First, I'm not sure that the
4  committee accepted Mr. Ursprung's denial. They state
5  that he denied it. I don't believe that the
6  committee then said, so, therefore, we are not
7  crediting Mr. Frank's claim in the demand. I think
8  that's an important distinction. They've
9  acknowledged that there was a demand and they've
10 acknowledged that Mr. Ursprung denied it. I think
11 when you couple that statement, "They will never have
12 liquidity as long as I'm president," with the facts
13 that the committee found, that in fact they availed
14 themselves of liquidity events --
15     THE COURT: While he was CEO?
16     MR. RAABE: While he was CEO, could lead
17 to a reasonable conclusion that the statement, even
18 if made, didn't matter, and that the Franks were not
19 treated unfairly. So, it is reasonable to conclude
20 that there was no malice, and again, I think the
21 Court can take judicial notice of the recent PJR
22 proceedings where the Franks obtained $3 million of
23 liquidity while Mr. Ursprung was the president, and
24 in fact reduced their percentage share of the
25 company, which is exactly what they've been claiming

86

1  through the suit.
2      THE COURT: All right, since I referred
3  the PJR matter to Judge Margolis, I don't have much
4  familiarity with that. I didn't understand that to
5  be a part of this motion.
6      MR. RAABE: I don't think it has to be,
7  your Honor. I just raise it because it is relevant
8  to some of the inquiries that your Honor has asked of
9  counsel today.
10     THE COURT: And so what shows the
11 committee's, the SLC's, basis for its recommendation
12 on legitimate business purpose separate from the
13 financial director's analysis?
14     MR. RAABE: I would agree with your
15 Honor, to the extent you're raising the question of
16 did the SLC conduct a business justification analysis
17 for the Rowland transaction, I don't think that they
18 engaged in a detailed analysis of that. How did it
19 affect the balance sheet of the corporation? They
20 did go through what the elements of the transaction
21 were, including the amount of it, the payout, the
22 interest rate. So presumably they had some
23 familiarity with what the transaction was all about.
24 The documents that they reviewed included financials,
25 from my recollection, which would let them assess the

87

1  financial impact viability of the company after the
2  transaction.
3      THE COURT: But did they do that? Is
4  there something in their report that tells me that
5  they did it and how they did it? I mean, I don't
6  know that your position that the law firm was to be
7  engaged in a sham is quite correct. They could be
8  pro forma -- what is the other -- or shallow.
9      MR. RAABE: The Bennett case, your Honor
10 --
11     THE COURT: There is some language in
12 Auerbach from the -- out of New York.
13     MR. RAABE: That's right, the same case I
14 was referring to as Bennett. We paraphrased it, a
15 good faith standard as described in that court is
16 that the investigation is so restricted in scope, so
17 shallow in execution or otherwise, so pro forma or
18 halfhearted, so as to constitute a pretext or sham.
19 It has to be so shallow that it is a pretext or a
20 sham.
21     THE COURT: So, that's different from
22 just not being very good.
23     MR. RAABE: I think so, your Honor.
24     THE COURT: Or very adequate.
25     MR. RAABE: I think you don't need to get

88

1  to that point in this case because I think a fair
2  review of all of the pleadings on this issue and of
3  the report itself show that it was more than so
4  shallow or halfhearted, and it involved a reputable
5  law firm put on the kind of sterile legal issue. I
6  think that's right, you need to get to the level of
7  pretext or sham, because the law is that the courts
8  should not be coming back in to be probing the depths
9  and seeing how shallow it was unless the plaintiffs
10 could make the threshold showing it was a pretext or
11 a sham. As your Honor noted, when we started the
12 day, it is their burden under these circumstances.
13     THE COURT: Pretext or sham on whose
14 part? What if the board of directors simply wanted
15 to go through the motions, since they are the
16 decision makers, if the report they get doesn't
17 analyze anything that they need to have analyzed with
18 respect to the demands made, wouldn't that be a
19 pretext or a sham on their part as opposed to the law
20 firm's part?
21     MR. RAABE: I think that could be the
22 case. I don't think that the Court could draw the
23 conclusion here, but I think that could be the case.
24 I think you could have a board of directors either
25 hire a shoddy law firm or hire a good law firm and

89

```
 1  tell them don't look at this, don't look at that.
 2           THE COURT: Or just not give it to them.
 3           MR. RAABE: When you say "it," I'm not
 4  sure.
 5           THE COURT: Documents.
 6           MR. RAABE: I don't think that's what's
 7  been alleged here, fairly.
 8           THE COURT: Okay, thank you.
 9           Ms. Merriam.  Now, I know that you are
10  going to talk about equal liquidity, but I don't
11  understand the plaintiff to be claiming that it has a
12  right to equal liquidity.
13           MS. MERRIAM: Your Honor, I understand
14  that that's what the plaintiff has stated in their
15  opposition brief.  That was news to me, frankly.  We
16  had a conference call with the Court in which
17  repeatedly all the parties referred to the claim in
18  count two as being about an equal opportunity for
19  liquidity, and I think a reading of the complaint as
20  a whole and the briefs of the plaintiffs suggest
21  that's really what this is about, it's about Mr.
22  Frank wanting an opportunity to get his stock cashed
23  in.  Sometimes that's framed as "I want what Rowland
24  got," sometimes it's framed as, you know, I just --
25  "I had a contract that said I should get that right."
```

90

```
 1  but that's what it all boils down to, is he wants
 2  them to buy back his stock.
 3           THE COURT: Is that the equivalent of an
 4  equal -- a liquidity right?  Is that what you are
 5  saying?
 6           MS. MERRIAM: Yes, your Honor, because he
 7  bases his claim that he's been treated unfairly on
 8  the fact that someone else, or sometimes two other
 9  people, have been given a right to resell their stock
10  and he hasn't.  And the only way that that's a
11  problem is if he has a right to be treated
12  identically to those other shareholders, and, your
13  Honor, our brief sets forth our argument on the law
14  on that.
15           I would just point out that in
16  opposition to our argument that there is no right to
17  equal opportunity for liquidity, the plaintiff cites
18  only two Delaware cases, and Connecticut regularly
19  follows Delaware law on corporation issues.  One of
20  those we noted in a footnote in our reply, it's
21  actually a transcript of an oral ruling on
22  preliminary injunction, and in fact in that oral
23  ruling the Court acknowledges our position, which is
24  shareholders can be treated differently.
25           As in Nixon v. Blackwell, again, that
```

91

```
 1  court says what we say it does, which is there is no
 2  right to be treated identically, and the fact that
 3  that was an ESOP that the corporation chose to treat
 4  differently, doesn't matter.  The corporation has
 5  that right to make decisions about how they're going
 6  to run their business, and one of the decisions
 7  they're permitted to make is to repurchase their own
 8  stock, and they can do that selectively.  When a
 9  corporation decides to repurchase their own stock,
10  even selectively, that decision is protected by the
11  business judgment rule.
12           We've talked a lot about the business
13  judgment rule in connection with the derivative
14  claim.  It has a slightly different impact in this,
15  on this aspect.  First, you know, the burden is on
16  the plaintiff to overcome this rule.  There is a
17  presumption that the decision was reasonable.  The
18  plaintiff's opposition brief says, well, we've
19  alleged bad faith, that's enough.  It's not
20  enough.  The case law is clear that conclusory
21  allegations do not suffice to overcome the
22  presumption and that evidence of bad faith has to be
23  presented.
24           Here, there is just sort of talk, "Well,
25  I don't think they're treating me fairly.  I don't
```

92

```
 1  think that they like me."  In fact, as has been
 2  repeatedly mentioned, year after year after year, the
 3  trust, and prior to that Mr. Frank, have been given
 4  the same opportunities to cash in stock as everyone
 5  else, with the limited exception of the Rowland
 6  transaction.
 7           I want to back up just a minute to the
 8  standing question as to count two.  Plaintiffs'
 9  counsel's is still repeatedly attempting to argue
10  standing collectively.  The United States Supreme
11  Court, the state supreme court, and everyone in
12  between, has acknowledged standing is individual, and
13  Mr. Frank can't say, "Well, the trust has standing
14  for this piece and I have standing for this piece and
15  if you put it all together that should be enough."
16           The party who's bringing this action,
17  which is the trust, has to establish standing on its
18  own, and the fact that we can all refer casually to
19  "the Franks" doesn't change that.  And I don't think
20  that the trust has established that.  I'm
21  understanding now that Mr. Frank is no longer
22  individually a plaintiff in count two, so that's no
23  longer an issue.  The other aspect of count --
24           THE COURT: I'm not sure that plaintiff
25  agrees with you on that.
```

93

```
1          MS. MERRIAM: I'm sorry, I did get a
2   little lost in the earlier debate.
3          THE COURT: What I was asking Mr. Raabe
4   was if the plaintiff in count two were only the
5   trustee, was he disputing the capacity to be -- the
6   standing as opposed to -- well, sort of standing part
7   A as opposed to standing part B, which is whether
8   it's really an individual claim or a derivative
9   claim, and as to A he said he was not disputing that.
10  I don't think that plaintiff has said -- I thought
11  plaintiff said that they were claiming both, both
12  capacities, but that it didn't really matter because
13  they were not seeking double recovery.
14         MS. MERRIAM: Yes, your Honor, in that
15  case I would just limit my argument to saying I think
16  it does matter.  They have to establish specific
17  standing as to each party.  As to the trust, the
18  trust has been a shareholder since I believe 1997.
19  Mr. Frank is not.  He doesn't have any claims within
20  the limitations period for breach of fiduciary duty.
21         Count two alleges two distinct harms.
22  Initially one is the -- what we've construed as an
23  equal opportunity for liquidity.  The other is this
24  denial of information claim.  The opposition -- we
25  argue that that claim should be dismissed.  The
```

94

```
1   opposition sort of cursorily touches on it, but I'm
2   not sure that they're still pursuing that as a
3   separate basis for breach of fiduciary duty.
4          We argued in our motion to dismiss that
5   there are a number of statutes in Connecticut that
6   dictate what kind of information must be retained,
7   what kind of information must be turned over, and how
8   that process is to be done, and those have not been
9   alleged to be satisfied, and now in opposition to our
10  motion, we still have no further information on that.
11         Additionally, the only allegation in the
12  complaint about a specific denial of information
13  alleges that Morgan Frank made a demand for
14  information.  Morgan Frank was originally a party to
15  the case.  He has been dismissed.  Frankly, I'm not
16  100 percent sure what his relationship is to either
17  Jonathan Frank or the trust, but he was not a
18  shareholder.  Mr. Jonathan Frank is alleged to be the
19  trustee of the trust, in which case Morgan Frank was
20  not the trustee.  So he had no standing to demand
21  information, and any denial of information to Morgan
22  Frank can't be actionable.
23         THE COURT: You say that he's not a
24  shareholder at the time?
25         MS. MERRIAM: He hasn't been alleged to
```

95

```
1   be a shareholder.  The only allegations in the
2   complaint are that Mr. Jonathan Frank was a
3   shareholder.  He then transferred his shares to the
4   trust.  There has been no allegation that Morgan
5   Frank was a shareholder, and in fact, your Honor, I
6   believe that's why he was withdrawn as a plaintiff.
7          And one last point on count two.  It's
8   been argued that the plaintiffs had no duty to
9   respond to our argument that injunctive relief isn't
10  appropriate because the -- that the Court simply
11  can't dismiss a demand for relief.  Had they argued
12  that in their opposition, I would have included in my
13  reply the case law which indicates dismissing a
14  demand for relief is appropriate and is fairly
15  commonly done in this district and at the Second
16  Circuit.  I can still supply those cases, but I'm
17  sure your Honor can find those yourself as well.  But
18  it is standard; it happens regularly.
19         There is no opposition to the injunctive
20  relief.  Furthermore, there is no claim that there
21  will be future harm, and in fact three of the
22  defendants they represent are no longer members of
23  the board of directors and injunctive relief against
24  them is completely inappropriate.
25         THE COURT: Which ones?
```

96

```
1          MS. MERRIAM: Loomis, Patlovich and
2   Raffay.  And again, your Honor, the claims in this
3   case are about money, and this is just not the place
4   where injunctive relief is necessary or appropriate.
5   If your Honor has nothing else on count two, I will
6   address the tortious interference claim.
7          THE COURT: Go ahead.
8          MS. MERRIAM: I'm not going to get into
9   the arguments as to whether the contract was breached
10  by anything that happened, I'll leave that to Mr.
11  Shearin who represents Mr. Rowland, but I will
12  address two points.  One is that the complaint says
13  that the tortious interference was with three types
14  of contracts:  One, the 1979 agreement; two, the
15  shareholders' agreement; and three, I believe he says
16  other contractual agreements.  They've never
17  identified any other contractual agreements.  They
18  didn't respond to our argument on that point.  I'm
19  assuming they are no longer alleging any other
20  agreements.
21         As to the shareholders' agreement,
22  again, there was not much of a response to our
23  argument there.  The argument really is about the
24  1979 agreement, and any claims of tortious
25  interference, as your Honor discussed earlier in
```

98

1  questioning, would be barred by the statute of
2  limitations.
3        The amended complaint says in paragraph
4  45 that the Rowland deal was consummated in 1998, and
5  they used the term "consummated." That's right,
6  there was a deal made. If anything could have
7  violated the 1979 agreement, it would have been the
8  sale of stock by Mr. Rowland. The sale of stock by
9  Mr. Rowland occurred in 1998. The fact that the
10  corporation had an installment payment plan doesn't
11  change that.
12        In order to get around the statute of
13  limitations on this count, plaintiffs would have to
14  show that my clients, the individual directors,
15  somehow knew that there was an ongoing contractual
16  duty between Mr. Rowland and Mr. Frank, and
17  interfered to stop that after the year 2000. I just
18  -- there is nothing in the allegations that suggests
19  that.
20        The allegations as to tortious
21  interference in general are very scant, but
22  particularly as to anything that could have possibly
23  happened after the year 2000, the independent
24  directors, outside directors simply didn't do
25  anything that had anything to do with the 1979

99

1  opportunities for liquidity, some of which he took
2  advantage of, some of which he did not, but the
3  corporation is entitled to make those decisions.
4  There is a presumption that in making those decisions
5  they're acting properly under the business judgment
6  rule, and it's not the company's burden to articulate
7  a reason for declining to enter into a repurchase
8  deal with one shareholder, and in fact, under Mr.
9  Frank's count one theory, if the corporation were to
10  buy a bunch of his stock back and single him out, as
11  he seems to want, 219 shareholders would have a claim
12  that that was improper. His argument boxes the
13  corporation into an impossible situation.
14        The fact is, the corporation doesn't
15  have a duty to repurchase his shares, and it doesn't
16  have a duty to articulate why it's not repurchasing
17  his shares. That's one of the risks of being an
18  investor in a closely-held corporation, but that's
19  the price you pay.
20        THE COURT: And then with respect to the
21  failing to inform him claim, the defendants don't
22  claim that they did inform him or he didn't have a
23  right to be informed. So, why can their action not
24  -- why should that be dismissed at this stage, that
25  part of it?

98

1  agreement and/or Mr. Frank's rights under it.
2        And I would just reiterate that the --
3  as was discussed earlier, the contract does refer to
4  before actually selling stock the parties have
5  duties, and therefore, any interference with that
6  right would have to have occurred prior to the sale
7  of stock and not prior to simply the last payment
8  made in exchange for the sale of stock.
9        That's all, your Honor.
10        THE COURT: I want to go back to the two
11  parts of count two, the denial of information and the
12  refusal to buy back. Where in the record that we
13  have is the asserted legitimate business purpose for
14  refusing to buy back the Frank?
15        MS. MERRIAM: For refusing to buy back?
16        THE COURT: Correct.
17        MS. MERRIAM: Well, first is the board
18  and the corporation are not required to articulate a
19  reason to not enter into a transaction. Every share
20  -- there are 200 something shareholders of Reflexite,
21  I believe. Theoretically, every one of them would
22  have a breach of the fiduciary duty claim if they --
23  because the corporation hasn't singled them out for
24  special treatment as far as liquidity.
25        Mr. Frank has been given repeated

100

1        MS. MERRIAM: If your Honor is referring
2  to the allegation that Morgan Frank requested
3  information of the corporation, and the corporation
4  failed to provide it --
5        THE COURT: You've addressed that.
6        MS. MERRIAM: Right.
7        THE COURT: I'm thinking about the 1979
8  letter that --
9        MS. MERRIAM: The letter I believe
10  imposes a duty on the signatories to the letter to
11  inform Mr. Frank if they are going to sell stock in a
12  way that would result in a transfer of control. The
13  outside directors, the only signatories to that
14  letter are Mr. Rowland and Mr. Haffenreffer, I
15  believe his name is. I believe one of -- Mr.
16  Haffenreffer, I believe, has passed away. Mr.
17  Rowland is represented by Mr. Shearin who will
18  address the contract claims, but there is no duty of
19  the corporation, to my understanding, or specifically
20  to these individual directors, who probably never
21  heard of Reflexite in 1979, to inform the Franks of
22  anything under the 1979 agreement.
23        THE COURT: You referred to the statutes
24  that regulate information disclosure, and is your
25  position, I gather, that the demand for all minutes

101

1  of the meetings of the board of directors and all
2  accounting records of the corporation concerning the
3  repurchase of shares from large shareholders, the
4  ESOP plan, and the minority investor program, doesn't
5  satisfy the statutory requirements?
6      MS. MERRIAN: No, your Honor.  Our
7  argument is that there is more to the statutory
8  requirements than simply the nature of the
9  information requested.  As a preliminary matter, I
10  cannot tell you right now whether each of those
11  specific requests would or would not satisfy any one
12  of the relevant statutes.
13      What I can tell you is Mr. Frank's
14  complaint does not allege that he satisfied the
15  statutes governing demand for that information, which
16  is that he made the demands in good faith for a
17  proper purpose, that he described his request with
18  reasonable particularity which could reasonably found
19  to have been met, although it's not alleged, and that
20  the records are directly connected with his proper
21  purpose.
22      As has been discussed in relation to the
23  propriety of Mr. Frank serving as a derivative
24  plaintiff, Mr. Frank has a long and not always easy
25  history with Reflexite, and it is by no means a

102

1  foregone conclusion that his purpose in requesting
2  volumes of information from the corporation was
3  proper, or that he had -- that the specific documents
4  he sought were legitimately related --
5      THE COURT: If this is notice pleading,
6  how can I deal with that?  Does that all have to be
7  alleged?
8      MS. MERRIAN: Your Honor, I think when
9  there is a statute governing the release of
10  information, he has to allege he's complied with the
11  statute, but more importantly is the fact that the
12  only allegation I was able to identify in the
13  complaint about a specific request that was denied,
14  was the request from Morgan Frank.  The corporation
15  has no duty to Morgan Frank as a nonshareholder to
16  turn over information.  If anything, it would be
17  irresponsible to turn over information to someone who
18  is not properly entitled to it.
19      So that is the more significant point
20  here, your Honor.  Your Honor, I'm being informed by
21  my co-counsel that in fact the information they
22  requested, that the Franks requested, was sent to
23  them prior to the conclusion of the SLC's
24  investigation.  That is reflected in the appendix to
25  the SLC report listing documents reviewed, and it

103

1  reflects a letter from Jack Kennedy, who is an
2  attorney for the corporation, to counsel for Mr.
3  Frank enclosing documents that he had requested.  So,
4  that claim is, in any case, moot.
5      THE COURT: All right, thank you.
6      MS. MERRIAN: Thank you, your Honor.
7      THE COURT: Mr. Shearin.  All right, you
8  are going to talk about the breach of contract claim,
9  count three.
10      MR. SHEARIN: I am, your Honor, three and
11  four.
12      If your Honor would indulge me, I have
13  just a very few short thoughts on one and two.  This
14  is the fourth derivative case I've been involved with
15  in recent time, and the Court's colloquy with counsel
16  today is the same colloquy that happens in each of
17  these proceedings, and I think it's worthwhile to
18  step back and decide while we're here, and let's be
19  blunt, the existence of the derivative claim gives
20  the plaintiffs a right to seek legal fees.
21      Your Honor asked a very pointed question
22  when the proceeding started, what's the difference,
23  what if I just jerry-rig one and two?  Well, there is
24  a big difference, because the allegation of
25  attorney's fees provides even greater burden on the

104

1  corporation if in fact they are awarded.
2      But let's be clear as well what role the
3  plaintiff occupies, whoever we define to be the
4  plaintiff.  The role that plaintiff occupies is a
5  spokesman for the corporation and its shareholders.
6  The statute -- there is two statutes in Connecticut
7  that talk about the status of a derivative plaintiff,
8  52-572(j) and 33-721.  572(j) discusses the
9  shareholder representing the interest of the shares
10  of like statutes, preferred, class C, class B, class
11  A, what have you.  But 33-721 talks about the
12  interests being in favor of the corporation.  The
13  derivative count must be good for the company, which
14  is why we have the provision in the statute for the
15  Special Litigation Committee.
16      The Special Litigation Committee isn't
17  there to second guess what the board did previously,
18  not whether it did it right or wrong, not whether
19  they would do it again the same way, simply whether
20  there was a breach of fiduciary duty, because
21  ultimately that's what has to be proved in a
22  derivative claim.  And if the Special Litigation
23  Committee concludes that there was no breach of
24  fiduciary duty, albeit they may have done it
25  differently, albeit they would have liked to have it

105

1   recorded in a different manner, albeit they would
2   have liked to have it documented in some different
3   manner, it doesn't matter. What matters is was there
4   a breach of fiduciary duty. If there isn't, we have
5   no business being here as a derivative claim.
6        Mr. Frank -- whether the trust might
7   have a direct claim, and that may be why he alleged
8   count two in addition to count one, but he does not
9   have a derivative claim. I say "he," I should say
10  "it." And I think it is -- there should be no doubt,
11  your Honor, and I think your Honor clarified it for
12  plaintiffs, and perhaps for defendants, the only
13  party under the statute who can bring a derivative
14  case is a shareholder, and the only shareholder as of
15  the time this complaint was filed was the trust.
16  That's the only proper party to a derivative claim.
17  It's the only proper party to count one.
18       That's also true, by the way, your
19  Honor, of count two. Mr. Frank doesn't own any
20  shares. Mr. Frank cannot sue as a shareholder of the
21  corporation. Mr. Stassberg referenced the Court to
22  the definition of shareholder in the statute
23  33-720(a)(2) and said there is a reference there to a
24  trust. It's not a trust, it's a voting trust. It's
25  a party who votes on behalf of an agreement among

106

1   several individuals as to how a collection of shares
2   will be voted. It's not a family trust, which is a
3   separate entity as the plaintiffs concede by suing in
4   that capacity, created for tax purposes.
5        Your Honor asked a series of questions
6   about the Special Litigation Committee, and the
7   quality of its investigation, whether it should or
8   shouldn't have relied on Mr. Ferrari and the like,
9   and I guess what I would urge your Honor to consider
10  is that what that Special Litigation Committee is
11  doing is doing what the statutes set up to establish,
12  to allow corporations to run their own business.
13       We have now got a check on what the
14  original board exercising its fiduciary duties did.
15  That new Special Litigation Committee also has
16  fiduciary duties to the shareholders. They conduct
17  their investigation, they make their inquiry, they
18  make their conclusions, they report them to the
19  board. That new board has fiduciary duties to the
20  shareholders and to the corporation. It makes its
21  independent assessment. Those assessments are
22  whether or not there was a breach of fiduciary duty,
23  plain and simple.
24       Your Honor asked a question, well,
25  Massachusetts seems to allow a merits determination,

107

1   and your Honor is quite correct, although I think
2   there is a 2003 case in Massachusetts calling into
3   question the one your Honor has alluded to, and if I
4   -- the best source I can point your Honor to, and I'm
5   afraid I don't have it, is the Model Business
6   Corporation Act, in the annotation there, and in
7   Morris, the Morris, federal practice section under
8   Rule 23, there is a good discussion about the
9   dichotomy or differences between the Massachusetts
10  theory and the New York and Delaware theories. The
11  New York and Delaware theories are what Connecticut
12  commonly turns to, but more importantly, is what our
13  our statute is modelled after. Our statute does not
14  embrace a merits determination, merit two-prong
15  determination that's set forth in the briefs.
16       So, why does this matter? Your Honor
17  asked a question, well, maybe I can just reformat one
18  and two. Well, you can't, with all due respect. If
19  your Honor were to take a look at paragraphs 43 and
20  45 of the complaint, you would see that in paragraph
21  43 of the complaint, Mr. Frank -- or I should say the
22  Franks plural, is commenting upon the Rowland
23  transaction. In the second sentence of that
24  allegation it says "The Franks believe that this
25  course of action was injurious to Reflexite." Again,

108

1   alluding to the Rowland transaction.
2        Now skip down two paragraphs. In 1998,
3   the year in which the Reflexite deal was consummated,
4   the Rowland deal, quote, "It made no offer to
5   purchase any shares from the Franks." Now, what do
6   we know about that allegation? Well, what we know
7   about that allegation is what the Franks say in their
8   brief at page 28, which is that was a breach of
9   contract. Not giving Franks the deal that Rowland
10  got was a breach of contract. That's what they say
11  in their brief. So now ask yourself, your Honor, in
12  count one, the Franks stand there and say the Rowland
13  deal was bad for me.
14       THE COURT: So you are saying they wanted
15  to participate in the same illegal deal.
16       MR. SHEARIN: Absolutely, and I'm not
17  saying it, they say it. And that's the problem with
18  wearing both hats. This notion that somehow this
19  case isn't about liquidity is -- I can't understand
20  it. If your Honor were to read the demand that
21  started this proceeding, the original complaint and
22  the amended complaint, it's all about liquidity, it's
23  all about "I didn't get the Rowland deal." But
24  that's the problem with wearing two hats in this
25  case, because you can't on the one hand say the

109

1  Rowland deal was bad for the company, and on the
2  other hand say it was a breach of contract not to
3  give me the deal, because now what does Mr. Rowland
4  stand up in front of your Honor a year, a year and a
5  half from now and say? "I want the Rowland deal"?
6  Your Honor has to approve of the discontinuance of
7  the derivative action under the statute.  So your
8  Honor turns to Mr. Rowland's counsel and says "Why
9  are you selling?"  "Well, I got liquidity."
10          THE COURT: Mr. Frank.
11          MR. RAABE: Frank.
12          MR. SHEARIN: Frank's counsel, I'm sorry.
13  Says, "Why are you selling?"  "I got the Rowland
14  deal.  They finally acknowledged they breached the
15  contract, they're giving me the deal."  Your Honor
16  says "Wait, you said that was bad for the company."
17  That's the tension.  You can't have it both ways.
18          Now, is there a plaintiff out there, is
19  there a shareholder plaintiff who properly could
20  bring those claims if in fact they had merit?  Maybe.
21  Do we care?  With all due respect, no.  That's not a
22  relevant inquiry for this Court.
23          The Supreme Court said last year, it's
24  Smith v. Snider, your Honor, I have a Westlaw cite,
25  2004 Westlaw 73418, where two shareholders in a

110

1  corporation sued a party who was a former director
2  and employee who had started a competing business,
3  the Court dismissed both shareholders saying the
4  claims you brought belong to the claims of the
5  corporation, and the Supreme Court goes on to say
6  that "It is commonly understood a shareholder, even
7  the sole shareholder, does not have standing to
8  assert claims alleging wrong to the corporation."  It
9  is entirely possible under jurisprudence in
10  Connecticut to have a situation where there was a
11  corporate wrong, but have no plaintiff who is able to
12  bring it.
13          Now, the trust may have individual
14  claims, those that are say in count two, but they
15  don't have derivative claims.  And I would suggest,
16  your Honor, that the motivation is the attorney's
17  fees, and that can't be the motivation for permitting
18  a derivative proceeding.
19          Moving to count three, your Honor, and
20  not to repeat this issue of who's who, but it is
21  somewhat relevant to the counts directed to Mr.
22  Rowland.  The '79 agreement is entered into between
23  four individuals, the four individuals who owned the
24  company at that time, Mr. Rowland; Mr. Hugh Rowland,
25  his brother, now deceased; Mr. Haffeprefter, the

111

1  brother-in-law, now deceased; and Mr. Frank.  We sit
2  here today, and on the one hand we hear it really
3  doesn't matter who is who because after all, the
4  intent was the intent.  Well, the intent is to be
5  gleaned from the words of the contract.  There was
6  only four signatories to that contract.  The only one
7  who can bring that claim is Mr. Frank, if in fact
8  there was a breach of that agreement.  The trust was
9  not a signatory to that contract, didn't even exist
10  at the time, has no standing to bring that claim.
11          So, why does that matter? Well, it
12  matters because in 1997, a year before Mr. Rowland
13  sold his stock to the company, Mr. Frank sold his
14  stock to his trust.  So, what contract could we
15  possibly have breached owing an obligation to Mr.
16  Frank when in fact Mr. Frank had no shares?
17          To the extent the suggestion is made,
18  well, it ought to just run -- it's all one big happy
19  family and it ought to be benefitting the successors
20  here, well, one, that's not the language of the
21  contract.  Two, if we actually consider the only
22  available parole evidence, the course of dealings, we
23  look at the shareholder agreement written seven years
24  later where the parties, the same four individuals,
25  along with others at that point in time, say that in

112

1  that case it does run to successors.  The obligations
2  they're taking on in the 1986 agreement do run to
3  successors.  Those words weren't used in the '79
4  agreement.
5          I heard your Honor ask Mr. Stassberg I
6  believe it was twice, maybe three times, "But what
7  about the voting control?"  And the best I could
8  figure out from the answer was I guess we don't care
9  about the voting control.  But with respect, that's
10  not what the contract says.  There is seven lines to
11  this letter.  If Mr. Stassberg was correct in his
12  reading, paragraph two would say before actually
13  selling stock now owned by us, we will use all
14  efforts that are reasonable to assure you the
15  opportunity of selling your shares.  We would cut out
16  the dependent clause.  What Mr. Stassberg did was
17  just make that language superfluous, and it is
18  fundamental under contract law you don't do that.
19  This Court can't conform the contract, it can't read
20  those words out.
21          But why does it matter?  There are three
22  people signing this -- four people signing this
23  contract.  These four people are the individuals
24  owning the company.  The issue here is voting
25  control.  We know that because the pronoun that is

113

1  used is "we" will use all efforts.  The three of us
2  are going to use our efforts to make sure that if the
3  voting control changes, you will know about it and
4  you will have an opportunity to participate.
5          So does the voting control change in
6  1997?  What Mr. Stassberg said was correct, the
7  stock was retired.  The stock sold to the company by
8  Mr. Rowland was retired, no longer voted.  Mr. Frank
9  and/or the trust, whichever one you want to claim was
10 the shareholder at that time, had absolutely no
11 diminishment of voting control.  Indeed, the argument
12 could be made that proportionally his voting control
13 increased.
14         THE COURT:  Because there are less
15 shares.
16         MR. SHEARIN:  Yes.  Now, Mr. Stassberg
17 says, well, you know, what we really intended back 25
18 years ago had come to pass.  No, it didn't.  It
19 didn't.  There was no voting control that was upset
20 by what Mr. Rowland did, not as to Mr. Frank or as to
21 the trust.  And I would submit, your Honor, that this
22 motion that somehow, "Well, we can claim a breach of
23 contract and we'll figure out what it says later on,
24 we need to conduct discovery because maybe it doesn't
25 mean what it says or maybe the defendants will turn

114

1  out to be right on their interpretation, but we're
2  allowed to explore whether there is another
3  interpretation."
4          With all due respect, that's not only
5  wrong, it's not fair.  Mr. Rowland shouldn't have to
6  spend the next three years defending this case
7  because they don't want to read the sentence that's
8  in the contract.
9          The '86 agreement, and I guess I have a
10 hard time understanding this agreement -- this
11 argument as well, your Honor, because I think it's
12 quite clear.  First of all, signed by the same
13 individuals, and our argument is that it replaced the
14 '79 agreement.  That argument is not responded to in
15 the opposition memorandum.  It's clear by the
16 language that the parties agree there is no prior
17 contracts, understandings, governing the subject
18 matter, which was the sale of stock.
19          In paragraph one of that stockholders'
20 agreement, very first sentence, "None of the
21 stockholders shall sell, assign, transfer, pledge,
22 dispose of any shares of stock, except in the case of
23 a transfer of such shares to the corporation itself,
24 without first obtaining consent of the others."
25 Exactly what Mr. Rowland did.  Exactly what he did.

115

1  He didn't need their consent.
2          So, now you jump to paragraph two, and I
3  would urge your Honor to look at the amended
4  complaint because you won't find in the amended
5  complaint any suggestion that there was some breach
6  of notice, but be that as it may, we're here.  "If a
7  stockholder desires to sell or otherwise dispose of
8  all or any portion of his shares in the corporation,
9  and shall have received a bona fide written offer to
10 purchase all such shares which he's willing to
11 accept," then he gives the corporation notice,
12 because after all, the corporation might want to buy
13 them, right of first refusal, and if the corporation
14 after 10 days says no, then he notifies the other
15 shareholders, the other signatories to this
16 agreement.  They don't get notice unless the
17 corporation says no, and when the corporation is
18 buying them, guess what, it's not saying no.
19          I heard today, your Honor, what I thought
20 was a count that was no longer in the complaint, and
21 that's the promissory estoppel.  I also heard Mr.
22 Stassberg say that somehow there is this law out
23 there that disagrees with the authority that we've
24 cited in our brief.  I would submit there isn't, and
25 if there was, their time to have provided that

116

1  authority to the Court has long since passed, but
2  more importantly, I don't think this is a
3  particularly complicated situation.
4          I realize that they may have decided
5  that they wanted to plead as many different theories
6  as they could get, but if your Honor looks at the
7  fourth cause of action, promissory estoppel claim,
8  it's on page 23 of the amended complaint, it refers
9  to these promises, and if your Honor looks at the
10 promises, and I would ask you to just turn back to
11 page seven, you'll see that in paragraph 29 there is
12 a discussion alluded to between Mr. Frank and Mr.
13 Hugh Rowland that talks about the second condition
14 being that he would -- that he, Mr. Frank, would be
15 able to sell his shares, other insiders will be able
16 to sell theirs.  The last line of that paragraph.
17 The next line in paragraph 30 is that the other
18 individuals agree.  The very last line.  They then
19 executed an agreement reflecting this agreement.
20          And if you look at paragraph 96 of count
21 three you will see that same 1979 agreement being
22 referred to saying this agreement was memorialized in
23 the 1979 agreement.  So, the reality, your Honor, is
24 that even if this estoppel claim had legal merit, the
25 promises are the exact -- by plaintiffs own

117

1  admission, the exact same promises memorialized in
2  the 1979 agreement.  And since that count doesn't
3  succeed, neither should count four.
4          THE COURT: All right, thank you.
5          MR. SHEARIN: Thank you, your Honor.
6          THE COURT: Let's finish up then giving
7  Mr. Stassberg an opportunity to respond to the
8  various arguments and questions that have been
9  raised.
10          MR. STASSBERG: Your Honor, I'll try not
11  to repeat the ground that we went over to begin the
12  argument today.
13          THE COURT: Just to respond to what
14  they're saying.
15          MR. STASSBERG: Let me respond as I go
16  through point by point.  The first point Mr.
17  Rowland's counsel was just talking about, the
18  definition of shareholder with respect to the
19  derivative action, unfortunately he left out the only
20  one sentence that defines it, but he left out the
21  second half of the sentence which includes "a
22  beneficial owner whose shares are held in a voting
23  trust." He said that, and it continues "or held by a
24  nominee on the beneficial owner's behalf." That's
25  the clause we are talking about when we talk about

118

1  the family trust and why they're both appropriate
2  plaintiffs.
3          The statute couldn't be any clearer for
4  the derivative action.  They are both appropriate
5  plaintiffs.  I would suggest to your Honor, as we've
6  argued, that the logic behind that statute applies to
7  all of the other claims as well.
8          There has been a bunch of reference made
9  to Morgan Frank.  Morgan Frank, as I believe everyone
10  knows, and if they don't, and perhaps the Court
11  doesn't, is the son of Jon Frank.  What's important
12  is not so much that, but what's important is what's
13  alleged in the complaint.  What's alleged is Morgan
14  Frank, and I'll put this in quotes now "on behalf of
15  the Frank Family Trust," end of quotes, reached out
16  and attempted to get information from the board of
17  directors.  That's alleged in, I believe, paragraph
18  58, but clearly it's alleged.  It's alleged he's
19  acting as their agent, and so that activity of course
20  is proper to consider at the motion to dismiss level.
21          Sort of working our way back through the
22  counsel that spoke, I think, again, we're seeing a
23  conflating what the standard is.  There was a lot of
24  talk from counsel for the individual defendant
25  directors that the Franks have to prove this or the

119

1  Franks have to prove that.  Again, that may be true
2  if we're standing here before a jury, but that's not
3  true on a motion to dismiss stage where the
4  allegations in the complaint have to be taken in the
5  light most favorable to the plaintiffs.  And, your
6  Honor --
7          THE COURT: Isn't that just -- that
8  belies the Special Litigation Committee statute that
9  we've been talking about.
10          MR. STASSBERG: Yes, and I'm not talking
11  -- those claims were directed to the personal direct
12  claims and not the SLC.  So, let's get to the SLC
13  because in some ways your Honor's questioning really
14  highlights the problem with the SLC.  In my view it
15  highlights the whole problem with this case, and
16  while I understand defendants doing their job as good
17  defense attorneys want to dismiss it and say, hey,
18  it's just like these cases that have been dismissed,
19  a disgruntled person, there really aren't facts to
20  support that, and let's look at the SLC.
21          There are a couple of pieces in that,
22  but I think the most important piece is what's your
23  Honor's role?  Mr. Raabe suggested, well, your Honor,
24  it is the potted plant role.  I submit to you that
25  that is not the role, that's not what the statute

120

1  requires, it's not what the law requires.  In fact,
2  it's just the opposite.  Whether it is our burden or
3  not, and let me take -- it doesn't matter because the
4  standard here for the SLC is we need to look at
5  whether the SLC did the job that they were supposed
6  to do in an independent way in good faith, and Mr.
7  Raabe, unfortunately, didn't mention this third
8  criteria in responding to your Honor's questions,
9  whether that was reasonable or not.
10          That doesn't mean that whatever they
11  decide the Court defers to.  It means that if there
12  are genuine issues of fact about any of those three
13  areas, then in fact their decision does not deserve
14  the deference it would otherwise get.  And if we just
15  focus on the reasonableness of what they did, your
16  Honor, it is hard to find anything other than
17  substantial questions of how this could be determined
18  to be reasonable given the narrow way they
19  constrained their own inquiry.
20          Your Honor highlighted them.  I'm going
21  to try not to highlight the same ones your Honor
22  highlighted, but a couple of points that I think were
23  not mentioned.  A lot of focus has been directed to
24  the Rowland transaction, and that clearly is the
25  subject of the contract claim and the tortious

1  interference claim that has been alleged here, the
2  demand, and Mr. Frank's claims in the derivative
3  nature in count one are not solely based on the
4  Rowland transaction, and there is no fair reading of
5  what the SLC did, that they did anything to look even
6  at that transaction, but certainly at any of the
7  other potential self-dealing transactions involving
8  the directors.  There is no excuse for it.  There is
9  no justification for it.
10         And what they did look at, they didn't
11 do the basic steps to entitle someone to say, okay, I
12 may disagree about everything, but at least I can
13 credit that you've looked at it and made a reasonable
14 determination, they didn't decide and then look at
15 it.  Well, was this a reasonable thing for the
16 company to do in any reasonable way?  I submit they
17 didn't attempt to identify what alternatives could
18 have been available for the $8 million of the
19 company's money at that time.  Again, very, very
20 basic steps.
21         They didn't even speak to some of the
22 key people.  You've identified a number that Mr.
23 Frank identified for them, Mr. MacDonald being one of
24 them.  There were several others as well they didn't
25 even speak to.  Worth Loomis who was initially one of

1  the members who told the guys, "Hey, guys, I was the
2  champion of this transaction."  They didn't even talk
3  to him about what in fact was behind the transaction.
4          So because they didn't do the basic
5  steps that were required, the deference they seek
6  this Court to apply is not applicable, and more
7  importantly, the standard that would result in the
8  SLC's determination ending the matter is not
9  appropriate to find here that has been met because
10 there are issues of fact that relate to all of the
11 issues of independence, good faith and
12 reasonableness.
13         Focussing on reasonableness, we're
14 clearly there.  We focussed on independence.  They
15 bleed into each other, but frankly, defendant
16 Ursprung's involvement in so many aspects of this
17 investigation is very, very troubling, and again, it
18 very much suggests that issues of fact exist, so that
19 deference is not warranted.
20         THE COURT: Defendants make much of the
21 fact that the Frank trust was offered opportunities
22 for liquidity and sometimes took them and sometimes
23 didn't take them.  Why is that not a sufficient
24 neutralization of the statement of the CEO?
25         MR. STASSBERG: Your Honor, I'm glad you

1  brought that up so I didn't miss it.  First of all,
2  factually, the opportunities for liquidity afforded
3  the Franks were a tiny, minuscule percent, less than
4  one percentage of their shares.  They may be able to
5  have the opportunity to sell a few hundred shares at
6  particular times, sometimes maybe a little bit more
7  than that.  Considering they had shareholdings of
8  several hundred thousand shares, you are talking
9  about -- you know, in the argument, it kind of sounds
10 like, "Hey, you want to sell, come on and sell."  In
11 fact, the facts and the opportunities were just the
12 opposite in terms of what was presented to them.
13         So, I think factually it doesn't support
14 it, but legally it doesn't support it either because,
15 again, this was a broader approach.  Yes, there is,
16 as Mr. Rowland's counsel indicated, yes, there is in
17 -- behind certain of the claims, especially with
18 respect to the contract, the understanding that,
19 "Hey, we had an agreement, Rowland, that I was going
20 to know if you were selling, I was going to at least
21 have a reasonable opportunity to see if that selling
22 for me would be appropriate, as well."
23         Yes, that is not there, but the broad
24 allegations about what the company did wrong are,
25 frankly, much broader than that.  It is that they

1  used the company's assets inappropriately to enrich
2  themselves.  Rowland is an example of that, but there
3  are other examples alleged as well.  And because the
4  SLC doesn't do anything to attempt to explore whether
5  in fact that exists or not, their findings are not
6  entitled to any deference.
7          Your Honor, if I may, just one or two
8  other points.  The idea of equal liquidity came up
9  again.  Yeah, just because the issue of how Mr. Frank
10 should be treated with respect to liquidity is an
11 issue in the case doesn't mean that that is the only
12 and the sole issue in the case, and doesn't allow the
13 defendants to frame the issue that it's all about
14 treated equally with other defendants.  That's not
15 what we've pled, that's not what we allege.
16         What we allege on his personal claims is
17 that there is an intentional act as evidenced
18 specifically by Cecil Ursprung's comments and the
19 activities that occurred that are directed to
20 depriving them of knowledge and of their rights that
21 are directed against those shareholders.  That states
22 a claim under any -- I think under any fair reading
23 of what fiduciary duties are for, and I put that back
24 out there again when we keep in mind what the
25 standard is on a motion to dismiss where you have

125

```
 1  directors who have fiduciary duties to the Franks.
 2       So while we've alleged various
 3  instances, the Morgan Frank instance was one where
 4  they asked for information, they had a duty to make
 5  sure they're treated fairly, and is there is a plan
 6  that we're going to make sure that they are treated
 7  unfairly, that states a claim, that gets us over to
 8  the next phase of this case into discovery.
 9       Your Honor, if you just give me one
10  moment, I'm trying not to repeat things I think we
11  have covered because I know we've gone on for a very
12  long time, and let me just perhaps end with one place
13  that came up that was far removed from everything
14  that had been involved with the motion up until this
15  point, and that was the application for prejudgment
16  relief.
17       I suggest to your Honor that the idea
18  that because we have been in this lawsuit, and so now
19  for the first time ever they have actually allowed
20  liquidity activity to occur for the Franks, sheds no
21  light, no light at all, upon their actions before we
22  brought this lawsuit, when after repeated requests
23  for fair treatment and for information were denied,
24  there were no substantial liquidity activities taken.
25       So, I suggest the prejudgment remedy
```

126

```
 1  documents and the sequence of events that are
 2  occurring with respect to that actually highlight
 3  what at base is our attempt to get to the bottom of
 4  what appears to be substantial problematic conduct by
 5  the people running Reflexite.  That's not right.
 6       Mr. Shearin says, "Well, do you know,
 7  maybe that's the case, too bad.  That's the way
 8  corporate law works."  I submit to your Honor that's
 9  not the way corporate law should work, and it's not
10  the way corporate law does work in Connecticut, that
11  these claims are fairly construed to make out the
12  allegations both derivatively on behalf of the
13  company and personally on behalf of the Franks, and
14  they should be allowed to go forward.
15       THE COURT: Now, you said just a moment
16  ago that what plaintiffs wanted was the notice of
17  Rowland's transaction and the opportunity to have
18  similar treatment, and that the intentional acts
19  directed at depriving of knowledge of that and other
20  transactions and the right, and their rights, was
21  part of the claim in count two.  But if necessarily
22  count one, the derivative claim, is saying those --
23  shows transactions, those sales by Rowland and the
24  other insiders were bad for the corporation, how can
25  that coexist with the idea that they want the same
```

127

```
 1  thing?
 2       MR. STASSBERG: Well, I think they can,
 3  your Honor, and in part it is really the parsing of
 4  the contract language.  The derivative claim is
 5  saying there appears to be no justification, we've
 6  seen no justification back in the SLC process for why
 7  this transaction occurred, and therefore, the
 8  transaction harmed the company, there should be
 9  activity to benefit the company to bring that back.
10  If that is the case, and if we unwind the roll of the
11  transaction, so to speak, to benefit the company, we
12  don't have the situation where the Franks have the --
13  you know, ultimately would have the contract to
14  enforceable in a way that would allow it to get what
15  the -- what Rowland got and then had unwound.
16       So, I think that the tension is not a
17  tension that undercuts the ability to maintain the
18  action.  The position being taken by the defendants
19  is that the Rowland transaction was proper for
20  business purposes.  If that's the case, then the
21  Franks had a contractual claim that should have
22  allowed them to be at least notified and treated the
23  same, at least given a reasonable opportunity to be
24  treated the same, but if the derivative claim, which
25  is saying that is incorrect, is in fact found to be
```

128

```
 1  meritorious at the end of the day, then what we have
 2  is a different set of circumstances, we have
 3  circumstances where the Rowland transaction was
 4  improper and needs to be rescinded, rewound so to
 5  speak, then there wouldn't have been a situation
 6  where the Franks were entitled to -- they're not
 7  entitled to sell and have it unwound as well.
 8       So, the conflict, while I agree there is
 9  a technical conflict out there in the claims, the
10  conflict is not one that I submit to you is
11  incompatible, and we have a situation here where, you
12  know, the Franks appear to be the only shareholders
13  who are able to attempt to vindicate the company's
14  interest in bringing this derivative lawsuit.
15       THE COURT: When you say they "appear to
16  be," what is the basis for that other than they're
17  the only ones that did it?
18       MR. STASSBERG: Well, they are in a
19  significant minority shareholder position.  They own
20  roughly 10 percent of the stock.  That gives them the
21  financial incentive to be able to make sure that if
22  the company's interests are being looted, if the
23  company is being harmed by the insiders, that that
24  conduct is brought to light.
25       THE COURT: Doesn't Barrett say -- in
```

129

1  essence, what you are saying is count one and count
2  two are pleadings in the alternative, if this, then
3  that goes away; or if not that, then this stands.
4  Doesn't Barrett say you can't do that?
5       MR. STASSBERG: I don't think so, your
6  Honor.  I think Barrett is summary judgment in the
7  first place.  That's where it's being decided.  But I
8  think what Barrett says is we look hard at these
9  issues.  When you say conflicting claims, yes, and we
10 wouldn't disagree you look hard at it, but we look to
11 see is that a conflict that means we can't have
12 confidence, can't have faith that the derivative
13 claim will be adequately prosecuted, and I don't
14 think that situation is one that we have here.
15      THE COURT: Why not?  The trust stands to
16 benefit from selling its stock, getting liquidity by
17 selling its stock back to the corporation.  Why is
18 that not just inherently inconsistent with standing
19 to say, oh, my heavens, you never should have let
20 Rowland sell the stock back to the corporation?
21      MR. STASSBERG: Well, your Honor, it's
22 not inconsistent because the claim for -- well, there
23 is tension there, I'll grant you that, but it's not
24 inconsistent in a way that I submit suggests that the
25 Franks are not appropriate derivative plaintiffs

130

1  because the claims about the self-dealing are broad
2  based.  Rowland is a piece of it, but there are the
3  allegations of other directors, including Mr.
4  Ursprung doing similar transactions for their own
5  benefit.  It's a much broader allegation, and that
6  conduct all renovns to the benefit of the company,
7  and Mr. Frank as a substantial shareholder.  He has
8  been beating this drum for a long period of time
9  attempting to get information to assess it.
10      THE COURT: Why does it matter that count
11 one relates to transactions of people -- of directors
12 selling their stock back in the manner that Rowland
13 did?
14      MR. STASSBERG: Well, your Honor, I think
15 it matters in terms of determining if there are
16 personal or derivative interests here.  Is there a
17 conflict that is too great a conflict to have them
18 standing as the plaintiffs in the derivative action,
19 to look at what is the action being alleged to
20 understand the nature of the particular conflict.
21 So, that's why I bring out that the allegations are
22 much broader in terms of the self-dealing that the
23 defendants are alleged to have been involved with.
24      THE COURT: But the self-dealing is the
25 same selling stock back to the corporation and not

131

1  giving him notice or opportunity to sell his, right?
2       MR. STASSBERG: Yes, your Honor, although
3  the -- the self-dealing is that activity exactly, but
4  that's not in tension with anything other than the
5  contract-type claim that's asserted, you know, not --
6  against Mr. Rowland, for example.
7       The only tension that comes in here,
8  your Honor, is the tension with the tortious
9  interference claim, or where the defendant company is
10 still a defendant, and on that claim, again as we
11 indicated, if your Honor was troubled that there was
12 tension in terms of proceeding forward as a
13 derivative plaintiff on count one and also pursuing a
14 tortious interference claim against the company, we
15 would be willing to withdraw the claim of that
16 tortious interference action against the company so
17 to eliminate the tension.
18      The other claims pled against the
19 individual directors don't raise that same issue that
20 a claim directly against the company arguably does
21 raise.
22      THE COURT: When you say that there --
23 that the tension does not make counts one and two
24 irreconcilable because count one is more broad based
25 than just Rowland, what's the other conduct other

132

1  than other directors' self-dealing and selling back
2  that's incorporated in count one?
3       MR. STASSBERG: We should -- you know,
4  there are -- that is the broad-based conduct, other
5  directors' self-dealing, as well as the denial of
6  information, but with respect to count two, count two
7  is not just that, hey, you didn't provide me with the
8  same opportunity to sell as these other directors,
9  that's not the thrust of the claim, and that's not
10 the relief sought by the claim.
11      The thrust of the claim in count two,
12 which is why I submit to you there is no tension
13 here, is that, once I started asking questions about
14 what you guys were doing with yourselves, you started
15 on a campaign to injure me as a shareholder.  That
16 activity is not that I didn't get the same
17 opportunity, although perhaps that's relating to it,
18 but it's really that you took steps to make sure I
19 was treated differently and unfairly and separately
20 than the other shareholders broadly, and that's why
21 you don't have the tension between count one and
22 count two, and that's why those exist in -- frankly,
23 in harmony.
24      In our view, you are attempting to
25 collect for the damage to the company in count one

133

```
1   that was done by their self-dealing, which is
2   focussed on their own sell backs of stock to the
3   company.  In count two you are attempting to focus on
4   what they did directly to harm the Franks.
5           Thank you, Judge, unless you have other
6   questions.
7           THE COURT: I don't think I do.  I just
8   was looking at the language of count two.
9           Oh, yes, the injunctive relief issue,
10  why should that not be struck if what you're seeking
11  is money damages if some of the directors are no
12  longer directors such that they could be enjoined, or
13  that there is no claim of ongoing conduct?
14          MR. STASSBERG: Well, your Honor, I don't
15  know -- I mean, I won't agree there is no claim of
16  ongoing conduct.  I think at the relief stage, are
17  certain defendants no longer affiliated as directors
18  with the company not likely to be subject to
19  injunctive remedy?  I think that's probably right.  I
20  would say we're kind of putting the cart before the
21  horse there.
22          THE COURT: What's the injury that money
23  damages will not remedy?
24          MR. STASSBERG: Well, your Honor, we
25  still have a situation where the Franks are a
```

134

```
1   substantial minority shareholder in Reflexite.  The
2   injunctive relief is designed to make sure that after
3   whatever the outcome of this lawsuit we don't go back
4   to a situation where they're treating unfairly,
5   singling them out and trying to deprive them of their
6   rights.
7           THE COURT: That's not a claim for
8   injunctive relief.
9           MR. STASSBERG: Well --
10          THE COURT: That something might happen
11  as a result of the lawsuit.  Doesn't that have to
12  arise out of the allegations of the lawsuit?
13          MR. STASSBERG: It clearly does arise out
14  of the allegation of the lawsuit.  I'm thinking the
15  relief is not appropriate until we're done with the
16  lawsuit.  That's why I framed it that way, but their
17  course of conduct, continuing course of conduct to
18  attempt to personally disadvantage the Franks means
19  appropriate relief for some of these claims, in
20  addition to monetary judgment, might be that they are
21  directed, the current officers or directors, not to
22  disadvantage the Franks going forward in their rights
23  as a minority shareholder.  That would be the type of
24  equitable injunctive relief that would be embodied
25  here.
```

135

```
1           So, again, I think that it is certainly
2   possible.  Is it likely that that would apply to
3   individuals who were not affiliated with Reflexite?
4   I think that's very unlikely, I agree, but I think
5   this is not the appropriate time to make those
6   determinations.
7           THE COURT: Thank you.  Any quick other
8   points that any of the defendants want to make?
9           MR. RAABE: Your Honor, I think the only
10  point on behalf of the company is I'm still not sure
11  where the plaintiffs lie with respect to the company
12  with regard to count one.  I thought I heard them
13  backing up to say no, perhaps the company is a
14  defendant under count one.  I would just suggest to
15  your Honor that count one itself cannot be read to
16  have such a meaning.
17          THE COURT: Anything else?  All right, I
18  appreciate your assistance, and most particularly
19  your stamina.  This is not an easy case and I will
20  take it under advisement.
21          Thank you very much.  We stand in
22  recess.
23
24
25
```

136

```
1
2
3
4   I certify that the foregoing is a correct
    transcript from the record of proceedings in the
    above-entitled matter.
5
6   _____
                Date
7
8   - - - - - - - - - - - - - - -
                Official Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```